# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| FRITO-LAY NORTH AMERICA, INC. | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:12cv74 |
| | § | (Judge Mazzant) |
| MEDALLION FOODS, INC. and | § | |
| RALCORP HOLDINGS, INC. | § | |

## MEMORANDUM OPINION AND ORDER

This claim construction order construes the disputed terms of United States Patent No. 6,610,344. Claim construction arguments were submitted in Plaintiff's Brief in Support of its Proposed Claim Constructions for U.S. Patent No. 6,610,344 ("Opening") (Dkt. # 82), Defendants' Responsive Claim Construction Brief ("Response") (Dkt. # 92), and Plaintiff's Reply Brief in Support of its Proposed Claim Constructions for U.S. Patent No. 6,610,344 ("Reply") (Dkt. # 97). The Court conducted a claim construction hearing on September 12, 2012. For the following reasons, the Court adopts the constructions set forth below.

## BACKGROUND

Plaintiff filed suit alleging infringement of United States Patents No. 6,610,344, 6,592,923, 6,638,553, and D459,853. *See* Complaint (Dkt. # 1). Plaintiff now asserts only Unites States Patent No. 6,610,344 ("the '344 Patent"), titled "Process for Making a Shaped Snack Chip." *See* Second Amended Complaint (Dkt. # 90). Plaintiff also asserts other causes of action, such as trademark infringement and misappropriation of trade secrets, that are not relevant to the present claim construction proceedings. *See id.* at ¶¶ 40-52 & 58-82. Plaintiff's embodying commercial product is the "TOSTITOS SCOOPS!" bowl-shaped tortilla chip. *See id.* at ¶ 2. The Abstract of the '344 Patent states:

The process for making a shaped snack chip uses various components to form a chip having depth such as a bowl-shaped tortilla chip. The chips are formed by sheeting into an initial flat shape. The chips are then passed along for shaping by a mold and plunger conveyor. Once plunged to the mold shape, the chips are reduced in moisture content by baking and frying. After frying, oil is evacuated from the chips whereafter salt and flavoring is applied, if desired, prior to being packaged.

The disputed terms appear in Claims 1 and 16 and are italicized herein:

> 1. A process of making a snack chip, comprising:
> *sheeting* a dough into substantially flat pieces;
> feeding the substantially flat pieces at a feed speed onto an *alignment belt*;
> *adjusting positions of the substantially flat pieces on the alignment belt* with an *alignment system to form essentially even ranks*;
> discharging the substantially flat pieces at a discharge speed to mold racks;
> molding the substantially flat pieces into a liquid-retaining shaped piece; and
> drying the shaped piece to a final moisture content for a snack chip.

> 16. A snack chip formed by a process comprising:
> *sheeting* a dough into substantially flat pieces;
> *aligning the pieces* with an *alignment system to form essentially even ranks*;
> molding the pieces into a bowl-shaped chip having fluted edges; and
> drying the shaped chip to a final moisture content for a snack chip.

## LEGAL STANDARDS

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). The purpose of claim construction is to resolve the meanings and technical scope of claim terms. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). When the parties dispute the scope of a claim term, "it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303,

1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).   The Court examines a patent's intrinsic evidence to define the patented invention's scope.  *Id.* at 1313-14; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).   Intrinsic evidence includes the claims, the rest of the specification, and the prosecution history.  *Phillips*, 415 F.3d at 1312-13; *Bell Atl. Network Servs.*, 262 F.3d at 1267.   The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention.  *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms.  *Phillips*, 415 F.3d at 1314.  "[T]he context in which a term is used in the asserted claim can be highly instructive."  *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent."  *Id.*  Differences among claims, such as additional limitations in dependent claims, can provide further guidance.  *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'"  *Id.* at 315 (quoting *Markman*, 52 F.3d at 979).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning than it would otherwise possess, or disclaim or disavow some claim scope.  *Phillips*, 415 F.3d at 1316.   Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer.  *See SciMed Life Sys., Inc. v.*

*Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001).  This presumption does not arise when the patentee acts as his own lexicographer.  *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.  For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'" *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics*, 90 F.3d at 1583).  But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent").  The well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).  "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1988) (quotation omitted).  "As a basic

principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g*, 334 F.3d at 1324. However, the prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002). Statements will constitute disclaimer of scope only if they are "clear and unmistakable statements of disavowal." *See Cordis Corp. v. Medtronic Ave, Inc.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003). An "ambiguous disavowal" will not suffice. *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010).

Although "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

## DISCUSSION

As a preliminary matter, Defendants have objected that Exhibits B through I attached to Plaintiff's opening brief are extrinsic evidence describing Defendants' accused manufacturing

process that "should be ignored, or stricken, by the Court." Response (Dkt. # 92) at 14-15 & 14 n.6 (citing *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1340 (Fed. Cir. 2003) (noting that claim construction should not be "influenced by the structure and function of the alleged infringing device")). The Court finds no need to strike Plaintiff's exhibits but considers such evidence only for context in evaluating whether the terms at issue truly require construction. *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326-27 (Fed. Cir. 2006) ("While a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction."); *Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1319 (Fed. Cir. 2006) ("[A] trial court may consult the accused device for context that informs the claim construction process.").

The parties have agreed on constructions of the following terms: "a liquid-retaining shaped piece" as used in Claim 1 means "at least one liquid-retaining shaped piece"; and "a bowl-shaped chip" as used in Claims 5 and 16 means "at least one bowl-shaped chip." 7/27/2012 Joint Claim Construction and Prehearing Statement (Dkt. # 79) at § I; 8/31/2012 Joint Claim Construction Chart Pursuant to P.R. 4-5(d) (Dkt. # 98) at Ex. B.

