1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TEXAS
2                SHERMAN DIVISION

3 FRITO-LAY NORTH AMERICA, INC.  *   Civil Docket No.
                          *   4:12-CV-74
4 VS.                      *   Sherman, Texas
                          *
5                          *   February 11, 2013
  MEDALLION FOODS, INC, ET AL   *   2:25 P.M.
6

7
              TRANSCRIPT OF JURY TRIAL
8      BEFORE THE HONORABLE JUDGE AMOS MAZZANT
          UNITED STATES MAGISTRATE JUDGE
9

10

11

12 APPEARANCES:

13 FOR THE PLAINTIFFS:    MR. TIMOTHY S. DURST
                  MR. RUSSELL J. CRAIN
14               MS. SUSAN CANNON KENNEDY
                  Baker Botts, LLP
15               2001 Ross Avenue
                  Suite 600
16               Dallas, TX    75201

17               MR. CLYDE M. SIEBMAN
                  Siebman Burg Phillips & Smith
18               300 North Travis
                  Sherman, TX   75090
19

20 (APPEARANCES CONTINUED ON NEXT PAGE)

21

22 COURT REPORTERS:      MS. JUDITH WERLINGER, CSR
                  MS. SUSAN SIMMONS, CSR
23               Official Court Reporters
                  100 East Houston, Suite 125
24               Marshall, TX   75670
                  903/935-3868
25 (Proceedings recorded by mechanical stenography,
  transcript produced on CAT system.)

(APPEARANCES CONTINUED)

FOR THE DEFENDANTS:    MR. DAVID W. HARLAN
                       MR. B. SCOTT EIDSON
                       MR. DANIEL E. SAKAGUCHI
                       MR. MARK A. THOMAS
                       MR. TIMOTHY D. KRIEGER
                       MR. ZACHARY C. HOWENSTINE
                       Armstrong Teasdale, LLP
                       7700 Forsyth Blvd.
                       Suite 1800
                       St. Louis, MO    63105

                       MR. T. JOHN WARD, JR.
                       MR. WESLEY HILL
                       Ward & Smith Law Firm
                       1127 Judson Road
                       Suite 220
                       Longview, TX   75601


            *******************************

                P R O C E E D I N G S

            COURT SECURITY OFFICER:  All rise.

            (Jury panel in.)

            THE COURT:  Please be seated.

            Ladies and Gentlemen, thank you so much
for your attendance today.  I will have the clerk to go
ahead and call the 10 jurors that will serve in this
case.

            When your name is called, please come
forward.  Mr. Strandlien here and Mr. Smith will direct
you and be seated in the jury box.

            COURTROOM DEPUTY:  Deborah Owen; Toni
Maddox; Sarah Stobaugh; Stephanie Lanvers; Carie Seelye;

Larry Paul; Joseph Shimek; Glenn Bisset; Latricia Harjes; Debbie Windham.

THE COURT:  Congratulations, Ladies and Gentlemen.  If you will stand and raise your right hand to be sworn in as the jury for this case.

(Jury sworn.)

THE COURT:  Thank you very much.  You can stay standing.

I am going to release you back to the jury room.  There are a couple of matters to take up with counsel.  When you can come out, I will bring you back out to do the preliminary instructions as well as opening statement of the attorneys.

But, again, this is something you're going to hear me say time and time again.  Do not discuss anything about the case among yourselves.  And go have a good time back in the jury room, but don't discuss the case or what's happening here.

So if you want to go ahead and go back, and there will be things like notepads the CSO will give you, and I will tell you about those in the preliminary statements.

So thank you.  You are released back to the jury room.

COURT SECURITY OFFICER:  All rise for the

1  jury.

2              (Jury out.)

3              THE COURT:  Okay.  Thank you.  You can be

4  seated.

5              For everyone else that did not get

6  selected for this jury, I just want to thank you for

7  your participation.  Again, without citizens willing to

8  participate in our system, this couldn't function.  And

9  I just really do appreciate you taking your time today,

10 and I know you didn't have a choice, but it really is an

11 important function.

12             If you try to find who would be the best

13 jurors in this case, and despite your not being selected

14 for this case, who knows, you'll be called again.  And

15 there is probably a case out there that you would be a

16 perfect juror for.

17             So at this time, you are free to leave or

18 stay at your pleasure.  I think the CSOs will have

19 notes, if you need those for your work.  And you are

20 free to leave now at your pleasure.

21             Thank you.

22             (Jury panel excused and leaves the

23 courtroom.)

24             THE COURT:  Be seated.

25             Let's talk about the preliminary

instructions now, and I will give you some general
guidelines that we will do the preliminary statements or
my preliminary instructions.  The longer you take on
that, we are stopping at 5:00 o'clock.  So whatever time
is left, we are going to divide the time equally from
the time I finish the preliminary instructions.

We're going to read those and play the
video.  I'm just putting you on notice now that I'm not
keeping the jury past 5:00 o'clock, so we go 9:00 to
5:00.  Some have to drive a-ways.  Okay.

MR. HILL:  Your Honor, with regard to the
preliminary instructions, we have no objections to the
preliminary instructions as drafted by the Court on
behalf of the Defendants.

We note that Frito-Lay submitted a number
of changes.  We oppose all of them.  We would ask that
the Court in the interest of time not entertain those
things piece-by-piece, but that the Court stick with its
preliminary instructions as the charge to be given to
the jury.

THE COURT:  Okay.  Mr. Durst?

MR. DURST:  Sure.

THE COURT:  Just so you know, if we go
through these one-by-one, that's fine.  I'm not going to
prohibit you from doing so.  This is just going to come

1  off your opening statements, your time for opening

2  statements, because if we have to go back and make the

3  changes, so it's going to be in the -- I'm giving you a

4  heads-up.  I'm just giving you full notice.

5                MR. DURST:  Sure, Your Honor.

6                THE COURT:  That's fine.

7                MR. DURST:  The ones that matter the most

8  to us are the ones where there are claims that are

9  not -- for instance, the -- there is an inclusion in the

10 Court's draft of saying -- of abandonment on the Defense

11 side of the case, but not on Frito-Lay's side of the

12 case.

13               So the easiest and quickest approach

14 there is just to delete that altogether; otherwise, we

15 need to have an articulation of Frito-Lay's side of that

16 issue.  And I believe that occurs, Your Honor, on Page

17 No. 5 of the Court's draft.

18               THE COURT:  And Page 6?

19               MR. DURST:  Yes.  Yes, abandonment is on

20 Page 6.  The easiest thing I suspect is just to strike

21 any reference at all, one side or the other, on

22 abandonment.

23               THE COURT:  That the Defense had raised.

24               MR. DURST:  Then, Your Honor, we would

25 request that -- that something about our position on

that be included in the preliminary instructions as

well.  And if you look at the bottom of Page 5, we have

handwritten there -- I assume we're looking at the same

thing.

THE COURT:  I have that, yes.

MR. DURST:  Yeah, Frito-Lay contends that

it has continually used the same Tostitos SCOOPS! chip

design, never ceased using it, and never intended not to

use it.  That's the legal standard for abandonment.

THE COURT:  I don't see why it's

necessary for these preliminary instructions.  I mean, I

have indulged both sides in your request in your detail,

which I don't ever even give.  And I just say these

claims using the defense, and I give no other

instructions typically other than generic preliminary

instructions.

Because of the nature of this case, I

allowed it.  The fact that they inserted abandonment,

it's just an idea that they have a defense they've

asserted in a pretrial order.  So that's the reason why

it's in there.  I don't -- it's not necessary to include

every single instruction.

MR. DURST:  I understand, Your Honor.

THE COURT:  Okay.

MR. DURST:  The -- I think the next most

important one, Your Honor, is that at the bottom of

Page 6, the description of the patent-in-suit, the

patent does not cover the -- the patent for the most

part, Your Honor, relates to the process for making a

bowl-shaped tortilla chip, in particular with the

dropping of Claim 16.  We don't have a claim for a

bowl-shaped tortilla chip.

                THE COURT:  Do you agree with that one?

                MR. HILL:  (Nods head affirmatively.)

                THE COURT:  All right.  So I will make

that change.

                MR. DURST:  Your Honor, just in terms of

prioritizing things, those are the most important ones.

                THE COURT:  You can cross out in

Paragraph 3, the issues and decide it.  Was there an

issue in there?  You wanted that whole section taken

out.  I'm not sure why it should come out.

                MR. DURST:  Oh, because there -- the --

the proposed excise was on account of the sentence that

talks about there being two issues or questions being

asked to be resolve by the verdict returned in this

case.  And that is -- I guess the Court has mentioned

too because you're in the patent section.

                THE COURT:  Yes.  Probably a variation.

We made a change -- I mean, this is probably coming from

the patent -- normal preliminary instructions to the

fact that the claims and so.

                    MR. DURST:  So perhaps just a simple

insertion about two issues -- two questions or issues

with respect to the patent-in-suit or something like

that might be better, since we have all the variety of

IP, Your Honor.

                    THE COURT:  So what are you suggesting to

change there?

                    MR. DURST:  After the word, two issues,

just insert with respect to the patent-in-suit or with

respect to the '344 patent.  Probably with respect to

the '344 patent is better.

                    THE COURT:  Do you have any problem with

that?

                    MR. HILL:  No problem, Your Honor.

                    MR. DURST:  Your Honor, also on Page 6 --

and I think this was really just -- if we're on the

record, this is really just an item for the record,

unless the Court wishes to indulge additional discussion

of it.

                    THE COURT:  I am not trying to hamper

your ability to say anything you want to say or bring to

the Court's attention.  I was just given practicalities

of our timing issues.

1          MR. DURST:  I understand.  I understand.

2          THE COURT:  I never want to restrict the

3   attorney's ability to bring an issue to the Court and

4   address those.

5          MR. DURST:  There is a reference, Your

6   Honor, to comparing the -- we believe that the -- as you

7   know from our pretrial conference, that a direct

8   comparison, side-by-side on the chips, is an improper

9   comparison under the law.  And the reference to

10  comparison of the marks, I think, runs afoul, Your

11  Honor, of that -- of that legal proposition.

12         THE COURT:  Okay.  Point to me where

13  you're at, so I can make sure...

14         MR. HILL:  Your Honor, we fully argued

15  this, and it was ruled on at the pretrial conference.  I

16  don't know why we're arguing it again.

17         THE COURT:  I'm not sure -- I was trying

18  to point to where he's even at.

19         MR. DURST:  So we're at the bottom of 5,

20  Your Honor, and at top of 6.  And I guess actually what

21  we should be -- I misstated that.  I think what I should

22  be suggesting, Your Honor, is that we -- we would

23  encourage that -- that the -- that the instruction be --

24  that the requested instruction be clear that the

25  comparison is to be done in a manner that the consumers

encounter the chips, not which is -- there's not going

to be any testimony of that side-by-side comparison.

So this could be fixed by confusion can occur at any

point that consumers encounter a product in the manner

and should be assessed -- should be assessed according

to the manner that -- the manner that the consumers

encounter the process.

MR. HILL:  Your Honor, those are two

separate issues.  The issue that the Court has addressed

is the point in time, not the method of comparison.  And

the final charge will give the jury fulsome instruction

on what they need to do.  It's not necessary in a

preliminary statement, particularly when we're going to

lose probably half of our opening statements, if this

continues.

THE COURT:  I don't think a change is

necessary for that preliminary instruction.

MR. DURST:  Okay.  Those are the issues,

Your Honor.