The parties have briefed the following six terms for construction: (a) "sheeting"; (b) "alignment system"; (c) "to form essentially even ranks"; (d) "alignment belt"; (e) "adjusting positions of the substantially flat pieces on the alignment belt"; and (f) "aligning the pieces."

### A.  "sheeting" (Claims 1 and 16)

The parties briefed this term (Opening (Dkt. # 82) at 10-12; Response (Dkt. # 92) at 30), but after the close of briefing, the parties submitted their agreement that this term means "forming and cutting."  8/31/2012 Joint Claim Construction Chart Pursuant to P.R. 4-5(d) (Dkt. # 98) at Ex. B.  Because this term is no longer disputed, the Court does not construe it.

### B.  "alignment system" (Claims 1 and 16)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a system that aligns substantially flat pieces after separation from the cutter to position them for molding" | "a series of belts—including at least a transfer belt, phasing belt, alignment belt, and discharge belt—for moving pieces into even rows and synchronizing the speed of the rows with the mold conveyor" |

Plaintiff submits that its proposed construction is "true to the purpose of the alignment system as reflected in [the] claims" and the specification.  Opening (Dkt. # 82) at 14-17 (citing '344 Patent at Title, 2:5-6, 2:21-27, 3:16-17, 4:22, 4:24-26, 4:49-52, 5:6-17, 5:42-44, 5:50-51 & Fig. 7).  Plaintiff concludes: "The sole purpose of the alignment step is to deliver the pieces to the mold racks in proper alignment for molding.  The alignment system requires nothing further."  *Id.* at 17.  As to the prosecution history, Plaintiff argues that the patentee distinguished United States Patent No. 6,129,939, referred to by the parties as "Fink," by amending the claims to recite an "alignment system *after* the cutter."  *Id.* at 18.  Plaintiff urges that Defendants' proposed construction fails to acknowledge this prosecution disclaimer and also imports limitations from the specification, such as the use of four belts.  *Id.* at 19-20.  Finally, Plaintiff submits that Defendants have no support for their proposal of requiring two distinct steps of

moving chips into even rows and synchronizing the speed of the rows of chips with the speed of the mold conveyor.  *Id.* at 20.

Defendants respond that "the only alignment system disclosed, suggested, or contemplated in the intrinsic record" uses four belts and should be adopted in the Court's construction because "limiting the scope of the claim to the [only] enabled embodiment is appropriate."  Response (Dkt. # 92) at 24 & 25 (citing '344 Patent at 2:24-27, 5:6-20 & Fig. 4; citing *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998)). Defendants also argue that the two distinct functions of the alignment system are: "(1) moving chip pieces into even rows and (2) synchronizing the space between the even chip rows and columns with the space between the fixed rows and columns of molds on the mold belt."  *Id.* at 25 (citing '344 Patent at 4:20-24 & 5:28-32).   As further support for the synchronizing function, Defendants cite claims that recite differing "feed speed" and "discharge speed."  *Id.* at 26.  Finally, Defendants cite the prosecution history and argue that "Frito-Lay distinguished its allegedly inventive process—and amended its claims—by arguing that its alignment system is not just synchronization, but also requires the pieces be 'adjusted on the alignment belt with an alignment system to form essentially even ranks.'"  *Id.*

Plaintiff replies that "synchronization" of belt speeds in Fink was necessary because "if the sheeter makes more pieces of dough than the molds can receive, the system will not work as intended."  Reply (Dkt. # 87) at 6-7.  As a result, "components must be synchronized so that the number of pieces made by the sheeter and delivered by the conveyor belt equals the number of molds available to receive those pieces."  *Id.* at 7.  Plaintiff also points out that "[t]he

synchronization of the plunger belt and mold belt in the '344 Patent is accomplished by mechanically linking them so that they rotate at the same speed." *Id.* Plaintiff concludes:

> [B]oth the Fink Patent and the '344 Patent use the term "synchronized" to mean setting the speed of different components to be the same. Neither patent describes synchronization as aligning "the spacing between the even ranks and columns with the space between ranks and columns of the mold racks," as suggested by Defendants.

*Id.* at 8. As to Defendants' argument that the prosecution history requires that the alignment system do more than merely synchronize, Plaintiff replies that there was no clear and unmistakable disclaimer in this regard because the patentee distinguished Fink based on Fink's lack of any alignment mechanism after the cutter. *Id.* at 9.

At the September 12, 2012 hearing, Defendants urged that Plaintiff's proposal, which defines the "alignment system" as a "system that aligns . . .," fails to define the function of alignment, which is the critical issue. Defendants reiterated that the alignment system has two distinct functions: (1) to form even rows of pieces; and (2) to synchronize the spacing of the even rows of pieces with the spacing of the molds. Defendants also argued that Plaintiff's proposal must be rejected because it would encompass the Fink prior art that the patentee expressly distinguished. Defendants nonetheless offered that whether to limit the term to require the specific belts disclosed in the specification is the "closest call" in these claim construction proceedings.

Plaintiff responded that nothing in the claims requires the specific belts set forth in the preferred embodiment, which should not be imported into the claims. *Phillips*, 415 F.3d at 1323. Plaintiff urged that when the claims use a broad term, such as "alignment system," that broad term should be afforded a broad scope. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d

1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope.").  Plaintiff reiterated that because the only disclosed purpose for alignment is to facilitate the molding step recited in the claims, alignment should be construed with respect to molding.  For example, Plaintiff argued that a row of pieces could be evenly aligned along a line but yet not be aligned with the molds, such as if the molds were lined up perpendicular to the direction of belt travel but the chips were lined up diagonally across the belt.  Plaintiff also argued that Defendants are attempting to import an alignment belt requirement into Claim 16, which unlike Claim 1 does not recite an "alignment belt."