THE COURT:  I think that's minimal typos

we will try to clean up.  I assume Defendants don't have

any objection to some of those where they made those

minor changes, unfair competition, and --

MR. HILL:  Unfair competition, that

addition, Your Honor, that they made for the list of

1  causes of action, we have no objection.

2  THE COURT:  Okay.  Then let me go ahead

3  and we will make these changes and --

4  MR. HILL:  Your Honor, we have a couple

5  of other issues which are things under the --

6  THE COURT:  I believe we'll make these

7  changes and --

8  MR. HILL:  Your Honor, we have a couple

9  of other issues that are things under the limine

10  motions.

11  THE COURT:  I'm going to let my lawyer

12  start doing those changes so that we can get started.

13  MR. HILL:  We have a couple of issues on

14  limine-related things that we wanted to get clear before

15  we begin putting on evidence.  It's evidence subject to

16  limines before we start the opening statements.

17  THE COURT:  Okay.

18  MR. HILL:  I'll start with a couple of

19  things.  Number one, Your Honor, there is the issue in

20  the motion in limine regarding Dr. Okos and whether our

21  intention to cross-examine Dr. Okos with regard to the

22  trade secrets that he initially alleged to exist and

23  opined upon and then recanted in his deposition, we

24  would like to be able to use that information in opening

25  statement, because the trade secret claim was

highlighted during voir dire; that we've been called thieves.

At this point, the jury is entitled to hear the full presentation of the evidence, and we believe it's important for us to highlight in our presentation of what the evidence will show the fact that the person that made the accusation against us then recanted it in certain respects.

And we would ask that we -- we think that issue is fairly before the jury now in light of what went on in voir dire, and we would ask we be able to present that in our opening statement.

We've provided specific page and line designations of the two small clips we plan to use to Plaintiff's counsel in advance, and so they're on notice.

I don't know if you want me to move through the list of issues, Your Honor, or just stop there.

THE COURT:  Sure.

MR. DURST:  Your Honor, this issue is no different than what it was when you addressed it on Friday, and the place the Court wound up then was that this goes to -- if anything, it goes to Mr. -- to Dr. Okos' credibility, and that's not -- that's not an

1    issue in opening statements.

2                    So what we would request, Your Honor, is

3    that to adopt the same approach you had on Friday, which

4    was if this becomes an issue with Dr. Okos' credibility

5    on what is a trade secret and what is a misappropriated

6    trade secret is properly before the jury, then this

7    issue could be addressed and -- we could approach, and

8    this issue could be addressed at the bench.

9                    It is not -- it's not an issue yet, and

10   it won't be in opening statements.  So the motion in

11   limine we suggest should stay in place.

12                    MR. HILL:  Your Honor, it's a issue of

13   Frito-Lay's credibility and not Dr. Okos.

14                    MR. DURST:  It is not, Your Honor, and

15   that goes exactly -- that runs exactly afoul of those

16   policy issues that we talked about on Friday.  So they

17   want to -- I'm sorry if I'm talking over the Court.

18                    THE COURT:  No, that's fine.

19                    I don't see a basis of changing my ruling

20   based on your use of it in opening statements.  And I

21   told you at the pretrial conference that I do believe,

22   if you get into that on cross-examination of the

23   witness -- and we certainly can argue that later, but

24   for the purpose of opening statements, I don't think

25   it's necessary.

MR. HILL:  I have three other quick evidentiary issues, Your Honor.  Specifically with regard to Defendants' Exhibit 274, Defendants' Exhibit 274 is a book.  It is a corn spec.  It is a corn manufacturing processing book that we --

THE COURT:  Y'all mentioned this at that conference.

MR. HILL:  We did.  We put it on the exhibit list.  It's been probably two weeks ago now.  It was not -- we put it on when we got it and we got the book -- the reason the book is relevant is Frito-Lay will put a corn spec in front of the jury and say that we misappropriated it.

And attached to that corn spec is a table.  We now know from searching through that it is this table right here (indicating) out of this book.  We found the table.  It is a table that was in production that was given to us by Frito-Lay that they allege or -- excuse me -- was produced in this case.  Frito-Lay alleges it's a trade secret.  They say it came from them, which implies to us they should have had this book and the book should have been produced in discovery. We had to find the book on our own.  We found it.  We think we ought to be able to show the jury the corn spec and where it comes from, from a public source.  It's the

truth.  The jury is going to be told that that's a trade

secret.  We've got definitive proof that it's from a

textbook, and they ought to be able to consider that.

And our finding it, when we did find it, it is what it

is.  But we think they suffer no prejudice.  They have

been on fair notice.  That's out there.  The trade

secret claims have been moving pretty rapidly of late in

any event, and we think this is a fair defense.

MR. DURST:  Your Honor, Mr. Hill,

respectfully, has his facts wrong.  That document came

out of their files, not Frito-Lay's files.  And that's a

book that they examined three or four of our witnesses

also about, whether our witnesses knew the author.

So it's the book, Your Honor, that they want to put in

evidence that apparently they've had all along.

MR. HILL:  He's got the wrong book, Your

Honor.  He's thinking about the Rooney book.

MR. DURST:  And, Your Honor, that table,

if it is the one I believe it is, is a USDA table.  It

says right on it it's not part of our trade secrets

allegation.

So this was a late-produced document.

The page that he's concerned about actually came out of

their files, not ours.  And it's not part of our trade

secrets allegations.

1            MR. HILL:  It brings us to another issue,

2   Your Honor.  It's Plaintiff's Exhibit 95.  Plaintiff's

3   Exhibit 95 was put on the exhibit list.  It is the corn

4   spec.  It is a two-page document.  It came out of

5   Medallion's files, and it was used with witnesses in

6   depositions as a two-page document, because that's what

7   it was in our files.

8            The night before last, Frito-Lay pulled

9   the back page off and produced just the first page.  So

10  they got rid of the corn spec.  They changed the

11  exhibit, the exhibit that's been used with deposition

12  witnesses in this case.

13            And that's what they're trying to say

14  now.  It's not part of their allegation is because they

15  have altered Exhibit 95.  That's another issue on our

16  list, is we want the complete Exhibit 95 in the record,

17  not the one Frito-Lay has manufactured at trial.

18            MR. DURST:  Your Honor, there is no

19  testimony in the record -- those pages were produced

20  sequentially by Defendants and sent to us in an e-mail

21  from counsel.  There's no testimony by any fact witness

22  anywhere in the case that those documents existed

23  together in Ralcorp or Medallion's files.

24            Instead we have a transmittal e-mail from

25  counsel when we asked for what -- when we asked for

1  information about the corn specs, and counsel sent those

2  to us in a -- in a cover e-mail.  And there's no

3  testimony anywhere by fact witnesses that said these

4  appeared in the file together.

5              Your Honor, I question about why we're

6  arguing about this stuff in the opening statement or --

7              THE COURT:  What's the other one right

8  now?

9              MR. HILL:  Your Honor, if I can't

10  use Dr. Okos, I have to respond to their trade secret

11  allegation, and the way I plan to respond to their trade

12  secret allegations is to show what they claim as trade

13  secrets in many instances are publicly available

14  information in things like textbooks and other public

15  available sources.

16              If I can't push back because of Dr. Okos,

17  what he's now recanted, and I can't push back on what's

18  in the public domain, I just can't push back, Judge.  I

19  have to sit silent on the trade secret allegation.

20              THE COURT:  What's the objection to the

21  exhibit?  I guess I'm not sure I understand --

22              MR. DURST:  The objection --

23              THE COURT:  -- what the objection was.

24              MR. DURST:  The objection to the book?

25              THE COURT:  Yes.

1          MR. DURST:  The objection to the book,

2    Your Honor, is we believe that they've had it all along.

3    They produced it two weeks ago.  We didn't have a chance

4    to examine any of their witnesses, including their trade

5    secrets expert on it.

6          THE COURT:  Mr. Hill, this is not a

7    Defendants' exhibit.  I mean, in their own files?

8          MR. HILL:  This was not in the

9    Defendants' files, Your Honor, no.  What this was it was

10   a book that we searched around and found in the public

11   domain.  And it's from the Snack Food Association and

12   International Trade Association.

13          And we discovered, as we saw this trade

14   secret allegation, as we investigated their evolving

15   trade secret claims, that what they claimed as a trade

16   secret is something that's in a publicly available

17   textbook.  And we think we ought to be able to respond

18   to the trade secret claim about that.

19          MR. DURST:  Your Honor, there's no

20   allegation that --

21          THE COURT:  What I'm going to do now,

22   they only discovered the document two weeks ago, but how

23   they questioned their witnesses about the documents --

24          MR. HILL:  We did not.  We didn't

25   question any witnesses about this document.

1          MR. DURST:  The questions of our

2   witnesses was about a treatise, and you're telling me

3   that was a different -- that's not the book there?

4          MR. HILL:  This is not.  That was the

5   Rooney book, which is in evidence.

6          MR. DURST:  Okay.  So, Your Honor, the

7   document that was in their files is a Frito-Lay corn

8   specification document.  The other document that counsel

9   gave us was a USDA table, which is what Mr. Hill has in

10  his hand.

11          There's no testimony by a fact witness in

12  the record that ties those two together.  And so he

13  wants to now make that argument and use this

14  late-produced document to buttress it, and that's what

15  we're objecting to.

16          If he wants to make the argument and he's

17  got a fact witness that can say it appeared that way,

18  that's a whole different deal, but that's not what the

19  record is and that's not in opening statements.

20          MR. HILL:  Your Honor, I can use it with

21  his witnesses.  That's why I'm entitled to open on it.

22  It's fair evidence, and it's evidence he put in the

23  record and then changed two days ago.

24          THE COURT:  Well, certainly I don't see a

25  problem with you trying to use that document for

cross-examination purposes on their witnesses. I'm trying to figure out why is it necessary for opening statements.

MR. HILL: Your Honor, if we can't respond to the trade secret allegations to show that they are in the public domain and we can't talk about Dr. Okos, we have nothing we can talk about to push back to show that these trade secret claims are not secrets. And so this is our defense to trade secrets.

THE COURT: Mr. Hill, how -- this does not come under a motion in limine. The issue is the exhibit -- none of these things are actually admitted. I don't admit them until afterwards, so you're welcome to talk about what you think the evidence is going to show and certainly you can use them to cross-examine their witnesses.

So the evidence is coming in. Whether the exhibit itself gets admitted, I don't know yet. I'm not sure I understand what the problem is.

MR. HILL: Your Honor, what I want to be able to do is show Exhibit 95, Plaintiff's Exhibit 95.

THE COURT: You want to be able to show it?

MR. HILL: I want to show it to the jury in opening statements, because it's what the evidence is

going to show.  It's a Plaintiff's exhibit.  I want to

show Plaintiff's Exhibit 95.  I want to show them the

second page of it, and I want to tell them that document

comes from a public source, and we're going to prove it

to you.

MR. DURST:  And, Your Honor, we would

object to that document.  So the agreement between the

parties, I believe, and I thought the understanding of

the Court was that the evidence that would be discussed

that could be discussed in opening statement is that to

which there has been no objection.

And we have objected to that document

because of this factual circumstance, which is there

isn't a fact witness anywhere that puts those two

documents together.

MR. HILL:  And that's why we're raising

it, Your Honor.  I didn't just pop it up.  I wanted to

raise it and get a ruling.  And I can show you the -- I

can show you Exhibit 95.  I can show you 274, which is

the book, if you'd case to examine these.