Defendants replied that the "alignment system," which is recited in both Claim 1 and Claim 16, is disclosed in the specification as requiring an alignment belt and should be construed as such.

Turning to the '344 Patent, the Background of the Invention explains that "a process for forming a shaped snack chip that can operate at a high production capacity is desired."  '344 Patent at 2:5-6.  The Summary of the Invention discloses: "The piece alignment system aligns the chips prior to a plunger and mold conveyor system, which provides shape to the chips.  The piece alignment system comprises a series of belts whereby the ranks (rows) of chips can be adjusted for proper placement for the plunger and mold conveyor."  *Id.* at 2:21-27.  Figure 4, reproduced here, illustrates the alignment system of the preferred embodiment as well as surrounding components:



In general, "[t]he piece alignment system 40 aligns the product for feeding to a plunger and

mold conveyor 60." *Id.* at 3:14-17.  More specifically:

> Phasing belt 46 has an adjustable speed for transferring chips 202 from the speed
> on transfer belt 42 to the speed and position needed for mold alignment belt 50.
> Once at proper speed, the product is fed to alignment belt 50.

> With alignment belt 50, the chips are aligned by rank (rows) and file (columns)
> for eventual feeding to a plunger and mold conveyor 60.  Alignment belt 50 has a
> system for conveying the chips into essentially even ranks.

> * * *

> To ensure that the majority of chips 202 passing onwards to the plunger and mold
> conveyor 60 are in proper alignment, a position control system is utilized with
> piece alignment system 40.

> * * *

> The control system uses the information gathered from chip sensor 48 to
> determine the average rank position of chips 202 as to whether chips 202 are
> approaching on target, too early, or too late.  Based upon this average computed
> position, an adjustment to the overall system is made if needed to insure that piece
> alignment system 40 is delivering essentially uniform ranks of chips to plunger
> and mold conveyor 60.  To adjust the positioning of the chips, the control system
> could optionally adjust one or more of the speeds of transfer belt 42, phasing belt
> 46, cleats 52, and/or discharge belt 54 for optimal chip delivery to plunger and
> mold conveyor 60.

> * * *

[T]he average position of chips 202 in [a] rank can be determined.  The speed of phasing belt 46 is then adjusted if necessary to assure that the following ranks of chips 202 will be fed to plunger and mold conveyor 60 at the proper speed to assure maximum alignment of chips 202 being deposited onto molds 64.

* * *

With proper sequencing, each mold 64 receives a chip properly aligned from piece alignment system 40.

* * *

Mold belt 68 is timed to ensure that mold racks 62 are properly positioned for receiving the chips into molds 64 and for plunging.

'344 Patent at 4:20-27, 4:49-52, 5:6-17, 5:26-32, 5:42-44 & 5:51-53.  The chips are received in

the molds of the preferred embodiment as illustrated in Figure 7, reproduced here:



The parties dispute whether the claims should be limited, as Defendants propose, to require the following features: (1) "a series of belts—including at least a transfer belt, phasing belt, alignment belt, and discharge belt"; (2) "synchronizing the speed of the rows with the mold conveyor"; and (3) "moving the chips into even rows."  The parties also disputed whether "essentially" should appear in the construction and whether, as Plaintiff proposes, the alignment system operates "after separation from the cutter to position [the substantially flat pieces] for molding."

First, the specific number and type of belts disclosed as part of the preferred embodiment should not be imported into the claims.  Claim 1 only recites an alignment belt.  Claim 16 only recites "sheeting . . . ; aligning the pieces with an alignment system to form essentially even ranks; molding . . .; and drying . . . ."  Although Claim 1 does recite "discharging the substantially flat pieces at a discharge speed to mold racks," Claim 1 does not recite a discharge belt or any belt other than the alignment belt.

Defendants have relied upon *Digital Biometrics*, cited above, to argue that the construction should be limited to the disclosure, but Defendants have not sufficiently raised any issues with the adequacy of the disclosure in relation to Plaintiff's proposed construction, regarding enablement or otherwise.  149 F.3d at 1334 ("[I]f the claim is susceptible to a broader and a narrower meaning, and the narrower one is clearly supported by the intrinsic evidence while the broader one raises questions of enablement under [35 U.S.C.] § 112, ¶ 1, we will adopt the narrower of the two.").

Defendants' proposal of construing "alignment system" to include four specific belts is therefore rejected.  *See Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected the contention

that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").

Second, the above-quoted disclosures explain how, ideally, "each mold 64 receives a chip properly aligned from piece alignment system 40."  '344 Patent at 5:43-44.  None of those disclosures, even in the preferred embodiment, require synchronization of the speed of the rows with the speed of the mold conveyor.

Likewise, the synchronization of the speeds of the molds and the plungers that correspond to the molds is distinguishable because of the difference in context.  The plungers and molds must move at the same speed in order to interoperate, and "[f]or appropriate timing, plunger belt 82 preferably uses a link conveyor arrangement" in which the plunger belt is "driven by a mechanical linkage powered by a support chain connected to mold belt 68."  '344 Patent at 7:43-44 & 7:46-48.  The same is not true of separate belts.  Transferring rows of pieces to a faster belt, for example, simply results in wider spacing between rows, as evident from the parties' technical tutorials and the demonstrative animations during the September 12, 2012 hearing.

Thus, synchronization of the chip pieces with the molds refers not to synchronizing belt speeds but rather to synchronizing the timing of the falling pieces with the timing of molds arriving to catch the pieces.  In sum, the specification and the claims disclose that belt speeds can be adjusted to achieve alignment of the chip pieces with the molds, but synchronization of speeds is not required, even in the preferred embodiment.  *See* '344 Patent at 4:20-23, 5:13-17 & Claims 4, 21 & 22.  Defendants' proposal in that regard is therefore rejected.