THE COURT:  So, again, back to -- the

only -- the only objection you're making to the document

is it's late production?

MR. DURST:  That's the objection we make

to the book, and we withdrew the two-page -- when we

figured out what had gone on with the fact witnesses,

Exhibit No. 95 that he wants to use, and we figured out

that the pages had come together by virtue of the way

the lawyers produced it and not supported by the facts,

we withdrew it and put them in as independent pages.

And so Exhibit 95, Your Honor, is a document from their

files that has a Frito-Lay logo on it of our corn

specifications.

MR. HILL: And, Your Honor, Exhibit 95

has been used as a two-page document with deposition

witnesses throughout this case. It's marked as an

exhibit, and it was on their exhibit list until they

figured out, because of the orders and what's been going

on with the trade secret claim, that we had a way to

push back against it. So they tried to strip out the

page that they know shows the incredulity of their

assertion of that trade secret.

MR. DURST: Your Honor, we withdrew that

exhibit. I will not use Exhibit 95. I won't use the

corn spec with the Frito-Lay exhibit.

MR. HILL: Your Honor, we have

cross-designated everything that's on their list, so it

is in play, and we want an opportunity to push back

against the claims being made against us. And this is a

fair confrontation of evidence they have put forward as

1  proof of a trade secret and it shows what we think the

2  jury ultimately will need to understand about the nature

3  of the claims being made against us.

4          MR. DURST: Your Honor, if he has a

5  witness that can come up and take the stand and tell the

6  jury under oath that those two pages are together in the

7  Ralcorp and Medallion files, this debate is completely

8  different. There is no foundation for that.

9          MR. HILL: Your Honor, it's an opening

10 statement. If I put it up and create a credibility gap

11 for myself and I can't get it in through a witness, he

12 can skewer me in a closing argument like nobody's

13 business. I am entitled to that much rope to try to

14 hang myself.

15         MR. DURST: That's why we objected to it,

16 Your Honor, because of the undue prejudice of him making

17 that suggestion as they did when they produced it to us

18 without facts to support it is the basis for our

19 objection.

20         THE COURT: Well, Mr. Hill, I will let

21 you -- I still haven't decided whether I am going to

22 admit the exhibit at this point, though I will let you

23 go ahead and use in it opening statements. If it

24 doesn't come in later, then we will deal with that and

25 they can make that argument later.

1           MR. HILL:  Thank you, Your Honor.

2           MR. DURST:  Which exhibit are you

3 allowing, Your Honor?  The book?

4           THE COURT:  I'm allowing them to use it

5 in opening statements.  I'm not saying I'm going to

6 admit the exhibit.

7           MR. DURST:  With respect to the book?

8           THE COURT:  274.

9           MR. HILL:  The book is 274.  And then

10 also, Your Honor, we want to show the two pages of

11 Exhibit 95 as it existed before it was altered two days

12 ago.

13           THE COURT:  Is that a Plaintiff's

14 exhibit?

15           MR. DURST:  No, Your Honor, we withdrew

16 that.

17           MR. HILL:  It was their exhibit, Your

18 Honor.  We didn't object to it until it changed night

19 before last.

20           THE COURT:  Well, they withdrew the

21 exhibit, so...

22           MR. HILL:  We cross-designated it, so

23 we're not turning it loose.

24           THE COURT:  So they admitted it as an

25 exhibit as well, so --

1          MR. DURST:  They did not, Your Honor.

2    It's on our exhibit list.  They had the opportunity to

3    put it on their exhibit list.  They did not withdraw it

4    if they put in some pro forma boilerplate somewhere that

5    they cross-designated, I --

6          THE COURT:  Is it a listed exhibit?

7          MR. HILL:  We cross-designated everything

8    that was on their list just as they did ours, as you do

9    in every case when you go to trial to avoid this very

10   problem when the other side realizes they've got

11   evidence you're going to use and they try to pull it out

12   from under you.

13         MR. DURST:  It's not listed on their

14   list, Your Honor.

15         THE COURT:  Again, I am not restricting

16   your ability to use it in opening statement in that

17   regard, because you're telling the jury you think this

18   is what the evidence is going to show.  And I don't know

19   if it's going to come in or not, but we'll deal with

20   that later.  We'll deal with the ramifications of that,

21   if it happens.

22         MR. HILL:  Thank you, Your Honor.

23         There's one last issue I want clear, so

24   that I make sure I was clear about everything that might

25   be in the opening.  And that's Defendants' Exhibit 171.

It is a Pepsi document in regard -- that has a
discussion of what they call low-cost SCOOPS!
The Court entered a limine order and asked us to
approach before that issue was used.  Based on the
allegations in the case about that we are a lesser
quality during voir dire, we want to show that Pepsi
considered our process to be a favorable alternative to
their own.

MR. DURST:  Your Honor, the record on
that hasn't changed at all, and there's nothing in the
record that suggests that those documents about what we
have under development is the same as the Defendants'
process.  And there won't be, because it's just not
true.

So that limine motion, Your Honor, should
stand.

THE COURT:  That's the part of the motion
in limine which is different from the other arguments
you're making outside the motion in limine I'm not
changing at this point.

MR. DURST:  I have one, Your Honor.

MR. HILL:  Thank you, Your Honor.

MR. DURST:  And particularly given where
we just were, I beg the Court's indulgence on this,
because it is a limine motion.

1          THE COURT:  It is not an issue of my

2    indulgence.  Again, I'm not going to restrict you, but

3    we are dealing with a time issue.  If we don't get

4    through, we can always go to the next day.

5          MR. DURST:  Your Honor, in voir dire, you

6    heard what Mr. Hill did with us, and the fact that there

7    was an expiration date on the bag of chips that had

8    been, you know, purchased and developed along in the

9    case, and that the expiration date had passed.

10          He even got one of the jurors to say that

11    the juror thought that was an act of deception.  The

12    Court will remember that, calling into account not only

13    Frito-Lay's credibility, Your Honor, but my personal

14    credibility.

15          We have a motion in limine in this case

16    that the Defendants filed, and I would ask the Court to

17    renew its consideration of it.

18          There is a company policy at Medallion

19    that allows expired products to be mixed back into the

20    products that are being produced.  So they can take

21    expired products that have been sitting around on the

22    floor, pour it back in the production line, and it goes

23    out to consumers for consumption.  That policy exists in

24    the Medallion plants.

25          It's older products that may not be --

I'm sorry. I said expired products. It's at least

older products, and there's testimony that this happened

with Mr. Vickery in nearly expired products, Your Honor.

But the notion that you take products that are near the

end of their life and you mix them back in there and you

produce -- and there's a policy in the plant --

THE COURT: Different vendors that they

make them for have different dates they require. So it

really wasn't on expired products per se. It was

only expired -- they are only expired probably as to

let's say, for example, Walmart, for one, versus Kroger

has a later date or something. So it's not like they

were out of date for what they normally would be, let's

say, the longest date for an expiration date --

MR. DURST: That's the Defendants

argument, Your Honor. Mr. Vickery was turned into his

superiors for violating this and taking chips that were

too old and pouring them back in. It's a policy in

their plant, quality of their product is at issue

because of dilution of our mark.

And particularly given what happened

with -- with the chips in voir dire, Your Honor, that

door should be opened. The jury is now left with the

impression that somehow that we've tried to mislead them

with respect to old chips, when in reality, the

Defendants in this case are using older chips and
selling them to consumers.

MR. HILL:  Your Honor, Mr. Vickery didn't
put the chips in Mr. Durst's bowl.  Mr. Durst put them
in there himself.  He chose that.

THE COURT:  Well, Mr. Durst, I don't
think that opens the door to that.  I mean, the Court's
view is it was a simple mistake.  Y'all can think about
that issue.  I didn't think it was intentional on your
part.  But I don't think it opens the door to that.
You are the one -- your side selected chips for the voir
dire, and they happened to be expired.  I don't think it
was intentional, but --

MR. DURST:  I understand.

THE COURT:  And I don't know that --
Mr. Hill tried to even downplay it.  He wasn't trying to
make a big deal of it.  One juror made some comment.

MR. DURST:  You're being too generous.
Do you remember his comment when he turned and looked at
me and said -- he looked at me and he said to the jury,
do you think that anything that happens in the courtroom
is not intentional?

Your Honor, this issue -- he has -- he's
demonstrated the force with this jury panel of the
notion that old chips -- the relationship between old

chips and current chips is a powerful issue, and these people have that as a plant policy, selling goods that have gone into the stream of commerce and being confused with ours.

MR. HILL: Your Honor, this has nothing to do with the issue that was raised in jury selection.

MR. DURST: If they didn't want expired chips and old chips and that issue in the case, Mr. Hill should not have opened that door in voir dire, Your Honor.

THE COURT: I'm not saying that I won't allow you to get in that area. I don't see it at this point. I don't think that opens the door to the issue. I really don't.

MR. DURST: We'll raise it at a later point then, Your Honor.

THE COURT: I didn't think it is imputing -- I didn't take it that way. Maybe I am being too generous, but I didn't take it that way.

So anything else?

MR. HILL: We'd like to open, Your Honor.

THE COURT: Yes. How much time are you planning on hoping to have?

MR. HILL: All that you will give us, Your Honor.

1          MR. DURST:  Indeed.

2          MR. HILL:  I would -- the last thing I

3   want is the guy that's got to go second is to spill over

4   to tomorrow.  So I would ask the Court to give us as

5   close to an hour a side as you can and turn us loose.

6          THE COURT:  Let me ask you how important

7   is it to do the patent video?  It's 15 minutes.

8          MR. HILL:  We can skip it.

9          THE COURT:  In this case, I'm not sure

10  it's that important.  I only do that if both sides agree

11  to it.

12         MR. HILL:  Or we could even play it

13  tomorrow, Your Honor, after the openings.  No reason

14  they have to see it before.

15         THE COURT:  That's true.  I just

16  mentioned that.  That's what I will do just to save

17  time.

18         MR. HILL:  And, Your Honor -- if I could

19  ask one thing.  I know it may be the Court's commitment.

20  If the jury blesses in advance of 10 minutes or 15

21  minutes so that we get a complete opening today, we

22  don't have to retread this ground.

23         THE COURT:  I will take care of that.

24  Before I tell the jury you get each an hour, you're

25  going to stay within an hour each?

1          MR. HILL:  I will stay within an hour,

2   Your Honor.

3          MR. DURST:  I can stay within an hour,

4   Your Honor.  That's not my preference, but I can do

5   that.  I mean, the other option is opening tomorrow,

6   right?  It's not very attractive of an option.

7          MR. HILL:  No.  We'd like to open today,

8   Your Honor, and we could certainly commit to an hour to

9   get it done.

10          THE COURT:  Well, we will try -- by the

11  way, my rule on day one is not going beyond

12  5:00 o'clock, and I try to be mindful to the jurors,

13  because they have to drive, some quite a distance.

14          MR. HILL:  The only thing we couldn't

15  accept, Your Honor, would be they get to open today, and

16  we would have to until tomorrow.  We wouldn't want that.

17          THE COURT:  I don't want that either.

18          MR. DURST:  Your Honor, shall we do a

19  little bit of math here?  So you're going to read the

20  preliminary instructions.  Those are 15 pages long or 10

21  pages long?

22          THE COURT:  I talk quickly, but these are

23  longer than my normal preliminary instructions, so --

24          MR. DURST:  So that's 20 minutes

25  probably.  Probably 20 minutes.