Third, as to Defendants' proposal of "for moving the chips into even rows," Defendants' proposal comports with the express requirement in Claims 1 and 16 that the alignment system operates to "form essentially even ranks," which is a disputed term addressed in subsection C., below.  The intrinsic evidence also discloses, as quoted above, that the alignment system can adjust the position of entire rows to better align with the mold racks.  Indeed, both parties' proposed constructions reference either "molding" or "the mold conveyor."   In short, the intrinsic evidence consistently demonstrates that the "alignment system" operates to move pieces in a row with respect to one another and to align rows for molding.

Plaintiff also argues that Defendants' proposal imports an alignment belt requirement into Claim 16, which does not recite an "alignment belt."  Claims 1 and 16 both recite, however, "to form essentially even ranks," which is discussed in subsection C., below, as requiring movement of pieces into even rows.  In other words, as discussed in subsection C., below, "even ranks" refers to the pieces being lined up along a straight line, which necessarily requires movement of pieces with respect to one another.

Fourth, to address Plaintiff's concern that the finder of fact might believe that perfectly even rows are required if "essentially" is omitted from the Court's construction (Opening (Dkt. # 82) at 23), the constituent term "essentially" should be included in the construction.  The parties have not disputed the meaning of "essentially," which is a term that will be readily understood by the jury in the context of aligning pieces for molding.  *See Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 738 (E.D. Tex. 2005) ("[A]lthough every word used in a claim has a meaning, not every word requires a construction."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present

in a patent's asserted claims."). At the September 12, 2012 hearing, Defendants had no objection to the Court's suggestion that including "essentially" in the construction might be appropriate.

Finally, Defendants have not argued against Plaintiff's proposal that the alignment system must operate after sheeting has been completed. *See* Response (Dkt. # 92) at 26. Such a limitation is supported by the specification and the following prosecution history:

> After their separation from the cutter, no further manipulation or adjustment of the preforms to form essentially even ranks is disclosed. In contrast, the Applicant discloses and claims a process in which the substantially flat pieces of dough are adjusted with an alignment system to form essentially even ranks *after the pieces have been sheeted and fed onto an alignment belt.*

3/27/2003 Response to Office Action (Dkt. # 92, Ex. 5) at FL82 (emphasis added). Plaintiff's proposal in this regard is therefore adopted.

In light of the foregoing, as well as in light of the analysis regarding the term "to form essentially even ranks" in subsection C, below, the Court hereby construes **"alignment system"** to mean **"a system, positioned after the sheeter cutter, for moving pieces in a row with respect to one another and for aligning rows of pieces for molding."**

## C. "to form essentially even ranks" (Claims 1 and 16)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "in order to mold the pieces in essentially even ranks" | "to put pieces into even rows" |

Plaintiff argues that "the alignment step," in which the disputed term appears, "exists to transition from the sheeting phase to the molding phase" and "serves no purpose in isolation from the molding phase." Opening (Dkt. # 82) at 21-22 (citing '344 Patent at 5:42-45). Plaintiff submits:

> The goal of the alignment system is not to ensure that one piece of dough is aligned with another piece of dough.  Rather the goal of the alignment system is to improve the alignment of the rows of pieces with the rows of molds.  This allows the pieces to be molded in essentially even rows.

*Id.* at 22.  Plaintiff also argues that Defendants' proposed construction omits the constituent term "essentially" and thus would require perfectly even rows, which would conflict with the claim term as well as disclosure in the specification that only "the majority of chips" are in proper alignment.  *Id.* at 23 (quoting '344 Patent at 4:49).

Defendants respond that Plaintiff's proposal improperly reads "to form" as meaning "to mold."  Response (Dkt. # 92) at 16.  What is formed, Defendants argue, are even rows of pieces, as evident from the plain language of the claims.  *Id.*  Defendants argue that Plaintiff's proposal violates the doctrine that different terms in the claims are presumed to have different meanings. *Id.* (citing *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010)).  For additional support, Defendants cite disclosure regarding how the "even ranks" are aligned.  *Id.* at 17 (citing '344 Patent at 4:28-40 & Fig. 5).  Further, Defendants cite a purported prosecution disclaimer in which the patentee distinguished Fink as "rely[ing] upon the configuration of the cutter roller," as opposed to the patentee's claimed invention of "a process in which the substantially flat pieces of dough are adjusted with an alignment system to form essentially even ranks."  *Id.* at 18 (quoting 3/27/2003 Response to Office Action (Dkt. # 92, Ex. 5) at FL82).  Defendants argue that Plaintiff's proposed construction would encompass the Fink technique and is thus an attempt to recapture what the patentee disclaimed.  *Id.* at 18-19.

Plaintiff replies that there was no prosecution history disclaimer as to this term because "[t]he applicants instead disclaimed systems that did not adjust the pieces after separation from the cutter."  Reply (Dkt. # 97) at 9 n.6.  Plaintiff thus argues that the prosecution history does not

limit the manner in which pieces are adjusted.  Plaintiff re-urges that its proposed construction "incorporates the definition of 'ranks' as 'rows,' reflects the plain language of the claims, and flows directly from the purpose of the alignment step as reflected in the claims—to align the substantially flat pieces in order to mold the pieces in essentially even rows." *Id.* at 10.

The Court noted at the September 12, 2012 hearing that molding is recited in the claims as a separate step, and Plaintiff responded that the molding step is relevant because "aligning has no purpose but for the molding step."  Plaintiff submitted that a straight row that is not aligned with the molds is inoperable and is not "even" in the context of the claims.