1          THE COURT:  I don't want to get into the

2  case and be -- but I do think that -- here's the problem

3  we face, is that I want the jury's full attention in

4  this case, and I know that if we get to the 5:00 o'clock

5  hour, they are going to be antsy.

6          So what about me doing the preliminary

7  instructions with the video, and then just stopping for

8  the day and doing openings in the morning, knowing that

9  it may spill over into the -- I told y'all the two-week

10  period, but I do have time.  I'm flexible with my

11  schedule.

12          And I just don't want to make any

13  shortcuts, and I agreed to allow Mr. Durst a little

14  extra time.  I believe he wants between an hour and

15  75 minutes.

16          MR. DURST:  I'm fine with that, Your

17  Honor.

18          THE COURT:  Both sides okay with that?

19          MR. HILL:  Your Honor, we will certainly

20  accept that too.  My only other suggestion is we can

21  read all preliminary instructions after argument.  We

22  argue today and they get all the charging in the

23  morning.

24          THE COURT:  Well, now I have to give my

25  preliminary instructions before we begin the case.

1  That's sort of how I want to do it.

2                   So -- okay.  Are we ready?

3                   MR. DURST:  Yes, Your Honor.

4                   THE COURT:  Okay.  Let's go ahead and

5  bring the jury in.

6                   COURT SECURITY OFFICER:  All rise for the

7  jury.

8                   (Jury in.)

9                   THE COURT:  Please be seated.

10                  Ladies and Gentlemen, I'm about to give

11 you my preliminary instructions.  These are the

12 guidelines as we begin the trial.  Sit back and enjoy

13 and please pay attention.

14                  Ladies and Gentlemen of the Jury,

15 congratulations.  You have now been sworn in as the jury

16 who will hear and decide this case.  Your role as a jury

17 is to decide all disputed questions of fact, and it's my

18 role as the Judge to decide all questions of law and

19 procedure.

20                  I will provide you with instructions on

21 the rules of law and procedure that you must follow in

22 making your decision.

23                  I am now giving you some preliminary

24 instructions, and at the end of the trial, I will give

25 you more detailed final instructions on the law and

procedure that you must follow in reaching your verdict

in this case.

           The party who brings a lawsuit is called

the Plaintiff.  In this action, the Plaintiff is

Frito-Lay North America, Inc., who we will refer to as

either the Plaintiff or as Frito-Lay.

           The party against whom the suit is

brought is called the Defendant.  In this case, the

Defendants are Medallion Food, Inc., and Ralcorp

Holding, Inc., who will be collectively referred to as

Medallion.

           This is a case with alleged patent

infringement, misappropriation of trade secrets, unfair

competition and trade dress infringement and dilution.

           At this time, I will give you my

preliminary instructions, and then you will hear the

attorneys' opening statements.

           An opening statement is an overview of

what each side expects the evidence to show -- I think I

misread that.

           The opening statement is an overview of

what each attorney expects the evidence to show, but

what the attorneys say is not evidence.  It is only

intended as a roadmap to help you understand the

evidence as you hear it during the course of the trial.

After opening statements, the Plaintiff will present its evidence, and then the Defendants will present their evidence, and finally, the Plaintiff will present rebuttal evidence.

Once all the evidence is in, both sides will present their closing argument after which I will give you my final instructions, and finally, you'll retire to the jury room to begin your deliberations to reach your verdict at that time.

Now, during the course of the trial, you should keep an open mind until you have heard: (1) all the evidence; (2) the attorneys' closing arguments; and (3) my final instructions called the Court's charge.

Be sure to pay close attention to all the testimony and the evidence. To help you, you may take notes during the trial if you wish. If you decide to take notes, consider note-taking in evidence -- if you decide to take notes, consider noted testimony and evidence that you not only disagree with but also agree with.

You do not have to take notes, but if you do, do not get so involved in your note-taking that you become distracted and miss part of the testimony. Your notes are to be used only as aids to your memory, and if your memory should later be different from your notes,

you should rely on your memory and not on your notes.
If you do not take notes, rely on your own independent
memory of the testimony.  Do not be unduly influenced by
the notes of other jurors.  A juror's notes are not
entitled to any greater weight than the recollection of
each juror concerning the testimony.

Until this trial is over, do not discuss
the case with anyone and do not permit anyone to discuss
this case in your presence.  This includes your family,
friends, and even your fellow jurors.

The very first time you should ever
discuss this case is at the end of the case when you and
your fellow jurors retire to the jury room and actually
begin deliberating on your verdict.

If anyone should attempt to discuss the
case or approach you concerning the case, you should
inform me through my court staff immediately.

Now, during the trial, you should hold
yourself completely apart from the people involved in
the case:  The parties, the witnesses, the attorneys,
and the persons associated with them.

It is important that you not only be fair
and impartial but also that you appear to be fair and
impartial.  That is why you should not have contact with
any of them.

1          Also, you may not communicate

2   electronically with anyone about the case.  You may not

3   communicate with anyone about the case on your cell

4   phone, through e-mail, BlackBerry, iPhone, text

5   messaging or on Twitter, through any blog or website,

6   including Facebook, Google, MySpace, LinkedIn, or

7   YouTube.

8          You may not use any similar technology

9   even if I have not specifically mentioned it here.

10  I expect you will inform me as soon as you become aware

11  of another juror's violation of these instructions.

12          Now, you should not make any independent

13  investigation of any fact in this case.  Do not learn

14  anything about the case from any other outside source.

15  Do not watch TV or read the newspaper about the case.

16  Do not use any kind of Internet search engine, such as

17  Google, to find out more information about the case, the

18  parties, or the attorneys in the case.

19          For example, if you have a home computer,

20  during this case, do not go home and get on your home

21  computer and start trying to figure things out.

22          In other words, you should not consult

23  dictionaries or reference materials, search the

24  Internet, website, blogs, or any other electronic tools

25  to obtain information about this case or to help you

decide the case.  You are to be guided only by the evidence in this case, only by what you see and hear in the courtroom, not by anything else.

Now, during the trial, it may be necessary for me to confer with the lawyers outside your presence or to conduct a part of the trial outside of your presence.  I will handle these matters as quickly and conveniently for you as I can, but you should remember they are a necessary part of the trial.

Now, this is a case with claims for patent infringement, trade dress infringement and dilution, and misappropriation of trade secrets and unfair competition.

I will now summarize each side's contentions and the general legal principles that apply in this case.  At the end of the trial, I will give you more detailed instructions regarding the law that you must follow in deciding the issues that are presented to you.

There are three types of intellectual property at issue in this case:  Trade secrets, trade dress, and patents.

Trade secrets and unfair competition.

Frito-Lay contends that Medallion competed unfairly by misappropriating the value of the

time, skill, and labor Frito-Lay spent in developing

their Tostitos SCOOPS! tortilla chips.

Frito-Lay also contends that Medallion

misappropriated Frito-Lay's trade secrets.

Medallion denies that the information at

issue is a trade secret, denies that they

misappropriated any trade secrets from Frito-Lay, and

denies that they competed unfairly.

Now, unfair competition is the

appropriation and use by a defendant in competition with

a plaintiff of monetary and financial or property

interest created by a plaintiff through the expenditure

of time, labor, skill, or money.

A trade secret is any formula, pattern,

or device, business or marketing plan, customer list or

other information used in a business which gives the

owner an opportunity to obtain an advantage over

competitors who do not know or use it.

Information that teaches what not to do

or what not to try may be a trade secret.

Now, misappropriation of trade secrets

requires that:

1.  The trade secret existed;

2.  That Medallion breached a

confidential relationship or obtained the trade secret

1  through improper means;

2              3.  That Medallion used the trade secret

3  without authorization from Frito-Lay;

4              And then 4.  Frito-Lay suffered harm as a

5  direct and proximate cause of such use.

6              I will give you more detailed

7  instructions to assist you in deciding whether something

8  is a trade secret at the end of the trial in my final

9  charge.

10             Trade dress.

11             Frito-Lay also asserts that Medallion

12 infringed and diluted Frito-Lay's trade dress rights in

13 the Tostitos SCOOPS! chip design and the Tostitos

14 SCOOPS! packaging.

15             Medallion denies any alleged trade dress

16 infringement.  They also contend that Tostitos SCOOPS!

17 chip design is not protectable trade dress because it is

18 functional.  The Defendants also contend that Frito-Lay

19 has abandoned its trade dress rights in the Tostitos

20 SCOOPS! chip design.

21             Now, trade dress refers to the design or

22 configuration of a product and/or packaging of a product

23 that a company uses to identify and distinguish its

24 products from products manufactured or sold by others.

25             The first company to use trade dress and

1  distinguish its product in the marketplace can acquire

2  the exclusive right to use that trade dress and the

3  right to exclude others from using it.  Ownership of

4  trade dress rights is established through use.

5              A trade dress owner can exclude others

6  from using its trade dress or a similar trade dress that

7  is likely to cause confusion, mistake, or deception as

8  to the source or sponsorship of the accused party's

9  products or likely to dilute the distinctiveness of the

10  owner's trade dress.

11              The likelihood of confusion can be shown

12  by a similarity between the trade dress, the products,

13  and the places they are stored or marketed, any intent

14  to copy the Plaintiff's trade dress and any actual

15  confusion or evidence of confusion presented through

16  consumer surveys.

17              However, proof that an actual confusion

18  occurs is not required.  Confusion can occur at any

19  point the consumers encounter a product before buying

20  it, at the moment of purchase, or after buying it.

21              Trade dress that is functional under the

22  law is not protectable.  The determination of whether

23  something is functional is made by considering the trade

24  dress as a whole.

25              Trade dress is considered functional if

1  (1) it is essential to the use or purpose of an article

2  or affects the cost or quality of the article, or (2) it

3  is a feature exclusive -- it is a feature of the

4  exclusive use, which would put competitors at a

5  significant non-reputation-related disadvantage.

6          Abandonment is a defense against trade

7  dress infringement.  Abandonment requires proof that the

8  trade dress owner ceased using the trade dress and

9  intended not to resume using it.

10          Patents.

11          Frito-Lay also contends that Medallion

12  willfully infringed one of Frito-Lay's patents.

13          Frito-Lay contends that Medallion used a

14  manufacturing process that infringes Claims 1, 5, 6, 7,

15  8, and 12 of the patent.  Medallion contends they have

16  not infringed the patent willfully or otherwise.

17          Now, generally, there are two questions

18  you may be called upon to answer at the end of the case

19  regarding this patent claim:

20          (1) Is there infringement?

21          And (2), if so, what are the damages?

22          Now, there's one patent involved in this

23  case, which you've heard it already referred to as

24  6,610,344, but the patents are usually referred to as

25  the last three digits, which you've heard the attorneys

mention.  So it will be referred to throughout the trial

as the '344 patent.

The patent-in-suit generally relates to

the process for making shaped tortilla chips.  You'll

hear more about the invention during the opening

statements.

I'm now going to play a short video for

you.  This video provides information as an introduction

to the patent system.

(Patent video playing.)

THE COURT:  Now, you just saw the video

that provided a good overview of the U.S. patent system

and how it works.  The video also showed a sample

patent.

Now, during the course of the trial or at

the end of the trial, you will have the opportunity to

look at the patent at issue in this case.  You'll

actually have a chance to look at it and see it.

The cover page of the '344 patent

provides identifying information, including the date the

patent was issued and the patent number along the top,

as well as the inventors' names, the filing date, the

assignee, and the list of prior art publications

considered by the Patent Office when deciding to issue

the patent.