Defendants responded that Plaintiff is attempting to replace an action, "to form," with a purpose, "in order to mold."  Defendants argued that because the disputed term is one of action, as explained in the specification, Plaintiff's proposal is overbroad and should be rejected.

As a preliminary matter, the claims explicitly require forming even ranks of substantially flat pieces *prior* to molding because if the "molding" occurred first, there would be no substantially flat pieces for the step of "adjusting positions of the substantially flat pieces" (Claim 1) or "aligning the pieces" (Claim 16).  *See, e.g., Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1370-72 (Fed. Cir. 2003).  The prosecution history further supports such a reading:

> Claim 1 as amended is drawn to a process of making a snack chip comprising sheeting a dough into substantially flat pieces and feeding the substantially flat pieces onto an alignment belt.  The pieces are then adjusted on the alignment belt with an alignment system to form essentially even ranks.  The pieces are *then* discharged to mold racks for molding.  The molded pieces are then dried to a final moisture content for a snack chip.

3/27/2003 Response to Office Action (Dkt. # 92, Ex. 5) at FL81 (emphasis added).

Plaintiff has not directly challenged this reading of the order of steps, although Plaintiff has presented a dictionary definition of "form" as "to shape or mold into a particular form."

Opening (Dkt. #82) at 21 n.5 (quoting Ex. L, *The American Heritage Dictionary* 535 (3d ed. 2000)).  This extrinsic, general-purpose dictionary definition is insufficient to overcome the language of the claims, which require that "molding" is a separate step that occurs *after* "form[ing] essentially even ranks."   *See Phillips*, 415 F.3d at 1318 ("[U]ndue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history.") (citation and internal quotation marks omitted); *id.* at 1319 ("[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."); *Playtex Prods., Inc. v. Proctor & Gamble Co.*, 400 F.3d 901, 908 n.1 (Fed. Cir. 2005) (noting that courts "may not use extrinsic evidence to arrive at a claim construction that is at odds with the intrinsic evidence").

Moreover, the language of Claim 1, which recites "adjusting positions of the substantially flat pieces on the alignment belt with an alignment system to form essentially even ranks," requires forming essentially even ranks "on the alignment belt" and not, for example, on the mold racks.  Claim 1 thus provides additional support for requiring movement of the pieces with respect to one another prior to the molding step.

Plaintiff's proposed construction of the disputed term as "in order to mold the pieces in essentially even ranks" is therefore rejected as being inconsistent with the intrinsic evidence, which requires forming even ranks of the substantially flat pieces, *not* even ranks of the molds or the "shaped pieces" (Claim 1) or "chip[s]" (Claim 16).

As to the proper construction, the parties agree that the constituent term "ranks" means "rows," which is supported by the specification. '344 Patent at 2:25 ("ranks (rows) of chips"); *id.* at 4:24-25 ("chips are aligned by rank (rows) and file (columns)"); *see, e.g.,* Reply (Dkt. # 97) at 2.

The specification and the prosecution history repeatedly disclose that ranks are lined up in "even" rows by moving pieces in a row with respect to one another (emphasis added):

> With alignment belt 50, the chips are aligned by rank (rows) and file (columns) for eventual feeding to a plunger and mold conveyor 60. Alignment belt 50 has a system for *conveying the chips into essentially even ranks*. Although the chips entering alignment belt 50 have essentially distinct and even files, the *ranks not sufficiently aligned* for eventual feeding to the plunger and mold conveyor 60. Therefore in one embodiment, alignment belt 50 is outfitted with a series of cleats 52 that extend upwards from alignment belt 50 as shown in FIG. 5. These cleats 52 are moving slightly faster than alignment belt 50 and are traveling on a cleat conveyor (not shown) disposed beneath alignment belt 50.
>
> As such, most chips are eventually *pushed along the moving alignment belt 50* so that *at the exiting from alignment belt 50 the chips have essentially even ranks*. To maintain even files, it is preferable that at least two cleats 52 be provided per chip 202. Thereby, a trailing edge of chip 202 will end up disposed between at least two cleats 52. To catch each chip 202, the distance between two cleats 52 in a rank is smaller than the width of the chip. Upon exiting alignment belt 50, chips 202 are deposited on a discharge belt 54 for transfer to mold belt 68 of plunger and mold conveyor 60.
> * * *
> With proper sequencing, each mold 64 receives a chip properly aligned from piece alignment system 40.

'344 Patent at 4:24-40 & 5:42-44.

In the preferred embodiment, cleats are used to align pieces with respect to one another by moving them along the alignment belt, as described above and as illustrated in Figure 5 of the '344 Patent, which is reproduced here:



FIG. 5

The specification is thus consistent with reading the disputed term to require moving pieces in a row with respect to one another.

The prosecution history provides additional support for construing the disputed term to require positioning the pieces in essentially even rows.  The patentee distinguished the alignment in the Fink reference as relying on the "cutter roller":

> Contrary to the assertion in the Office Action, Fink et al. does not disclose an alignment system as disclosed in the present application and claimed in claims 1 and 18.  While Applicant agrees that Fink et al. disclose[s] that the chip preforms be aligned in rows before they are conveyed to the mold plates, Applicant notes that Fink et al. rely upon the configuration of the cutter roller 28 to discharge the chip preforms onto the conveyor 50 in rows.  Fink et al. states, *inter alia*

>> [I]t is essential that the cutter roller 28 be configured such that the chip preforms in each of the columns be aligned in rows extending transversely across the conveyor 50, as shown in FIG. 1[.]  (See Col 4, lines 47- 50).