1          Then you will see the abstract, which,

2    again, is a brief statement about the subject matter of

3    the invention.  On the next several pages, you'll see

4    drawings, which are -- in this patent, the '344 patent,

5    appear as Figures 1 through 12.

6          The drawings include various aspects or

7    features of the invention, and they are described in the

8    words later in the patent.

9          The written description of the invention

10   would appear next.  In the portion -- in this portion of

11   the patent, each page is divided into two columns, which

12   are numbered at the top.  The lines on each page are

13   also numbered going down the middle column.

14          When you see a reference during the trial

15   to a column and a line number, you can go to that part

16   of the patent to locate it.  The written description of

17   the '344 patent begins with Column 1, Line 1, and

18   continues to Column 8, Line 54.

19          It includes a background section, a

20   summary of the invention, and a detailed description of

21   the invention, including some specific examples.

22   The patent ends with numbers -- numbered paragraphs,

23   which are called claims.  The claims may be divided into

24   a number of parts referred to as claim limitations.

25          In the '344 patent, the claims begin at

Column 8, Line 5, and continue to the end of the patent at Column 10, Line 52.

Now, the claims of a patent are the main focus of a patent case, because the claims are what define the patent owner's rights under the law. That is, the claims define what the patent owner may exclude others from doing during the term of the patent.

The claims of a patent serve two purposes. First they set out the boundaries of the invention covered by the patent. And second, they provide notice to the public of those boundaries.

The claims of a patent are what are -- are what are infringed when patent infringement occurs because the claims define what the patent is.

Thus, when a product or method is accused of infringing a patent, the patent claims are compared to the accused product or method to determine whether there is infringement. In reaching your determination with respect to infringement, you must consider each claim separately.

Now, patent claims may exist in two forms: Independent and dependent claims. In the '344 patent, Claim 1 is what is called an independent claim.

An independent claim does not refer to any other claim of the patent.

1    Thus, it is not necessary to look to any

2 other claim to determine what Claim 1 covers.  Claim 1

3 starts at Column 8, Line 55, and ends at Column 9,

4 Line 2.

5    Now, Frito-Lay's system or process for

6 making Tostitos SCOOPS! is not relevant to whether

7 Medallion's manufacturing process infringe Frito-Lay's

8 '344 patent.

9    Therefore, you are directed not to

10 consider the actual system and process used by Frito-Lay

11 in determining whether Medallion's manufacturing process

12 infringes any claim of the '344 patent.

13    The correct comparison for the purpose of

14 patent infringement is to look at the asserted claims of

15 the '344 and Medallion's manufacturing process.

16    Now, when the claims define the

17 invention, sometimes there's a disagreement between the

18 parties as to what certain words in the claims mean.

19 When this happens, they ask the Court to interpret those

20 terms in light of the patent as a whole.  This is to

21 help resolve their disagreement and to give you, the

22 jury, guidance in applying the claims to the facts of

23 the case.

24    Now, this has happened in this case, and

25 sometime prior to trial, we had a hearing, I heard

arguments, and then rendered a claim interpretation of
the disputed terms.

     The claim construction of those terms
will be set forth in the Court's charge that will be
given to you at the end of the trial.  You must use
these meanings when you decide the issues of
infringement in this case.

     Now, as I mentioned earlier, there are
really two questions at issue with respect to the '344
patent that you will be asked to resolve by the verdict
you return in this case.  Those issues related to the
'344 patent are infringement and damages, and Frito-Lay
has the burden of proof on issues of infringement and
damages.

     Also at issue in this case are claims for
trade dress infringement and dilution and
misappropriation of trade secrets and unfair
competition.

     There are two different burdens of proof
that you must consider when deciding these issues.  I
will give you more instructions in my final instructions
regarding which burden of proof applies to which claim.

     Now, in any legal action, facts must be
proved by what -- as a -- start over again.

     In any legal action, facts must be proved

by a required standard of evidence known as the burden
of proof.  You must -- you have probably heard of the
beyond-a-reasonable-doubt burden of proof that's
required in criminal cases.  This is the very highest
burden of proof that is not involved in this case.

There are two different burdens of proof
that are involved in this case.  The first one is what
is called preponderance of the evidence, and the second
is called clear and convincing.

Now, the preponderance-of-the-evidence
burden of proof means that you must be persuaded that
what the party seeks to prove is more probably true than
not true.

Put it another way.  If you were to put
the evidence for and against the party who must prove
the fact on opposite sides of a scale, the
preponderance-of-the-evidence standard requires the
scale to tip at least somewhat toward the party who has
the burden of proof.

The clear-and-convincing burden of proof
means that the evidence must produce in your minds a
firm belief or conviction as to the matters sought to be
established.

In other words, if you were to put the
evidence for and against a party who must prove a fact

on opposite sides of a scale, the clear and convincing

evidence requires that the scales tip more heavily

toward the party who has the burden of proof.

Now, normally, during the trial of a

case, only the lawyers for the parties ask questions of

the witnesses.  In this case, I'm going to do something

different.  I'm going to permit the jurors to also ask

questions of the witnesses.

Now, this is the first time I've used

this procedure during a trial, so you are my guinea pigs

on this procedure.  It is my hope that this procedure

will be helpful to you.  So we are going to do it in

this case, and I want to explain though how it's going

to work.

After the attorneys are through

questioning each witness, each of you will have the

option of submitting written questions for the witness.

I will give you these jury questionnaire forms --

they'll be blank -- that will allow you to fill in your

questions.

If during a particular witness's

testimony, you believe that there is something important

that you would like to ask the witness, you may write

your question in the form, enter the name of the

witness.

1            After the attorneys have completed their

2    questioning of the witness, I will then ask each juror

3    to pass their form to the court security officer.  You

4    should pass a form even if it is blank.  By doing this,

5    the identity of the juror asking the question would not

6    be readily apparent.  There's also no need to put your

7    name on the form.

8            The Court will then take a short recess

9    to consider your questions for the witness.  During the

10   recess, the Court will review the questions with the

11   attorneys.  The Court will then decide whether it

12   believes the question is appropriate.

13           And I'll make that ultimate decision, so

14   please do not be offended if I don't ask any questions

15   you submit to the Court or if I rephrase it.  It has

16   nothing to do with the attorneys; it's me deciding

17   whether or not that's an appropriate question or not.

18           After you return from the recess, the

19   Court will then ask the witness the questions it

20   believes are appropriate, and the witness will then

21   answer the questions to the jury.

22           After the witness answers all the jurors'

23   questions, the Court will allow the attorneys, if they

24   desire, to ask any follow-up questions.

25           It is my hope that allowing you to ask

questions will be -- allow you to be more engaged in the

proceedings and get the information you need to reach a

just verdict.

My one concern about the procedure is

that it not become too time-consuming.  Please do not

feel compelled to ask questions even if you -- if you do

not feel it necessary.

At the same time you should not be afraid

to ask a question if you believe it will help you better

understand the witness' testimony.  Your questions

should be limited strictly to the witness' testimony,

and you should not ask questions that are unrelated to

the specific testimony of that witness.

Again, the Court will decide whether your

question is appropriate and whether it should be asked.

You should not draw any adverse inference against any

party should the Court decline to ask a question or if I

rephrase a question that you have submitted.

Now, this just about concludes my

preliminary instructions.

Now, you have two duties as jurors.  Your

first duty is to decide the facts from the evidence in

the case.  Your second duty is to apply the law that I

give to you to the facts.

Perform these duties fairly and

impartially.  Do not allow sympathy, prejudice, fear, or public opinion to influence you.

Do not be concerned if you feel a little lost at this point.  I will give you -- I'll be giving you much more detailed final written instructions at the end of the case, and you will have all these instructions -- that you will have all these instructions in much greater detail accompanied by the verdict form that we will ask you the questions that will go to these claims and defenses.

You will also have the opportunity to have those final instructions with you as I read them to you at the end of the case.

By the time you get the verdict in this case, you will have a better understanding and confidence in answering those questions as we complete all the evidence.

Also, let me assure you, you do not have to be an expert on the law to be applied to this field of the invention.  We have very fine attorneys on both sides, and they will do a good job of simplifying and explaining all this to you, and they will also call very capable experts who will help you understand the issues and facts of this case.

By the end of the case, with the

assistance of the testimony and the evidence in the case
and the Court's charge, it is my hope that you will feel
very comfortable in deciding the issues in this case.

Now, let me just ask the parties, are you
planning on invoking the Rule?

MR. HILL:  Yes, Your Honor.

THE COURT:  So do we have witnesses here
that would not be excused from the Rule that are in the
courtroom?

MR. HILL:  I don't believe we do at this
point, Your Honor.

THE COURT:  Okay.  That's fine.

Now, Ladies and Gentlemen of the Jury, at
this time, we would typically go into the opening
statements.

However, because of the long nature of
the day and because of -- I run a kind of strict
timeline.  We run a schedule from 9:00 to 5:00.  That's
our schedule each day, and I do my best to make sure we
are completed by 5:00 o'clock every day.

I know that everyone has a drive to make,
and the closest juror is about 30 minutes away, and
everyone else is even further.  So we'll run that kind
of schedule.

There's no way to get the opening

statements done before 5:00 o'clock, before the end of

the day, so I'm going to release you a little bit early

today, and then we'll have opening statements in the

morning.

Now, the same instructions I gave you in

the preliminary instructions, I'm going to repeat again,

and you'll hear this at every break. I know this case

is interesting to you, and I think you're going to be

very engaged in the case, but you cannot go and discuss

this case with anybody else.

You can't go do any research, and you

will not discuss this case with anybody until you are

instructed by me at the end of the case to discuss it

with -- when you go to -- with the other jurors when you

go to retire.

I know and understand that you're going

to want to talk to your family about it, but you cannot

do that at this time. Once the case is over, you will

have that opportunity to do so. But until then, you

cannot do that.

And so it's something that's -- I'll be a

broken record. I'll be repeating that instruction

constantly.

Now, tomorrow we are going to start again

at 9:00 o'clock. And just for your pleasure, tomorrow

is a holiday in my book.  It's called Fat Tuesday, and
my chambers will have certain sweets, and I'll make sure
you have some cookies tomorrow in celebration, so you
can share it, and my staff will also be sharing those
tomorrow.

So I'll be sugaring you up in the
morning, so you'll really be paying attention tomorrow
at 9:00 when we start opening statement.

So on that, you'll have your notepads,
and then your -- you can have those again -- please
bring those in tomorrow whenever we come back in, so you
can take notes if you desire to do so.

I'm now going to excuse you at this time,
and we'll see you -- if you'll be back here just before
9:00 o'clock, we'll do our best to start at 9:00 o'clock
in the morning.

So thank you.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  Please be seated.

Anything else?  Do we know where we're
going?

MR. DURST:  Yes, Your Honor.  There are
some things -- let me get to the mic.

There may be some things, Your Honor, if

1  the Court's schedule permits, that we could bang out now

2  that would save us some time as we move forward over the

3  next couple of days.

4  THE COURT:  Of course.

5  MR. DURST:  Got a number of items.  Let

6  me start with, Your Honor, the unobjected-to exhibits.

7  We have a list of the exhibits on our side of the case,

8  the Plaintiff's exhibits that are unobjected to.

9  And I see here that our Exhibit 95 is on there, so I

10  guess y'all didn't object to that, it sounds like.

11  But other than that, Your Honor, we have a list of the

12  exhibits for which, after an extensive back-and-forth

13  process, we've either resolved all the objections or the

14  objections were not made in the first place.