> Thus, according to Fink et al., alignment of the chip preforms relies upon the configuration of the assembly responsible for the sheeting and cutting of the chip preforms.  *The chip preforms are deposited in rows directly from the cutter* onto

the conveyor, and conveyed onwards to the mold plates.  After their separation from the cutter, no further manipulation or adjustment of the preforms to form essentially even ranks is disclosed.  In contrast, *the Applicant discloses and claims a process in which the substantially flat pieces of dough are adjusted with an alignment system to form essentially even ranks after the pieces have been sheeted and fed onto an alignment belt.*  Neither Fink et al. nor Khalsa [(another reference cited by the examiner)] alone or in combination discloses this adjustment step.

3/27/2003 Response to Office Action (Dkt. # 92, Ex. 5) at FL82 (emphasis added).  Reliance on

the roller cutter alone "to form essentially even ranks" is therefore outside the claim scope.

*Springs Window Fashions LP v. Novo Indus., LP*, 238 F.3d 989, 995 (Fed. Cir. 2003) ("A

patentee may not state during prosecution that claims do not cover a particular device and then

change position and later sue a party who makes that same device for infringement.").  This

provides further support for Defendants' proposal that the disputed term requires moving pieces

in a row with respect to one another.

As to extrinsic evidence, the Plaintiff's confidential documents cited by Defendants

during the September 12, 2012 claim construction hearing are also consistent with requiring that

chip pieces be moved along the belt so as to form an even line because those documents illustrate

that, as disclosed in the specification, "the ranks [of chips entering alignment belt 50] are not

sufficiently aligned for eventual feeding to the plunger and mold conveyor 60."  '334 Patent at

4:27-31; *see* Defs.' hr'g slides # 2 & 3 (FL428, FL1609, FL2075 & FL14786).  Although

extrinsic evidence is generally of limited weight during claim construction, the consistent context

across both the intrinsic and extrinsic evidence is noteworthy.

Plaintiff responded at the September 12, 2012 hearing that the constituent term "even," as

in "even ranks," has no meaning by itself and must instead be defined with respect to something

else.  Plaintiff reiterated that the only purpose of forming a line of chip pieces across the belt is

so that the pieces are properly aligned with the molds when the pieces reach the mold belt. Plaintiff concluded that the disputed term requires only that the ranks be "even" with respect to the molds.  Plaintiff submitted this as the basis for its proposal of "for molding" in its proposed construction.

Claim terms must be considered in context.  *See, e.g., Netword LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001) (noting that "the claims are directed to the invention that is described in the specification" and "do not have meaning removed from the context from which they arose"); *Advanced Fiber Techs. Trust v. J&L Fiber Serv., Inc.*, 674 F.3d 1365, 1372 (Fed. Cir. 2012) ("A patent is a fully integrated written instrument; the claims must be read in view of the specification, of which they are a part.").

The "consistent[] and exclusive[]" disclosure of forming even ranks as including lining up pieces with respect to one another, as discussed above, "is clearly what the inventors of the . . . patent conceived of" and should inform the proper construction of the disputed term. *Hologic, Inc. v. SenoRx, Inc.*, 639 F.3d 1329, 1338 (Fed. Cir. 2011); *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005) (construing term "board" to mean "wood cut from a log" in light of the patentee's consistent usage of the term; noting that patentee "is not entitled to a claim construction divorced from the context of the written description and prosecution history.").  Defendants' proposed construction should be adopted to the extent it requires moving pieces with respect to one another.

Still, as Plaintiff argues, "alignment" is also disclosed with respect to the molding step. The specification refers to "proper alignment" of rows of chips with rows of cleats or with molds:

> *To ensure that the majority of chips 202 passing onwards to the plunger and mold conveyor 60 are in proper alignment, a position control system is utilized* with piece alignment system 40.  Further the *control system* is used to insure that chips 202 are deposited onto alignment belt 50 such that chips 202 will be *between rows of cleats* 52.  The control system compensates for the differences of the incoming speed of chips 202 being fed into the piece alignment system 40 and the *positioning needed for the plunger and mold conveyor* 60.  If not positioned properly within a determined acceptable range for the plunger and mold conveyor 60, then a number of chips 202 will not be positioned properly into the molds of the plunger and mold conveyor 60.

'344 Patent at 4:49-62 (emphasis added).  Defendants' response brief appears to agree: "Any movement of pieces into a position is done relative to the other pieces *and the mold conveyor*." Response (Dkt. # 92) at 29.  Also, Defendants' proposed construction for the related term "alignment system" makes reference to the "mold conveyor" as noted in subsection B., above.

Claims 1 and 16 are process claims that both recite "molding," but only Claim 1 recites "mold racks," so construing "alignment system" to require mold racks in Claim 16 would be disfavored.  Because "to form essentially even ranks" is used in both claims, and because both claims recite molding, the Court's construction should reflect that in addition to pieces in a rank being lined up with one another, the rank as a whole must also be aligned "for molding."

To summarize, the alignment system is a system that can move pieces in a row with respect to one another.  The additional limitation of "to form essentially even ranks" requires positioning the pieces along a straight line.  Further, because the alignment and "evenness" must also be with respect to the molding step, the straight line of pieces must itself be aligned for molding.

Finally, for the same reasons discussed regarding the term "alignment system" in subsection B., above, the Court will include the constituent term "essentially" in the construction.

The Court therefore hereby construes **"to form essentially even ranks"** to mean **"to move the pieces in each row with respect to one another so that the pieces in each row are positioned along an essentially straight line and to align the essentially straight line of pieces for molding."**

### D.  "alignment belt" (Claim 1)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction needed; the meaning is clear from the context of the claim.<br><br>If the Court determines that a construction is needed, the term should be construed as "a belt of an alignment system." | "a belt on which uneven rows of pieces are moved into essentially even rows" |

Plaintiff argues that "an alignment belt is merely a belt of an alignment system" and "is recited to clarify which pieces are being aligned — the pieces on the alignment belt."  Opening (Dkt. # 82) at 24.  Plaintiff also argues that Defendants' proposal introduces a requirement of "uneven rows" despite the absence of any disclosure of "uneven" rows in the intrinsic evidence, let alone any disclosure that rows must be uneven.  *Id.* at 24-25.