15  So how would the Court like to do that?

16  Can I offer it to the Court?  Surely, we don't need to

17  read the numbers.  I'd be happy to --

18  THE COURT:  No, we don't need to read the

19  numbers.  What you can do is, is that you can tender

20  that to Ms. McCord now, if you'd like, and what I will

21  do is, after closing arguments -- or after opening

22  statements have finished, that's the first thing I will

23  do, is I will inform the jury, before we call the first

24  witness, whenever that happens, tell them that all

25  exhibits that -- by both sides, which were unobjected to

or -- will be admitted into evidence at that time.

MR. DURST: All right, Your Honor. Then I will hand up two copies of this.

THE COURT: That will be great. Thank you.

MR. HILL: Your Honor, with regard to the copies he's handing up, I don't think we've had a chance to review those. We'd like to review it, of course, before they're moved in formally in the morning. We will have a list in the morning as well. And we understand -- I guess it's the Court's intention to move these in on the record, because that's when we need to do it, is on the record in front of the jury to actually move them in.

THE COURT: Well, it's not necessary in that sense. What I would do is, he's submitted all the exhibits that they're offering, that have not been objected to. And so I would just make a general statement that those are being admitted into evidence at this time.

MR. HILL: Okay. All right.

THE COURT: I'll do that in front of the jury.

MR. HILL: Okay.

THE COURT: So you can give the same

1   list -- I mean, there should be no issue here because

2   these are unobjected-to exhibits.  They were on your

3   exhibit list.  Of course, I want you to review it and

4   make sure --

5               MR. HILL:  That's -- we just want a

6   chance to verify that, Your Honor.

7               THE COURT:  I know.  Make sure there's

8   nothing slipped in.  I'm sure that's not been the case.

9               MR. HILL:  Well, there's been some

10  movement of late, so we want to make sure of what we've

11  got.

12              THE COURT:  I understand.  So you can

13  look at those, but that's the plan unless you tell me

14  something different, if there's a problem --

15              MR. HILL:  Okay.

16              THE COURT:  -- that's what I would do

17  after opening statements.  And I assume we'll need a

18  break after both opening statements, and then I'll do it

19  right after that before we call -- before Plaintiff

20  calls their first witness.

21              MR. HILL:  Thank you, Your Honor.

22              THE COURT:  What's next?

23              MR. DURST:  Next, Your Honor, we have an

24  objection to a demonstrative that they have proposed to

25  use in opening statement that we lodged at the time they

were exchanged last evening, and our suggestion would be that we take that up now.

So that objection, Your Honor, is -- they certainly have their opening -- their --

MR. HILL:  We do.  I can switch over, and we can put it up.  It's the claim constructions, Your Honor.  We made a chart.

Can you put it up the construction chart? There we go.

MR. DURST:  The objection to this, Your Honor, is with respect to the second item:  To form essentially even ranks.  The -- I'm sorry.  The third item -- sorry -- alignment belt:  A belt on which uneven rows of pieces are adjusted.

The Court will recall that you added into that construction that there is not a requirement that the rows be uneven.

And so our objection is that that construction of that term should include that limitation that the Court put on it.

MR. HILL:  Your Honor, we were just unsure about it.  The Court had put that in parentheticals, and it said note, and then it had this other statement.  We didn't know whether that was formally a part of the claim construction you would want

1  in front of the jury or not a part, so...

2              THE COURT:  I'll have to go back.  I

3  don't have that in front of me.  It's on my desk, my

4  claim construction order.

5              MR. HILL:  We're happy to do it either

6  way.  We just -- we thought that was the complete

7  construction, and that was just an advisory note.  We

8  didn't put the extra language in.

9              THE COURT:  When we adjourn, I'll go back

10  and look at it, so I can get -- I can't tell you in the

11  abstract here, because I didn't look at that again,

12  so -- but whatever my claim construction is, that's the

13  only objection is using this -- you're saying it doesn't

14  match up to what I did, my claim construction.

15              MR. DURST:  Right.  And it's really just

16  that specific language on the alignment belt and the

17  Court's -- the Court's -- about not requiring uneven

18  rows.

19              THE COURT:  If you'll stay here, I'll

20  check that.  I just want it to be the same, whatever I

21  ordered.  I'll go back and --

22              MR. HILL:  We're checking.  Judge, I've

23  got the order here, a copy of it, if you'd like.

24              THE COURT:  That's fine.

25              MR. HILL:  That helps.

1          THE COURT:  Do you remember what term?

2          MR. HILL:  It was for alignment belt.

3          THE COURT:  I know, but --

4          MR. HILL:  Off the top of my head, I do

5   not, Your Honor.  I apologize.

6          (Pause.)

7          THE COURT:  I see what you're saying.

8   The way the Court -- the Court construed that as a belt

9   on which uneven rows and pieces are adjusted into

10  essentially even rows.  That's the construction.

11  But then I kind of -- I don't know what you want to call

12  it.  I added another little statement saying, but the

13  Court also notes this construction does not require the

14  presence of an uneven row limitation to be met, so...

15          MR. HILL:  Your Honor, we viewed that as

16  an indication to the parties of what was still available

17  in an infringement/non-infringement argument, not a

18  portion of the claim construction.

19          THE COURT:  I agree.  I agree.  It's not

20  part of the claim construction term.  So that's not the

21  Court's intent, to put that -- that's not part of the --

22  that's not the actual way to define the term.

23          MR. DURST:  Your Honor, it's a little

24  more than just an infringement argument.  It is -- it is

25  a -- and this is going to be up in front of the jury,

1  and we all know the esteem that the Court will be

2  held -- in which the jury will hold the Court.

3                And this is going to be Mr. Hill telling

4  the jury that this is what Your Honor said about these

5  terms.  And one piece of the meaning of alignment belt

6  is that it does not require uneven rows.

7                So it's more than just -- a

8  non-infringement argument would be them saying that

9  they -- they don't have uneven rows.  But this proviso

10  that the Court put in there is part of the order that

11  the Court gave with respect to what these terms mean.

12                THE COURT:  Right.  I understand that.

13  I'm just saying, what's the best way to --

14                MR. DURST:  I'm fine if they put it in

15  parenthesis, like Mr. Hill suggested.  I --

16                MR. HILL:  Your Honor, we see that as

17  instructing the jury on the claim construction with

18  something that's not a portion of the Court's

19  construction.  We think it tells Mr. Durst what he can

20  certainly present as an infringement theory still, and

21  we couldn't claim that he's arguing against the claim

22  construction based on that.

23                But that's the construction.  So that's

24  what ought to be in front of the jury when they get

25  their charge at the end of the case, and it's what we

were going to put in front of them to argue the claim

construction issues as we go.

             THE COURT:  All right.  I agree.  I just

don't see that as -- I don't see that as part of -- the

claim construction is what's involved.

             So, now, we'll see if it's something we

actually need to add in the Court's charge or something

to make sure, if it becomes an issue, but -- so I guess

the objection's overruled.

             MR. HILL:  Thank you, Your Honor.

             MR. DURST:  So you're overruling the

objection on that, Your Honor?

             THE COURT:  Yes.

             MR. DURST:  I want to make that clear for

the record.

             THE COURT:  I did.

             MR. DURST:  Okay.  Okay.  So we are not

prohibited from putting up, obviously, what the Court

actually wrote, including that proviso, I suppose.

             THE COURT:  Of course.  I'm not

preventing you from doing that either, so...

             MR. DURST:  Just a housekeeping matter,

Your Honor, one more.  In the Court's Motion in Limine

rulings, most of those were made mutual, and there was

one, I think, that the Court intended to be mutual, but

as it was modified, that language was not included in
the ruling.

This is the Court's ruling on Defendant's
Motion in Limine No. 8, which is the net worth salary or
compensation of the Medallion and Ralcorp employees, and
the Court will recall we had a little dialogue about Mr.
Vickery and Mr. -- and Ms. Price.

And the Court will permit us to present
evidence on those two, but as to all other employees,
both their employees and our employees, our
understanding was that this was mutual. I think that
was the intent.

MR. HILL: We have no intention to bring
up their employee compensation, Your Honor.

THE COURT: I think that's -- sorry about
that. That's my mistake.

So everyone is clear that was -- it was
meant as mutual.

MR. DURST: All right. And under the
last item I have for today is just a housekeeping item
with respect to how the Court wants to handle certain
objections.

The Court has overruled some items with
respect to motions in limine to which I would like to
have an objection in the record. Would the Court like

1  to -- perhaps the most efficient way is for that to

2  happen this afternoon on the record, is just a handful

3  of items that relate to the motions in limine.

4  The Court has already ruled on them.  I don't intend to

5  reargue these, but I think we need something in the

6  record -- the trial record that shows we objected to a

7  handful -- a half dozen or so particular items that I

8  expect to be in opening statement tomorrow.

9            THE COURT:  Okay.  That's fine.

10           MR. DURST:  One is reliance on advice of

11  counsel.  We stated the basis for that objection in our

12  motion in limine, Your Honor, both the Wheelock opinion

13  and the Adkins opinion.

14           THE COURT:  So these are the objections

15  you're anticipating on what his opening statement is

16  going to be?

17           MR. HILL:  I think he's -- that's what it

18  sounds like, Your Honor.

19           THE COURT:  I mean, I'll give you a

20  chance to make a record.  If you don't want to stand up

21  in opening statement and make an objection, that's fine.

22  I'll let you make a record after we're done with opening

23  statements.

24           Is that what you're trying to do now

25  or --

```
 1                    MR. DURST:  Yes.  And I just thought it

 2    would be more efficient to do it now.  It will go quick.

 3    I think it's only a half a dozen or so.  As I said, I'm

 4    not trying to reurge, but if the Court would rather us

 5    do it after opening, I just thought we had a little bit

 6    of time to --

 7                    THE COURT:  No.  I mean, I'll let you do

 8    it now, but we haven't heard opening statements, so --

 9    go ahead.

10                    MR. DURST:  Well, it's not just with

11    respect to opening statements, Your Honor.  I mean, I --

12    if I could, I'd like to have a running objection on this

13    reliance on advice of counsel because --

14                    THE COURT:  Oh, I don't do running

15    objections, so --

16                    MR. DURST:  Okay.  Well --

17                    MR. HILL:  Your Honor, trial objections

18    are a part of the trial, and when we offer evidence that

19    he has an objection to, he ought to object, as will we

20    to make our record.

21                    THE COURT:  No.  I agree.  I mean, I

22    don't do it that way.  That's -- because a motion in

23    limine is just a motion in limine.  It's not to prevent

24    any error whatsoever, so...

25                    MR. DURST:  Well, Your Honor, we object
```

to any presentation in opening statement or suggestion

that the Defendants relied on advice of counsel on the

basis that we stated in the prior briefing to the Court.

THE COURT:  That's fine.  I mean, I want

to be consistent when I overrule that -- I overrule the

objection, if they're going to make any reference to

that.  That's fine.

MR. DURST:  Same with respect to patent

application, Your Honor, the Defendant's patent

application.  We object to presentation of evidence with

respect to Defendants' application to the jury.

THE COURT:  Assuming he makes that, then

I'll overrule that objection, just as I did the motion

in limine.

MR. DURST:  And, Your Honor, we heard a

little bit of this, I think --

THE COURT:  And, Mr. Durst, maybe things

will change when the evidence -- as the evidence goes

on, but for the purposes of opening statement, that's

the case.