Defendants respond that the claims, the specification, and the prosecution history all explain that the positions of pieces on the alignment belt are adjusted to form even ranks.  Response (Dkt. # 92) at 21-22 (citing '344 Patent at Claims 1 & 3, 4:24-39 & Fig. 5; citing 3/27/2003 Response to Office Action (Dkt. # 92, Ex. 5) at FL81).  Defendants also submit that Plaintiff's proposed construction would fail to distinguish the "alignment belt" from other belts that are part of the alignment system, such as the transfer belt, the phasing belt, and the discharge belt.  *Id.* at 23 (citing '344 Patent at 4:14-48).  Defendants emphasize that the patentee "amended its claims to indicate that the formation of even ranks must occur *on* the alignment belt."  *Id.*

Finally, as to Plaintiff's argument that there is no disclosure or requirement of uneven ranks,

Defendants respond that:

> the specification states that "the ranks [of chips entering the alignment belt] are not sufficiently aligned for eventual feeding to the plunger and mold conveyor." Ex. 4, '344 patent, 4:29-30.  This is an obvious description of uneven ranks.  In any event, the formation of even ranks implicitly requires, as a starting point, ranks that are relatively uneven.

*Id.*

Plaintiff replies that "[a]lthough alignment belt (50) is used to improve the alignment of the pieces, there is no requirement, and indeed no disclosure, that the pieces must be 'uneven' prior to the alignment belt."  Reply (Dkt. # 97) at 3.  Plaintiff cites Figure 6 as evidence that "the pieces on [the] phasing belt may be in substantially even ranks before they ever arrive at alignment belt (50)."  *Id.*  Plaintiff further replies that although Defendants argue that the intrinsic evidence "defined the alignment belt," neither the patent nor the prosecution history contain any lexicography.  *Id.* at 5.

At the September 12, 2012 hearing, Plaintiff further explained that there is no requirement for the "uneven" rows that Defendants have proposed because "alignment" includes adjustments other than those that correct for unevenness, such as timing, spacing, or rotation. Plaintiff nonetheless requested that if the Court refers to adjustment of "uneven" rows in the construction, then the Court should also note that the construction does not require the presence of uneven rows.

Although Plaintiff argues that this term should not be construed, the briefing demonstrates that the parties have a "fundamental dispute regarding the scope of a claim term," and the Court has a duty to resolve the dispute.  *O2 Micro*, 521 F.3d at 1362-63.

As discussed regarding the term "to form essentially even ranks" in subsection C., above, the patentee stated during prosecution that "the Applicant discloses and claims a process in which the substantially flat pieces of dough are adjusted with an alignment system to form essentially even ranks after the pieces have been sheeted *and fed onto an alignment belt*." 3/27/2003 Response to Office Action (Dkt. # 92, Ex. 5) at FL82 (emphasis added).  Indeed, the applicant added the limitation to Claim 1 by amendment as follows (additions underlined; deletions in strikethrough):

> 1.      (Currently Amended) A process of making a snack chip, comprising:
> sheeting a dough into substantially flat pieces;
> feeding the substantially flat pieces at a feed speed onto an alignment belt;
> adjusting positions of the substantially flat pieces on the alignment belt with an alignment system to form essentially even ranks;
> ~~aligning the pieces to form essentially even ranks;~~
> discharging the substantially flat pieces at a discharge speed to mold racks;
> molding the substantially flat pieces into a liquid-retaining shaped piece; and
> drying the shaped piece to a final moisture content for a snack chip.

*Id.* at FL81.  Claim 1 issued in this amended form.  Plaintiff's proposal, in which the "alignment belt" could be any belt, with or without any actual alignment performed thereon, should therefore be rejected.

Finally, as to Plaintiff's argument that none of the intrinsic evidence discloses "uneven rows," the specification and the claims disclose that "the ranks are not sufficiently aligned for eventual feeding to the plunger and mold conveyor 60" and that the pieces are therefore adjusted or aligned "to form essentially even ranks."  *See* '344 Patent at 4:29-30, Claim 1 & Claim 16; *see also* 3/27/2003 Response to Office Action (Dkt. # 92, Ex. 5) at FL82; *cf. Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1332 (Fed. Cir. 2010) ("[A]nticipation by inherent

disclosure is appropriate only when the reference discloses prior art that must *necessarily* include

the unstated limitation.") (quoting *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364,

1373 (Fed. Cir. 2002)) (emphasis added).

At the September 12, 2012 hearing, Plaintiff repeatedly cited Figure 6, which is

reproduced herein:



Plaintiff argued that Figure 6 illustrates rows that are already even *before* they reach the

alignment belt illustrated in Figure 4 (reproduced in subsection B., above).  As a result, Plaintiff

urged, the specification includes an embodiment in which aligning the pieces merely involves

controlling the spacing between rows or the timing of rows, such as by adjusting the speed of one

or more belts.  In light of the other intrinsic evidence, however, Plaintiff reads too much into

Figure 6, the purpose of which is not to illustrate the relative positions of chips but rather to

illustrate the position of the sensors with respect to the rows of chips.  *See Default Proof Credit Card Sys., Inc. v. Home Depot USA, Inc.*, 412 F.3d 1291, 1300 (Fed. Cir. 2005) (rejecting interpretation of figure that contradicted other intrinsic evidence).  For example, Figure 5 plainly illustrates uneven ranks and is a view of the same system illustrated in Figure 6, namely the "system shown in Figure 1." '344 Patent at 2:41-57 (Brief Description of the Drawings).