MR. DURST:  I appreciate the courtesy,

Your Honor.  I don't really want to interrupt

Mr. Hill's -- or whoever is going to be doing it --

opening statement tomorrow.  So I just kind of wanted to

iron these things out.

                    This one, I think, we heard a little bit

about in voir dire today, the comparison of Frito-Lay's

alignment system to Defendants' alignment system for

purposes of infringement.

                    The Court overruled that, I think, and

gave a -- gave a limiting instruction, but, Your Honor,

Frito-Lay objects to that presentation of that sort of

argument.

                    THE COURT:  And that's overruled.  I've

already given the jury a limiting instruction on that.

                    MR. DURST:  And that is -- Your Honor,

the Court -- the Court gave a limiting instruction on

that and then issued -- this is the one on which the

Court issued a separate opinion and allowed it in for

certain purposes.

                    Our objection, Your Honor, just to be

clear for the record, Frito-Lay's objection to that is

that that type of comparison is improper for any

purpose, including willful infringement.

                    THE COURT:  It's overruled.

                    MR. DURST:  And the side-by-side

comparison of the accused products, the SCOOPS!, in

other words, the chips and SCOOPS!, a side-by-side

comparison of that, Your Honor.

                    We believe that is not in keeping with

the proper legal standards, and I expect that argument
in opening statement tomorrow, Your Honor, and I -- we
object to that.

        THE COURT:  That will be overruled.

        MR. DURST:  The use of monopoly and
monopolist, also, Your Honor.  We heard that in voir
dire.  I think we're going to hear it again tomorrow.
We object to the use of that term in argument as it's
improper in this context.

        THE COURT:  Overruled.

        MR. DURST:  And the last one, Your Honor,
is with respect to the market for bowl-shaped chips.  So
you heard a little bit in voir dire about where that
argument is going to go, and there was examination of
potential jurors about the effect on the market of
competition.

        Your Honor, any suggestion that the
verdict by this jury will do anything other than impact
the products offered by these Defendants, we believe is
improper, and we moved in limine on that.

        The Court limited the evidence that
Defendants can offer -- the arguments that Defendants
can offer to bowl-shaped chips, but we believe that
limitation is not enough, that their argument -- they
want to argue, I believe, Your Honor, that all

1   bowl-shaped chips will be excluded from the market.

2                   We believe that's improper from the

3   perspective that the only chips that are going to be

4   impacted by this jury's verdict will be these chips

5   offered by the Defendants.

6                   MR. HILL:  And that's the same issue you

7   ruled on in writing over the weekend, Your Honor, and --

8                   THE COURT:  I just realized I haven't

9   been asking you for any responses.

10                  MR. HILL:  Well, if the Court is staying

11  with its prior rulings, I have no responses.

12                  THE COURT:  I'm going to overrule that

13  objection.

14                  MR. DURST:  Those are the ones I wanted

15  to raise, Your Honor.

16                  THE COURT:  Very good.

17                  Yours?  Anything further from Defendants?

18                  MR. HILL:  There is one thing, Your

19  Honor.  As far as trial objections, we'll object at

20  trial.  And I hope once we're past opening statements,

21  that that's -- there won't be pre-objection or

22  post-objection as a way to try to preserve a record you

23  didn't preserve at the time.

24                  That's what we're -- the process was just

25  concerning me a little as I thought about the

1  implications, Your Honor.

2              THE COURT:  Well, we had some extra time,

3  and anyone -- all these things will come in in the

4  morning, so -- I do this a little bit differently, and

5  so he just didn't want to have to stand up and object.

6  I'm sure if something comes up, I'll let either side

7  make a record after the fact of additional items that

8  come up so they have all the records preserved.

9              MR. HILL:  Okay.

10             THE COURT:  I'm not trying to inhibit

11 anybody's ability to preserve a record and do it in the

12 most efficient way that we can.

13             MR. HILL:  Thank you, Your Honor.

14             There is one other issue the parties have

15 discussed this morning that we never have put on the

16 record, and we need to, and it's with regard to Claim

17 16.

18             Plaintiff is abandoning Claim 16 as we

19 discussed with the Court this morning, and Defendants

20 are abandoning without prejudice -- all without

21 prejudice here, their invalidity and inequitable conduct

22 allegations, affirmative defenses as to all claims.

23             THE COURT:  I guess you'll have to file

24 things unless you --

25             MR. DURST:  We will.  We have not done so

1  yet.

2             MR. HILL:  We have not done so.  We

3  thought it may be more efficient to just state on the

4  record that those claims are dismissed without prejudice

5  and be done with it.

6             THE COURT:  Whatever y'all's pleasure

7  is going to be --

8             MR. HILL:  That's our pleasure.

9             THE COURT:  -- from my perspective, so...

10            MR. DURST:  It will go quicker if we do

11 it right here.  I'm not sure that's the best way to do

12 it, but it will go quicker if we do it right here.

13 So I understand that the stipulation is that Frito-Lay

14 will dismiss without prejudice its claim against

15 Defendants Ralcorp and Medallion that they infringe --

16 that their process infringes -- or their product, for

17 that matter, infringes Claim 16 of the '344 patent and

18 that the Defendants are dismissing without prejudice all

19 of their defenses related to Claim 16, including the

20 validity -- invalidity and also the defense of

21 inequitable conduct with respect to the patent.

22            MR. HILL:  And, Your Honor, that's -- the

23 dismissal of our invalidity case is across the board.

24 It's not simply to Claim 16.

25            THE COURT:  Right.  That's what I --

1            MR. HILL:  It's dismissal without

2   prejudice of all claims -- all affirmative defenses of

3   invalidity or inequitable conduct.

4            MR. DURST:  And unclean hands, I think is

5   in your list of defenses.

6            MR. HILL:  And unclean hands as well.

7   Yeah, to the extent it relates to Claim 16 on unclean

8   hands.

9            Do we have an unclean hands defense on

10  Claim 1 or anything else?  No?

11            Oh, the unclean hands defense, Your

12  Honor, goes to more than just the patent claims.  That's

13  the distinction we're trying to draw.  In terms of the

14  other claims that the Plaintiff has made, state law

15  claims, as well as the other trademark-related claims,

16  that's a portion of our unclean hands defense.

17            So we're not turning loose anything

18  outside the patent context.

19            THE COURT:  Okay.  So -- essentially, so

20  the record is clear, you're dismissing all invalidity

21  contentions and all other inequitable or unclean hands

22  as it relates to the patent.

23            MR. HILL:  As relates to the patent.

24            That's correct, Your Honor.  All without

25  prejudice.

         1           THE COURT:  Essentially, defenses to any

         2    other claims, you're still asserting?

         3           MR. HILL:  Correct.

         4           MR. DURST:  And to be clear, this

         5    stipulation relates to claims, defenses, and

         6    counterclaims.  They had filed some counterclaims.

         7           MR. HILL:  Correct.  That's correct, Your

         8    Honor, all dismissed without prejudice.

         9           THE COURT:  Mr. Durst, is that your

        10    understanding?

        11           MR. DURST:  That is my understanding as

        12    well.

        13           THE COURT:  And you realize -- you'll see

        14    the transcript later, and if there's a problem, I'm sure

        15    you'll follow it up, and we can correct the record and

        16    make sure it's all clear.  I try, again, to be

        17    user-friendly, so in any way I can help.

        18           MR. WARD:  And the last thing, Your

        19    Honor -- and I don't think we have filed anything on

        20    this, but we had filed an emergency motion, and then the

        21    Plaintiff has filed a response.

        22           We aren't intending to file a reply, so I

        23    didn't know if you want to hear argument.  At some

        24    point, that's going to become an issue when we start

        25    presenting evidence.

1          THE COURT:  Raise it at 4:00 o'clock.  I

2  think y'all filed it on Sunday or -- so I'll let y'all

3  go ahead -- if you want to make a record, that's fine.

4  We can discuss that now.

5          MR. WARD:  Your Honor, we've got the --

6  the dispute is really pretty much narrowed down to two

7  areas.

8          One is whether or not the Plaintiffs need

9  to make their response in the form of an answer to the

10  interrogatory, which is where we thought we were before

11  we got the Court's order, and we are seeking

12  clarification on that.

13          And then there were three items that

14  we're asking for some additional detail on, and that was

15  attached as an exhibit, and it's included in the body of

16  the motion.  And that's these additional 19 areas that

17  they specify in the supplemental brief that they filed.

18  One is Frito-Lay's specifications, configuration, and

19  design and integration of its corn soaking, cooking, and

20  washing equipment, and they cite to a number of

21  depositions, which my understanding from the discussion

22  on the record was that telling us to go look in

23  depositions is not what the Court was ordering them to

24  do.  They needed to tell us what the trade secret was.

25  The second one is how Frito-Lay operates its tortilla

chip lines, which covers all tortilla chip lines,

apparently, not just SCOOPS!  And if they were limiting

it to SCOOPS!, what is it about the operation of that

SCOOPS! line that is a trade secret.

And then the final one is knowledge of

how Frito-Lay cooks its corn, because in Dr. Okos'

report, the trade secret that was claimed was that

Frito-Lay's research and development does not set corn

cook times.

And we had dealt with that trade secret

claim head on, and now the claim is apparently knowledge

of how Frito-Lay cooks its corn, and we're not sure

exactly what specification with respect to how it's

cooking its corn has been claimed as a trade secret.

THE COURT:  Mr. Durst?

MR. DURST:  Yes, Your Honor.  I'm looking

at the ones he flagged here.

So, Your Honor, we complied with the

Court's order on Friday evening, which was to list the

trade secrets.  We complied that -- with that and went

above and beyond and gave some examples of where those

trade secrets were discussed in the evidence that has

been designated for trial.

Mr. Ward's commentary and concern now is

not that we didn't list them, which was the Court's

order. We satisfied that. That was the motion in limine that they raised on Friday, and that's been satisfied.

And now he's apparently not satisfied with the list that we gave and wants to take issue with the additional information we provided, which was not even required by the Court's order.

This is a discovery dispute, Your Honor. All of this information has been disclosed.

As far as Mr. Ward is concerned about looking through the documents, I told him then -- this over the weekend, and I think it's clear from our papers, that the deposition testimony, for instance, of Mike Trowbridge on the Frito-Lay's specs, configurations, et cetera, for corn washing and cooking equipment.

The deposition of Mike Trowbridge, the portions in that that we intend to rely on have been designated for trial testimony for a couple of weeks now, and that's true throughout.

So we gave them -- we've given them page/line descriptions. We've given them trial exhibit numbers. And I think we've gone above and beyond what the Court ordered. This is evolving back into a discovery dispute.

1           THE COURT:  Mr. Durst, what about the

2    issue -- the Defense raised an issue regarding it's not

3    an interrogatory format in terms of being verified.  But

4    is that -- I assume that you are going to have no

5    objection to them taking that document and saying to the

6    jury this is their official position on this?

7           MR. DURST:  I do have objection to that.

8    That's -- I do have an objection to that.  They need to

9    be addressing the evidence in the case.  If they wanted

10   a sworn interrogatory response or any interrogatory

11   response on this, they should have moved to compel back

12   during the discovery period.

13           So what the Court is positing, I suspect,

14   is exactly what the Defendants have in mind.  They want

15   to put up a list on the ELMO and check through them.

16   And our -- and our allegations of trade secret

17   infringement, Your Honor, will be the evidence that is

18   presented to the Court through the witnesses and the

19   documents that will be presented, and that's the --

20   that's the list of trade secrets that will be proven up.

21   That addresses the list.

22           Does the Court have a question about the

23   verification too?  The Court understands the issue of

24   verification, I think.

25           THE COURT:  Well, I guess -- go ahead,

Mr. Ward.

MR. WARD: Well, I was going to tell the Court that we didn't have a problem with the verification so long as there wasn't some argument that we couldn't stand up and confront witnesses with what Frito-Lay was claiming were its trade secrets or telling the jury what they were claiming now as trade secrets.

So I guess we don't have the list of what the trade secrets are, if we're not able to stand up and check them off as we go through this trial. That was the whole purpose of this exercise, I thought was to put us on notice of what they were going to claim as a trade secret.

I just wanted it in a format that we can use, that we can defend ourselves, and we can cross-examine witnesses with.

MR. DURST: Your Honor, I don't have any problem with him using this document as a reference point for his examination of our witnesses. What I do have an objection to is this document being displayed to the jury. It's not proper to do that.

If they wanted that sort of documentation and list shown to the jury, we should have had this discussion 60 days, not the morning before the trial.

So, Your Honor, in short, we've complied

with the Court's order.  We've given them, we think,
more than they're -- more than they're entitled to.  I
went above and beyond even what the Court ordered us to
do on Friday.

MR. WARD:  And, Your Honor, just to be
clear, we attached the transcript of that hearing, and
I'll quote it to the Court.  And this is Mr. Siebman
after the Court had ruled.  Mr. Siebman said:  Your
Honor, it's our understanding the Court has ordered us
to answer that interrog, the supplemental answer to that
interrogatory, and that's exactly what we're going to
do.

That was the discussion that we had, and
that's where we thought the lay of the land was on
Friday.  And then the order came out talking about a
supplemental brief, and now it sounds like they are
using that as an opportunity to wiggle and say, well,
you can't limit us to what we've told you in this
supplemental brief, which is exactly what we're
concerned about.

MR. SIEBMAN:  Your Honor, the context of
that was Mr. Ward was going beyond the scope of the
interrogatory.  It had nothing to do with the
verification.  He was going beyond the scope of the
interrogatory and continuing to add more and more

1   information about what was going to be required.  And

2   that was a limiting comment to the scope of what the

3   Judge was requiring us to provide.

4                 THE COURT:  All right.  I will tell

5   you -- I mean, I'm overruling -- it is what it is, so

6   I'm not going to expand upon it.  The question is

7   that -- I guess my original intent was for you to

8   supplement and give a new interrogatory and then somehow

9   I changed that when I did the written order.  I hate

10  when that happens.  I know what caused the confusion

11  now.

12                In terms of the matter, I'm not going to

13  retrod that background at all.  But the only thing is

14  that I guess when I wanted you to read something in the

15  interrogatory, was they should have the ability to use

16  that in front of the jury.  That's the only thing, let

17  them know what the allegations of the trade secrets are.

18                So, Mr. Durst, I'm not asking you to

19  expand upon that at all in terms of subject matter on

20  what you've given.  I'm overruling their objection to

21  that and deny it as to that.

22                The confusion, which is partly caused by

23  the Court, was the intent you supplemented the

24  interrogatory, which they could use an interrogatory in

25  answer to the jury.  And so you're telling me you don't

want them to use this. So I'm at a loss to say that I

could maybe go ahead and supplement the interrogatory,

which I originally intended you to do.

It's the same subject matter. I'm not

asking you to change the subject matter, but you're

telling me you're objecting to their ability to use that

to the jury. Now that they have an answer they could

actually use however they wanted to use it, it was an

interrogatory answer.

MR. DURST: Your Honor, if they wanted

the interrogatory answer, they have our supplemental

interrogatory response, which covers this same turf.

It's not as specific as we talked about on Friday. It

covers the same subject matter, though.

Your Honor, if they wanted an

interrogatory response, they needed to do it in time.

They needed to do it on time. What they are trying to

do is adjust the evidence in the way the case is tried

based on a discovery dispute that they raised at the

pretrial conference on the document that they've had for

60 days. And we object to that, Your Honor.

THE COURT: I understand that, but my

original intent -- and somehow I changed it in the

written order, and, again, it's my mistake, so we make

mistakes sometimes. But it was always my intention that

clearly from the transcript of the hearing that was the

intent, that I wanted you to supplement the

interrogatory.

Was there some confusion regarding that?

MR. DURST:  No, Your Honor.  That was the

conversation on Friday, and the order said supplemental

brief.  We filed a supplemental brief.  I mean, it's --

the Court has articulated the facts right.

THE COURT:  So I guess I'm going to ask

you this:  This is a bit -- if I hadn't made a mistake

in the order in saying it should be a supplementation of

the interrogatory, would your interrogatory answer be

different than what you submitted in the supplemental

brief?

MR. DURST:  The substance would not be

any different, Your Honor.

THE COURT:  So, again, was -- what's the

problem?  Because if I had made a mistake, you would

have done it -- the interrogatory supplemental, the same

information, allowing them to use the same supplemental

brief.

MR. DURST:  Your Honor, we are, of

course, going to do what the Court orders us to do.

THE COURT:  No, I know that.  I'm just

trying to -- I made a mistake in the way when I signed

the order that I shouldn't have signed, because that
wasn't the Court's intent.  And you understood what the
Court's intent was in supplementing the interrogatory,
which is something they could use in front of the jury,
if they so chose to do.  That's their decision whether
to use that or not.

I'm not quibbling with and I'm overruling
their objection as they wanted more detail they wanted
you to provide in a supplemental brief.  It's not in a
format that they wanted to use it for purposes for the
trial, and that's not what the Court's intent was.  And
I'm confessing that I made an error when I signed the
order changing that from a supplementation of the
interrogatories, so...

MR. DURST:  We're not trying to exploit
the -- any -- any situation of the Court in terms of the
chosen words.

This debate, though, Your Honor, is
unending.  With the claim language in the motion in
limine they intended to ambush us and try to handcuff us
on trade secrets we could try.  The Court ordered us to
provide a list.  We provided a list.

THE COURT:  Your list is probably wide
open that allows you pretty -- I mean, based on the list
you provided in the supplemental brief, you're not going

1  to try the case you wanted to try?

2              MR. DURST:  No, Your Honor, I'm not.  I

3  think that list gives us -- we have identified in the

4  list the --

5              THE COURT:  I contend that's sufficient.

6  I'm overruling their objection as to anymore detail.  I

7  just want it in a form, and so -- we're having this

8  discussion, because you've objected to their use of the

9  supplemental brief, how they want to use it in front of

10 the jury.  And so you told me the substance isn't

11 changing.

12             MR. DURST:  We'd just like --

13             THE COURT:  If you put it in an

14 interrogatory format, if you feel more -- if you would

15 feel better about doing it that way.  Just supplement it

16 and give it to them in that format.  The same

17 information is fine.  I'm not asking you to change the

18 information.

19             Again, I'm going to overrule the

20 objection as to that.  But that was the Court's

21 intention, and I'm the one that made the mistake in the

22 order.

23             MR. DURST:  So, Your Honor, the quickest

24 way through this is that -- perhaps, is I'm going to

25 object to this being shown to the jury under these

circumstances, whether it's in interrogatory response or a supplemental brief. That part of the objection is not going to change.

The lawyers have been working pretty hard in this case. If the outcome is going to be the same, the Court is going to order that they can show it to the jury, there's no difference to me whether you order that they show the brief to the jury or the interrogatory, except this: I would just assume save my team another 30 or 45 minutes or an hour, or whatever it will take us to get this thing turned into an interrogatory.

THE COURT: That's fine from my standpoint. I mean, as long as they're able to use it, and it's like any discovery response that are admitted in trials all the time.

MR. WARD: Just so long as I don't hear that it's not Frito-Lay's position as this trial goes on.

THE COURT: I understand. That's clearly their position. They're not waivering from -- those are the trade secrets. They all -- all the trade secrets we're arguing about began with that supplemental brief.

MR. DURST: Yes, Your Honor. That's our intention. I will tell you this: Every time we've examined one of their witness, they surprise us with

more.  And they're going to call some live witnesses and
happily we get to cross-examine them.  So with that
reservation --

THE COURT:  Mr. Durst, if their witnesses
give you new information that's never been disclosed
before, that's fair game in my mind.  If they offer
trade secrets that have not come out in any of the
depositions, then that's fair game for you.  So
that's -- I'm not restricting your ability to do that.

What else?

MR. WARD:  Nothing from the Defendant
that I know of.

MR. DURST:  I think that's all from us
too, Your Honor.  Thank you very much for your time.

THE COURT:  That's fine.  Maybe I'm too
user-friendly.

What I will tell you is we'll start at
9:00 o'clock in the morning.  If there are disputes,
which invariably -- y'all are so friendly with each
other, but invariably there will be disputes.  Just be
here at 8:30 and talk to each other.  I try to minimize
the time of the jury so we can start at 9:00 o'clock.

So if there are any issues you need to
bring to the Court's intention, we can start at 8:30 and
get those resolved before 9:00 o'clock.

1      MR. HILL:  Your Honor, one question.  All
2  of the slides we have --

3      THE COURT:  Can you just go --

4      MR. HILL:  I'm so sorry, Judge.

5      All of the stuff that we have in the
6  courtroom, can we leave it here overnight?

7      THE COURT:  Yes.  The courtroom will be
8  locked after the cleanup crew comes through.  That's not
9  a problem.  And then we're here -- the court security
10 officer will be here tomorrow around 7:00.  You can
11 leave all your stuff as you see fit.

12     MR. DURST:  Your Honor, you had requested
13 copies of the expert reports, and we have prepared
14 copies of our expert witnesses who have submitted
15 reports in the case, Dr. Van Liere, Mr. Phillips, Dr.
16 Okos has two reports, Dr. Floros, and Professor Visser.
17 And so if I may, I'm going to have one that -- do you
18 need more than one copy?

19     THE COURT:  I just need one.  I will
20 review it.

21     Are we going to have any experts
22 tomorrow?

23     MR. DURST:  We will not.

24     THE COURT:  Okay.  Just kind of give me
25 the heads-up, so I want to be able to read them as I

1  need to.

2              MR. HILL:  Your Honor, we have ours here

3  in the courtroom in boxes, but rather than burden your

4  time, we will dig them out and give them to you first

5  thing in the morning.

6              THE COURT:  That's all right.  I won't

7  need them till the second week, so...

8              MR. WARD:  Thank you.

9              THE COURT:  And then review each of the

10 exhibits so we can get that all -- so there are no

11 problems when I admit all the exhibits.

12             MR. WARD:  Yes.

13             THE COURT:  Y'all have a good evening,

14 and we will see you in the morning.

15             COURT SECURITY OFFICER:  All rise.

16             (Court adjourned.)

17             * * * * * * * * * * * * * * * * * * * *

18

19

20

21

22

23

24

25

1

2

3                          <u>CERTIFICATION</u>

4

5           I HEREBY CERTIFY that the foregoing is a

6    true and correct transcript from the stenographic notes

7    of the proceedings in the above-entitled matter to the

8    best of my ability.

9

10

11

12   /s/_____                    _____
     JUDITH WERLINGER, CSR                   Date
13   Official Court Reporter
     State of Texas No.:  731
14   Expiration Date  12/31/14

15

16   /s/_____               _____
     SUSAN SIMMONS, CSR                   Date
17   Official Court Reporter
     State of Texas No.:  267
18   Expiration Date  12/31/14

19

20

21

22

23

24

25