In the end, however, the intrinsic evidence discussed above discloses that *if* a row is uneven, *then* the pieces in the row are adjusted on the alignment belt.  Claim 1 does not require the actual presence of an uneven row in order for the "alignment belt" limitation to be met.

The Court therefore hereby construes **"alignment belt"** to mean **"a belt on which uneven rows of pieces are adjusted into essentially even rows,"** but the Court also notes that this construction does not require the presence of an uneven row for the limitation to be met.

**E.  "adjusting positions of the substantially flat pieces on the alignment belt" (Claim 1) and "aligning the pieces" (Claim 16)**

| "adjusting positions of the substantially flat pieces on the alignment belt" (Claim 1) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction needed; the meaning is clear from the context of the claim.  If the Court determines that a construction is needed, the term should be construed as "orienting the substantially flat pieces on the alignment belt." | "moving the position of the pieces on the alignment belt" |

| "aligning the pieces" (Claim 16) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction needed; the meaning is clear from the context of the claim.<br><br>If the Court determines that a construction is needed, the term should be construed as "orienting the pieces." | "moving the pieces into alignment" |

The parties have addressed these two terms together in their briefing and during oral argument, so the Court discusses both terms together here.

Plaintiff argues that "[a]djusting the positions of the substantially flat pieces is merely orienting the substantially flat pieces; they are adjusted or oriented so that they can be formed/molded."  Opening (Dkt. # 82) at 24.  Similarly, Plaintiff argues that "[a]ligning the pieces is merely orienting the pieces" and does not require construction.  *Id.* at 25.  At the September 12, 2012 hearing, Plaintiff submitted that one type of "orienting" under its proposed construction would be to "true up" the "axis" of a row of chip pieces to align with the "axis" of a row of molds, as discussed further in subsections B. and C., above.

Defendants respond that Plaintiff's proposals, together with Plaintiff's proposal as to the term "to form essentially even ranks," would encompass merely rotating a chip piece, or perhaps even flipping a chip over, rather than actually moving its position.  Response (Dkt. # 92) at 28. Defendants urge that "[a]ny movement of pieces into a position is done relative to the other pieces and the mold conveyor," as consistently described with reference to the "alignment system" in the specification and the prosecution history.  *Id.* at 29 (citing 3/27/2003 Response to Office Action (Dkt. # 92, Ex. 5) at FL82).  Defendants conclude that Plaintiff's proposal

"ignores the purpose of aligning the pieces," which is "to form essentially even ranks," and instead "expands the meaning of the term to encompass any sort of 'orientation.'" *Id.*

Plaintiff replies that Defendants' proposal lacks support and that "[D]efendants have not met their burden of demonstrating that the applicants clearly expressed an intent to redefine these terms." Reply (Dkt. # 97) at 5 n.3.

At the September 12, 2012 hearing, the Court inquired of Defendants whether this term truly requires any construction in light of the use of "an alignment system to form essentially even ranks" elsewhere in Claims 1 and 16. Defendants responded that if the Court adopts Defendants' proposed constructions as to "alignment system" and "to form essentially even ranks," then this term does not require construction. Defendants submitted that their proposed construction is intended to make clear that merely adjusting the spacing between rows is insufficient to meet the limitation of "adjusting positions of the substantially flat pieces on the alignment belt."

Although Plaintiff argues that this term should not be construed, the briefing demonstrates that the parties have a "fundamental dispute regarding the scope of a claim term," and the Court has a duty to resolve the dispute. *O2 Micro*, 521 F.3d at 1362-63.

Claim 1 recites, in relevant part: "adjusting positions of the substantially flat pieces on the alignment belt with an alignment system to form essentially even ranks." Claim 16 recites, in relevant part: "aligning the pieces with an alignment system to form essentially even ranks."

On one hand, the specification does, indeed, suggest rotational movement:

To maintain even files, it is preferable that at least two cleats 52 be provided per chip 202. Thereby, a trailing edge of chip 202 will end up disposed between at least two cleats 52.

'344 Patent at 4:39-42.   Rotational movement that can be caused by this action of the cleats, albeit slight, was apparent in the parties' demonstrative animations during the September 12, 2012 hearing, as well as in a video of Plaintiff's embodying process that Defendants provided to the Court as part of Defendants' Technology Tutorial.   Based on this disclosure in the specification, as well as Figure 5, a person of ordinary skill in the art would understand that the cleats can operate to rotate the substantially flat pieces in furtherance of the desired uniformity of orientation illustrated in Figures 5, 6, and 7 (Figures 5, 6, and 7 are reproduced in subsections C., D., and B., above, respectively).

On the other hand, as discussed in subsection C., above, the claims, the specification, and the prosecution history all discuss moving the substantially flat pieces with respect to one another so as to form "*even* ranks," not just uniformly oriented ranks.   *See, e.g.,* '344 Patent at 4:24-47; 3/27/2003 Response to Office Action (Dkt. # 92, Ex. 5) at FL82.   On balance, the better reading is that "adjusting positions" and "aligning the pieces" require moving the positions of pieces with respect to one another rather than merely rotating or orienting the pieces.

The Court therefore hereby construes **"adjusting positions of the substantially flat pieces on the alignment belt"** to mean **"moving positions of substantially flat pieces in each row on the alignment belt with respect to one another."**

The Court similarly hereby construes **"aligning the pieces"** to mean **"lining up positions of pieces in each row with respect to one another."**

## CONCLUSION

For the reasons stated, the Court adopts the constructions set forth above.

**SIGNED this 27th day of September, 2012.**


_____
AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE