```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                      SHERMAN DIVISION

 3  FRITO-LAY NORTH AMERICA, INC.  *   Civil Docket No.
                                   *   4:12-CV-74
 4  VS.                            *   Sherman, Texas
                                   *
 5                                 *   February 12, 2013
    MEDALLION FOODS, INC, ET AL    *   9:00 A.M.
 6

 7
                   TRANSCRIPT OF JURY TRIAL
 8        BEFORE THE HONORABLE JUDGE AMOS MAZZANT
               UNITED STATES MAGISTRATE JUDGE
 9

10

11

12  APPEARANCES:

13  FOR THE PLAINTIFFS:   MR. TIMOTHY S. DURST
                          MR. RUSSELL J. CRAIN
14                        MS. SUSAN CANNON KENNEDY
                          Baker Botts, LLP
15                        2001 Ross Avenue
                          Suite 600
16                        Dallas, TX    75201

17                        MR. CLYDE M. SIEBMAN
                          Siebman Burg Phillips & Smith
18                        300 North Travis
                          Sherman, TX    75090
19

20  (APPEARANCES CONTINUED ON NEXT PAGE)

21

22  COURT REPORTERS:      MS. JUDITH WERLINGER, CSR
                          MS. SUSAN SIMMONS, CSR
23                        Official Court Reporters
                          100 East Houston, Suite 125
24                        Marshall, TX    75670
                          903/935-3868
25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

1  (APPEARANCES CONTINUED)

2  FOR THE DEFENDANTS:    MR. DAVID W. HARLAN
                          MR. B. SCOTT EIDSON
3                         MR. DANIEL E. SAKAGUCHI
                          MR. MARK A. THOMAS
4                         MR. TIMOTHY D. KRIEGER
                          MR. ZACHARY C. HOWENSTINE
5                         Armstrong Teasdale, LLP
                          7700 Forsyth Blvd.
6                         Suite 1800
                          St. Louis, MO   63105
7
                          MR. T. JOHN WARD, JR.
8                         MR. WESLEY HILL
                          Ward & Smith Law Firm
9                         1127 Judson Road
                          Suite 220
10                        Longview, TX   75601

11
                 ******************************
12
                      P R O C E E D I N G S
13

14              (Jury out.)

15              COURT SECURITY OFFICER:  All rise.

16              THE COURT:  Please be seated.

17              Good morning.

18              Do we have something to take up before we

19  take up opening statements?

20              MR. DURST:  Plaintiff has nothing, Your

21  Honor.

22              MR. HILL:  Defendants don't either, Your

23  Honor.

24              THE COURT:  Very good.

25              And then y'all have lapel mics, so you

are not strapped to the podium or anything like that.

And what we'll do is my plan is to go ahead and have the

Plaintiff take up their opening statements.  We will

take a short break, and then we'll come back to the

Defense.  And depending on the time, we will take a

little short break, and then start the evidence -- admit

the exhibits and start the evidence.  And we'll see

where we're at.

Okay.  Go ahead and bring the jury in.

COURT SECURITY OFFICER:  All rise for the

jury.

(Jury in.)

THE COURT:  Please be seated.

Good morning, Ladies and Gentlemen.  It

is now time for opening statements.  I will call upon

Plaintiff, Mr. Durst, and have him give his opening

statement.

MR. DURST:  Thank you, Your Honor.

Your Honor, Ladies and Gentlemen of the

Jury, may it please the Court.

The people at Frito-Lay worked long and

hard on Tostitos SCOOPS!.  They are proud of their hard

work as any of us would be.  This has been a very

successful product for Frito-Lay, and we feel like it

has been taken unfairly from us.

1    You will hear from our people, our

2 witnesses, who will tell you about the hard work that's

3 gone on to this -- into this. And you'll also hear from

4 the Defendants' witnesses. You will hear evidence about

5 what has happened with the misappropriation of our trade

6 secrets, how Defendants are infringing our patent, and

7 how the Defendants intentionally copied the shape of

8 SCOOPS!.

9    The intellectual property in this case is

10 around this chip, the process that makes this chip, and

11 the packaging in which Frito-Lay has sold this chip.

12    There's much more to this than meets the

13 eye. You will shortly hear from the head of Frito-Lay's

14 Research and Development, that the development process

15 that led to Tostitos SCOOPS! was one of the most

16 complicated processes that Frito-Lay has undertaken in

17 its nearly 80 years of existence.

18    This fellow's name is Mike Zbuchalski.

19    Tracy, would you turn the flip chart

20 there for us.

21    I am going to be talking about a number

22 of businesses in my opening statements this morning from

23 Frito-Lay but also from Ralcorp and Medallion and third

24 parties. Mr. Zbuchalski is listed there as the first

25 witness, and when you read his name you'll understand

why I call him Mr. Z or Mike Z.

So he will come and talk to you about the development process that led to SCOOPS!, and you're going to hear a lot of the details about how this unfolded. One of the things that Mr. Zbuchalski is going to tell you is about all the people that were involved in this.

Frito-Lay invested nearly 70 people years in the development of this product. It happened over the course of about seven years, and there is the equivalent of 70 people years, full-time employees, 70, that led to the development of SCOOPS!, the process that manufactures SCOOPS!, and the way in which we sell them.

Now, what were those people doing?

This is the SCOOPS! team (indicating) Mr. Siebman showed you in voir dire yesterday. What were they doing?

It's a long list. Mr. Zbuchalski is going to tell you about some of that. They were creating ideas. They were doing consumer research. They were developing product identities. They were making prototypes. They were testing with consumers developing the recipe, designing the equipment, packaging the product, figuring out how to scale-up manufacturing, testing at the pilot plant, starting up

the factory, and launching the product.

Alexa Williams, Dr. Alexa Williams at my left here, was one of those people.  You will get to hear from her during the trial.  And Mr. Siebman showed you this team in voir dire a minute ago.  The fellow in the middle near the back right there is a guy named Rick Ruegg.

Rick will tell you about how he came up with the idea, that is, the shape of Tostitos SCOOPS! today.  He will take the stand and tell you the story about how that was developed.

So you'll hear from Dr. Williams.  You'll hear from Rick Ruegg.  You'll hear from Mr. Z.

Frito-Lay worked on this case -- on this product from 1994 to 2007, 7 years, 70 people years, and over $150 million invested in the development of this product.

And it's been a success.  Consumers bought nearly 130 million bags of Tostitos SCOOPS! last year.  Just last year, 130 million bags in the United States.  Consumers love the product.  Frito-Lay advertises it; invests heavily in that brand to get the word out to consumers.  It's on TV.  It's in print. SCOOPS! is what you might call famous.

They have even made a television show

about SCOOPS! through the Food Network.  They have a
show called Unwrap that focuses on unique and
interesting and exciting new products.  SCOOPS! is
featured in that.  That's about a four-minute clip.  I
suspect you're going to see it during the trial, and
there's not much secret in there, but it's an
interesting piece.

And what it demonstrates is the success
that Tostitos SCOOPS! has had, how much consumers are
fascinated by this product, and how much they love it.

Now, where do the Defendants come in?

The Defendants have been -- and I'm going
to choose my words carefully here, because I am going to
quote their president.  The Defendants have been in awe
of this product since the day we launched it.  That was
back in 2001.

You heard in voir dire and you will hear
in the evidence that Defendants launched their product
in 2012, 11 years later.

Rusty Karschner testified in this case --
this is a picture of Mr. Karschner.  He's the -- he was
the Medallion president in 1995, and he stayed there
until about 2007.  And he told us under oath that
Medallion had been in awe of the product, and he's
talking about Tostitos SCOOPS!.

1          And when he was asked in his

2  deposition -- you'll hear it -- my colleague,

3  Ms. Kennedy, asked him the question:  If you were in awe

4  of it, why did it take you 11 years before you launched

5  your emulation product?

6          And you'll see what he says:  We just

7  didn't know how to do it.  We didn't know how to emulate

8  SCOOPS!.

9          That's Mr. Karschner's testimony under

10 oath in the case.  They would have loved to have a chip

11 like it, but they couldn't figure out how to do it.

12          Well, that's what brings us here, because

13 their efforts to end run our intellectual property

14 rights lands us in this courtroom today.

15          Medallion had a manufacturing plant over

16 in Newport, Arkansas.  It's just down the road from one

17 of Frito-Lay's SCOOPS! lines.  We have a SCOOPS! line in

18 Jonesboro, Arkansas.

19          Medallion is owned and controlled by

20 Ralcorp, which is the other Defendant in this case.

21 Ralcorp is now owned by ConAgra, which is a big company

22 based up in Nebraska.  ConAgra and Frito-Lay are about

23 the same size, both multi-billion-dollar companies.

24          This case is about how the Defendants

25 acquired or had the motive, the means, and the

opportunity to commit their wrongful acts.  Medallion
had the motive.  You see it here, president of Medallion
telling you that they were in awe of SCOOPS!.

They had a problem.  They didn't know how
to do it.  So what changed?

A couple of things changed.  In 2005,
Ralcorp acquired Medallion.  Ralcorp is much larger than
Medallion, and having Ralcorp on board gave Medallion
access to funds to expand their product lines that they
would not have been able to do themselves.  That is the
means.

This is the motive.  Ralcorp became the
means.

What's the third piece?

The third piece, as all crime novel buffs
know, is the opportunity.  Well, what was the
opportunity?

The opportunity arrived for Ralcorp and
Medallion in the form of a gentleman named Kent Vickery.
Kent Vickery is a former Frito-Lay employee.  Worked for
us for five years.  He told me in his deposition that he
was an expert on the SCOOPS! manufacturing line.

You'll hear about Mr. Vickery leaving
Frito-Lay.  He called it a mutual departing of ways.  He
collected a severance agreement.  He signed a contract

and he went about his way.  He wound up working at

Medallion in 2007.  Started Medallion in 2007.

Medallion started what they call Project

Backhoe the next year, in 2008.

Project Backhoe is the code name that

Medallion and Ralcorp use for their BOWLZ product.

Project Backhoe -- you're going to hear a

lot about that in this case -- is the product, is the

method -- the project name that they gave to their

internal development efforts.

So the motive:  They've had it since

2001.  He said since the day we launched the product.

The means:  Ralcorp arrives on the scene

in 2005.

And the opportunity:  Mr. Vickery arrives

in 2007, and they began their work in 2008.

Let me spend a minute talking about

Frito-Lay.  Frito-Lay makes snack products.  We all know

them.  Many people love them.  You're going to learn

about Frito-Lay in this case and the way we do business.

And as the case goes forward, you're

going to hear lots of evidence about that.

But as it relates to this case, there are

two things that Frito-Lay does particularly well:

Innovation and creating brand identity.

Innovation -- you're going to meet several of our Research and Development people. Mr. Z is going to take the stand in a few minutes probably in a few minutes or right after lunch. Dr. Williams is going to testify, and I mentioned Rick Ruegg is going to testify as well.

Listen to this: Frito-Lay launches between 50 and 100 new items every single year. That means, on average, Frito-Lay is launching a new item either once a week or two times a week. One to two times a week year in, year out Frito-Lay launches a new idea. Now, some of those are flavor changes; some of them are wholly new products. Some are on the scale the -- actually Mr. Z will say none on the scale of Tostitos SCOOPS!, and some are changed to a flavor in an existing product.

But between 50 and a hundred new items launched every year by Frito-Lay. That takes a lot of effort. That takes a lot of work. It takes a lot of people.

Frito-Lay is good at creating brands, too. Look at this list of array of famous Frito-Lay brands, and I could -- if I listed all their brands up there, we wouldn't be able to see them. The space would be crowded out. But look at these brands we all know

1    and we've all grown up with:  Lay's and Doritos and

2    Ruffles and Cheetos, Tostitos, Fritos.  That list could

3    go on and on.

4              Frito-Lay creates a brand identity of

5    quality and consistency, and that's incredibly important

6    to Frito-Lay and Frito-Lay's success, to Frito-Lay's

7    people and to its success.

8              Now neither of these, innovation or

9    branding, come easily.  Both are the results of a lot of

10   hard work literally by thousands of people.  Now, sure,

11   the company has been a business success, and they're

12   proud of that.

13             Consumers have benefited greatly too.

14   Frito-Lay has been a leader in listening to what

15   consumers want and bringing them what they're asking

16   for.  Frito-Lay has been a leader in the healthy snack

17   segment.  Not up here but it well could be in

18   Frito-Lay's line of baked products, for instance.

19             And fun things, too.  Many of you have

20   seen the Doritos Tacos Locos at Taco Bell.  Taco Bell

21   has now sold more of those tacos than there are people

22   in the United States in the first year of its launch.

23             That's a fun thing that Mr. Z and his

24   team worked on.  He'll tell you a little bit about that

25   when he takes the stand.

You know, the truth is, without an innovative company, without an innovator company like Frito-Lay, companies like the Defendants wouldn't exist.

So think about it this way: If you didn't have a strong branded company like Frito-Lay, then the store-branded companies, like Ralcorp and Medallion, wouldn't exist.

If you don't have a leader, you can't have a follower. If you don't have an innovator, there won't be a company.

The very existence of companies like Ralcorp and Medallion is on account of Frito-Lay's innovation. Frito-Lay knows that. We embrace that. That's part of healthy innovation and competition in our business world.

That's not what this case is about. This case is about Ralcorp and Medallion crossing the line and copying it. They did it unfairly, and we're suing them.

I mentioned Medallion's plant over in Newport. That same plant run by Medallion, they make 21 different products in that plant: Snack chips, corn, potatoes, tortillas. 21 different products; 10 of them are what they call Frito-Lay emulation food products. They make 21 products; 10 of them are emulations of

Frito-Lay products.

So here's a few of them. If you look at this slide, all I've done is put some of the Medallion products there next to the Frito-Lay products. There's their Nacho cheese product. You know that's targeting Doritos Nacho cheese.

Here's their corn chip product. You know, that's targeting Frito-Lay's Fritos product.

Here's their cheese puff product. You know that's targeting Cheetos.

Here's the important point about this: Frito-Lay is a brand leader. We know people are going to follow us. Sure, when this stuff happens, it stings a little bit, but Frito-Lay's first response is to innovate, to make our products better.

This is the very first case in Frito-Lay's history that I've been able to find that Frito-Lay has sued a store brand for infringing intellectual property rights. We just don't go around suing people.

Even these folks, we didn't sue them for the Nacho Cheese Doritos knockoff. We didn't sue them for these corn chips that are targeting Fritos. We didn't sue them for these puffs that are targeting Cheetos.

1          So what's different about this case?  In
2  this case, with this product, Frito-Lay has very
3  specific rights.  We have trade dress rights in the
4  design of the chip.  We have a patent on the process
5  that makes the chip.
6          And we kept certain parts of our process
7  secret or confidential so that our competitors -- so our
8  competitors don't benefit from our hard work on that, on
9  certain parts of our products.
10         So there are those three types of
11 intellectual property:  The trademark, the trade dress,
12 the patent, and the trade secret.  Those are the things
13 that the Defendants have infringed, and that's what
14 brings us here today.
15         Let me turn to the -- something I
16 sometimes do, and that's kind of keep a list of things
17 that I say, arguments that are going to be made in the
18 case, and I started this list yesterday when Mr. Hill
19 was talking in voir dire.
20         So what I have here -- I'm going to start
21 that list -- is what I'm going to call this list of
22 false arguments.  You're going to hear these things from
23 the Defendants.
24         One of them -- and you heard a little bit
25 yesterday -- is that Frito-Lay is trying to eliminate

store brands with this lawsuit.  That's untrue.  That is
untrue.

   We have thousands of competitors.  Mr. Z
is going to tell you that there are a hundred new
competitors a year.  We don't go around suing them.  We
haven't sued Medallion for other things.

   This is about BOWLZ and SCOOPS!, and
that's what this case is about.  This case is not about
Frito-Lay trying to eliminate store brands with the
lawsuit.

   The Defendants are going to try to
misdirect your attention away from the facts of the case
to this broad argument, and that's not what we're doing.

   That is False Argument No. 1 that the
Defendants are going to make.

   Now, let's turn to the claims in the
case, some of the specific evidence in the case.

   So you're going to hear about this as we
go through the trial, is the discovery process.  I think
probably you have some sense of how that works already.
But under the Court's rules, we have the right to
inspect the Defendants' files.

   Now, we didn't get to see everything.  In
fact, we only have e-mail up through May of 2012, but
we've got rights to their files, and we got some of

their internal documents.

And we got to take depositions of their witnesses. Those folks appeared under oath and gave testimony, answered our questions under oath, and we took videos of those, so we're going to show you some of those.

And the same is true for them. They got to look at our files, and they got access to what Frito-Lay had in its files that were relevant to the case, and they got to take some of our depositions, and I bet you're going to hear some videos played of our people, too.

So that's the discovery process. So when you hear about an exhibit or a document produced in discovery, it came through this process, these rules administered by Judge Mazzant about how the parties exchange information relevant to the claims in the case.

And when you hear about depositions, all that is, is testimony under oath that happen usually in a law firm conference room with a court reporter, just like this one, and a videographer, under oath, just like they're in a court of law. They swore to tell the truth.

So that's what discovery is. That's where the evidence is going to come from and you're

going to hear in the case.  It's going to come from the

documents, and it's going to come from the -- from the

witnesses.

So let me talk about the first set of

claims in this case, and that's the use of confidential

information.

You're going to see, by the way, Ladies

and Gentlemen, in this case, that I have a great team,

and Ms. Kennedy is right there, and she just handed me a

note, and she said we have e-mails later than May of

2012.

So you're going to see us working

together, because we put a lot of effort in this case,

and you'll hear from her and some of my other colleagues

as well.

Let's talk about misuse of Frito-Lay

confidential -- confidential information and trade

secrets.

So back to Medallion.  This is Medallion

management team.  It's a succession of people.  Over

here on the left is Mr. Karschner.  You saw his slide.

He was the former president of Medallion up through

2007.  So he was president when Ralcorp bought them, and

he was president when Mr. Vickery was hired.

Mr. Karschner was succeeded by Andy

Westervelt right there in the middle.  Mr. Westervelt
became the president of Medallion, and then when Ralcorp
took over, I think he kept his title for a while, but he
ran the plant.  He was in charge of the plant over at
Medallion.

And after Mr. Karsch -- pardon me --
after Mr. Westervelt retired, that's when Mr. Vickery
took over in Newport, Arkansas.  And Mr. Vickery is the
plant manager over Medallion in Newport.

Medallion only has one plant.  A few
hundred people work there.  And Mr. Vickery tells us
that he's in charge.  And other people say that, too.
He's in charge at the plant at Medallion.

These people all have something in
common.  They all thought that SCOOPS! was a desirable
product.  Mr. Karschner used the most colorful language
when he said they were in awe of the product.  But they
all have that in common.  They thought SCOOPS! was a
desirable product.

They also had something else in common
and that is that they all used to work for Frito-Lay.
All three of these guys used to work for Frito-Lay.
But, you know, our point is -- on me saying that is
maybe not what you think.  We're not saying that Mr.
Karschner took any information from Frito-Lay and used

1  it at Medallion nor are we saying that Mr. Westervelt

2  took any information from Frito-Lay and used it at

3  Medallion.

4              But let me be clear about this:  We are

5  saying that Mr. Vickery took information, confidential

6  information, from Frito-Lay and used it at Medallion.

7              And the reason I make that point is this:

8  It's False Argument No. 2 of the Defendants.

9              You're going to hear this from them.  You

10 already heard it.  Got my false arguments misnumbered

11 here.  We'll call this one No. 2 because that's where we

12 are.  That Frito-Lay would keep people from changing

13 jobs.  Frito-Lay would keep people from changing jobs.

14             You heard a lot of discussion yesterday

15 about people having general skills and knowledge and

16 moving around.  That happens all the time.

17             Frito-Lay is an innovator.  They're the

18 leader in this space.  They have lots of employees.

19 People leave us and go to work for other people.  We

20 hire people from other companies.  Happens all the time.

21 That's not what this case is about.  This case is about

22 one guy who left us, promised not to use our

23 information, and then disclosed it to them while they

24 built SCOOPS! -- they built BOWLZ; we have SCOOPS!.  We

25 have SCOOPS!; they have BOWLZ.

So this is False Argument of the
Defendants No. 2, that Frito-Lay would keep people from
changing jobs.  It is not true.

Now, talk about what these guys have in
common.  Let me tell you what they did not have in
common.

Only Mr. Vickery had ever seen the
SCOOPS! line.  Mr. Vickery told me, as I said a minute
ago in his deposition, that he was an expert on the
Frito-Lay SCOOPS! line at Jonesboro.

So you're going to hear testimony that we
have plants in a number of locations across the country,
and they're all virtually the same.  Mr. Vickery was an
expert on the line that we had in Jonesboro.

These other guys had never even seen a
SCOOPS! line.  Mr. Westervelt and Mr. Karschner, they
had never even seen the SCOOPS! line.  You saw that in
what Mr. Karschner said when he said:  We just didn't
know how to do it.  We didn't know how to make SCOOPS!,
to make an emulation of SCOOPS! until Mr. Vickery
arrived.

So these guys have something in common,
but only Mr. Vickery had SCOOPS! information.

So they were in awe.  They couldn't make
it.  What happened?  Those two things I mentioned.

1  Ralcorp comes on the scene with the deeper pocket, and
2  Mr. Vickery arrives.
3              Mr. Westervelt told us in his
4  deposition -- Ms. Kennedy asked him the question of what
5  started the process.  He talked about it.  Mr. Vickery
6  talked about it.  In my deposition with Mr. Vickery, he
7  said one of the first things they did, Westervelt
8  started by asking Vickery if he thought that Medallion
9  could make a product like SCOOPS!.  Almost out of the
10 bag, almost right out of the box one of the first things
11 they did is went to Mr. Vickery.
12             That's when Mr. Westervelt was still on
13 duty as the president, and said, can we make a product
14 like SCOOPS!?  Mr. Vickery said, sure, we can make a
15 product -- we can make a product like SCOOPS!.
16             Over here in my chart, you see these
17 folks listed there.  I put that up there so you can help
18 keep track of these folks that I'm talking about.
19             There's Vickery and there's Karschner.
20 I'm going to tell you about Trowbridge in a minute,
21 okay?  And that's what -- the ones in red are obviously
22 the Defendants' witnesses, and people -- the ones in
23 black are ours.
24             Now, here's Mr. Vickery's contract.  I
25 told you that he used to work with us, and when he left,

he signed a contract.  Here is Mr. Vickery's contract.

Michael Kent Vickery agrees not to disclose or cause to

be disclosed in any way any information or documents

relating to the operations of the company.  That's

Frito-Lay.  Any information or documents relating to the

operation of Frito-Lay.

Mr. Vickery signed that document in 2006.

He says it's enforceable.  He says Frito-Lay has kept up

with its end of the deal, and he acknowledges that he's

under this obligation to keep all information and

documents relating to the operations of Frito-Lay

confidential.

Mr. Vickery didn't follow that.  He

didn't follow that contract.  He told Medallion a whole

laundry list of things.  You're going to hear about a

number of them here during the trial.  He told them how

the overall process worked, the overall SCOOPS! process

worked.  He told them who Frito-Lay's confidential

vendors were that helped them build the SCOOPS! line.

And he told them information about Frito-Lay's internal

quality control specifications.

You're going to hear the evidence played

out in this case.  In fact, there's going to be one of

their witnesses that's going to testify that says that

Mr. Vickery could hardly resist talking about

Frito-Lay's process.  Talked about it all the time.

One of the people that he talked to about SCOOPS! is one of the folks that worked for him Mike Trowbridge right here (indicating).  Mr. Trowbridge is an engineer who works for Medallion and who works for Mr. Vickery.

Now, we asked him about the process of learning about SCOOPS! and this is what Mr. Trowbridge says.  He said they reviewed the patent.  Now, what he's talking about there is the '344 patent, the patent we're going to be talking about in this case.  And as we all know, the stuff that's in that patent is public, and there's no claim in this case that the things in the patent are trade secrets.

So discussion about how we did some of those things in the patent, but the focus of trade secrets is different than the focus of patents.  They infringed the patent, but the patent is not secret.  So what he says up there -- we had reviewed the patent -- we don't have any complaints about that.

That's part of our deal with the government.  You saw the handshake yesterday on the video.  We don't have any complaints about them reviewing the patent.

But when Mr. Trowbridge was asked to

explain how they went about building their BOWLZ lines,
he said we referenced the patent. Then he went on, and
it's the -- he went on a piece -- that causes us to be
here talking about theft of trade secrets.

Kent was an ex-Frito-Lay employee. He
was familiar with the process, so he knew and he had
already told us how the process worked. We knew.
Vickery told them everything. Told them how the process
worked. They knew.

Mr. Vickery got a little frustrated with
me in the deposition at one point. You'll hear this
testimony. I asked him to give me a list of all the
things that he had told Ralcorp and Medallion about
Frito-Lay and about how Frito-Lay runs its business,
about Frito-Lay's information and documents. I asked
him to give me that list.

He said he couldn't do it, and the reason
he said he couldn't do it -- and I'm going to be careful
here to use the words that Mr. Vickery used. He said he
couldn't do it, because the information that had been
given to Frito-Lay (sic) had been, quote, given over a
long period of time, unquote, a lot of different topics.

He couldn't even list it all, all the
stuff that he had told Ralcorp and Medallion, about our
business, and about how we operate our plants and about

1  SCOOPS!.

2              You're going to hear that no one, not a

3  soul from Ralcorp or Medallion asked Mr. Vickery to stop

4  giving them Frito-Lay information.  No one said you

5  shouldn't be giving us that.  No one took steps to

6  prevent Mr. Vickery from giving the Frito-Lay

7  information -- Frito-Lay information.  And some people

8  even asked him for Frito-Lay information.

9              And everyone -- I took the deposition of

10 the president of the company.  Everyone from the

11 president on down to the people that work for

12 Mr. Vickery, everyone says that Mr. Vickery's actions on

13 Project Backhoe were in keeping with what the company

14 expected of him.

15             They knew what he was doing.  He was

16 providing them information.  They accepted it, and

17 you'll see how it infiltrated their process, their

18 SCOOPS! (sic) process.  You know, they collected

19 information in other ways too, ways that they knew was

20 wrong, other ways besides Mr. Vickery.

21             You'll hear about how they arranged to

22 look at confidential Frito-Lay's SCOOPS! equipment.

23 They knew it was confidential.  They specifically went

24 to look at the equipment so they could design their

25 equipment to be the same.

1        Now, let me show you a piece of evidence

2   from their files and e-mails.  This is Mr. Vickery's

3   contract.  We've already talked about that.

4        Here's an e-mail.  This is a blowup of an

5   e-mail, so this is P43, if you're keeping notes.  And if

6   you're keeping notes, Mr. Vickery's contract is

7   Plaintiff's Exhibit 308.

8        This is an e-mail that Mr. Trowbridge --

9   he's one of the engineers -- Mr. Trowbridge sent

10  Mr. Bender.  Mr. Bender is a vice president of the

11  company.  He works up in St. Louis at Ralcorp.  At this

12  point, he was working for Carriage House, which is

13  another subsidiary, but Trowbridge sends Bender an

14  e-mail and he copies Vickery and he says -- this may be

15  hard for y'all to see -- but he says a couple of very

16  important things in this e-mail.

17       He said they're going to go visit a new

18  SCOOPS! line.  They have been invited to go over to

19  Dallas to visit Quality Fab, and they're going to look

20  at a new SCOOPS! line being shipped out shortly.

21  It will give us the chance to look at exclusive

22  equipment.  We think this will be a one-time

23  opportunity.  This is what you're going to come to know

24  as the Quality Fabrication, the Quality Fab exercise.

25       So this is Trowbridge.  He's telling

Mr. Vickery, his boss, and Mr. Vickery's boss,
Mr. Bender -- actually, he's not really in the direct
line -- but Mr. Vickery -- but -- but -- Mr. Ralcorp's
vice president, Mr. Bender, that I'm going to go look at
this exclusive -- exclusive equipment for the Frito-Lay
SCOOPS! line.

Now, after he went, after Mr. Trowbridge
went, he wrote another e-mail reporting on it.  And,
again, this one is Exhibit No. 44, Quality Fab.  And
this is Mr. Trowbridge's trip report where he is
reporting to Mr. Westervelt.  We talked about who that
is.  Some other people, including both Mr. Vickery and
Mr. Bender.

And one of the things -- you guys will
have this whole document before we're done -- but one of
the things he says about it is that this system was
high-end and top-of-the-line Frito-Lay specifications.
Down here at the very bottom too, he says:  And, oh, by
the way, I took my camera and I took some pictures.
So we had a chance to ask the people some questions
about this little episode, the Quality Fab episode, in
deposition.  I'm going to let you hear what Mr.
Trowbridge said about this.  Listen to him.  He will say
he knew the equipment was confidential; that he went; he
called it high-end Frito-Lay equipment, Frito-Lay specs;

1  and he knew it was wrong.

2  So Mr. Trowbridge is going to tell you

3  it's wrong.  Mr. Bender is going to come to the stand

4  and admit on cross-examination that it was improper for

5  them to do this.  They all knew what they were doing and

6  they went and did it anyway.  Vickery approved the trip.

7  Now, some people say that when folks --

8  when we communicate with each other, 90 percent of what

9  we communicate is non-verbal communication.  You know,

10 facial expressions, hand movements, fidgeting with the

11 hands.  Watch Mr. Trowbridge's deposition and look for

12 his non-verbal communication as well as listening to his

13 words.

14 So let's go ahead.

15 (Video clip playing.)

16 QUESTION:  You've been handed what's been

17 marked as Exhibit 43, which is marked RALMED 021101.

18 Do you recognize this document?

19 ANSWER:  Yes.

20 QUESTION:  You understand this to be an

21 e-mail from you to Mr. Bender and Mr. Vickery, dated

22 July 13, 2009?

23 ANSWER:  Yes.

24 QUESTION:  Beginning of the e-mail says:

25 Tim, Kent is available after 1:00 p.m. on Wednesday.

1 Steve and I have been invited to Dallas on Thursday to

2 visit Quality Fab's new F-L scoop line that is shipping

3 the week of the 20th.

4                    Did I read that correctly?

5                    ANSWER:  Yes.

6                    QUESTION:  You understand that F-L scoop

7 refers to Frito-Lay's Tostitos SCOOPS!?

8                    ANSWER:  Yes.

9                    QUESTION:  It says:  The purpose of the

10 visit is to look at the equipment and technology.  QF

11 offered the visit, since they want to sell us some of

12 the same.

13                    Did I read that correctly?

14                    ANSWER:  Yes.

15                    QUESTION:  And QF is Quality Fab?

16                    ANSWER:  Yes.

17                    QUESTION:  And when it says to sell us

18 some of the same, you understood that to be the same

19 equipment that they were providing to Frito-Lay for

20 their SCOOPS! line?

21                    ANSWER:  Yes.

22                    QUESTION:  Did you go?

23                    ANSWER:  Yes.

24                    QUESTION:  Did you look at the equipment

25 that was prepared for Frito-Lay Tostitos SCOOPS!?

1                    ANSWER:  Yes.

2                    QUESTION:  Did you take any pictures?

3                    ANSWER:  Yes.

4                    QUESTION:  And you knew that Frito-Lay

5    had confidentiality agreements with its vendors,

6    correct?

7                    ANSWER:  Yes.

8                    QUESTION:  You've been handed what's been

9    marked as Exhibit 44, which is labeled RALMED 019819.

10                   What is this document?

11                   ANSWER:  This is a report of what we saw

12   at our visit at -- in Dallas at the Quality Fabrication

13   facility.

14                   QUESTION:  A third-numbered paragraph

15   refers to corn-cooking equipment.  Do you see that?

16                   ANSWER:  Yes.

17                   QUESTION:  The last sentence of this

18   paragraph says:  This system is high-end and

19   top-of-the-line F-L specs.

20                   Did I read that correctly?

21                   ANSWER:  Yes.

22                   QUESTION:  You understand that to be

23   Frito-Lay specifications?

24                   ANSWER:  Yes.

25                   QUESTION:  So what you're saying in this

paragraph is that the system that you went and looked at

was made to Frito-Lay specifications?

ANSWER:  Yes.  Well, made to -- made to

Frito-Lay for Frito-Lay.  I don't have any knowledge of

what their specifications are, but it was built for

Frito-Lay.

QUESTION:  But that's what you said in

your e-mail, Frito-Lay specs?

ANSWER:  Yes.

QUESTION:  By specs, you meant

specifications?

ANSWER:  Yes.

QUESTION:  So what you were saying in

this e-mail is that the system was built to Frito-Lay

specifications?

ANSWER:  Yes.

QUESTION:  Does Medallion believe that it

was an acceptable business practice to go to look at

Frito-Lay's confidential equipment?

ANSWER:  We -- we went to look at the

equipment that was on the floor.  It could have been

anybody's equipment, I guess.  So, again, we were -- we

were -- we were -- we were going to look at equipment --

equipment that we hadn't seen before.  In this case, it

happened to be Frito-Lay equipment.

1          QUESTION:  So did you think it was an

2    acceptable business practice to look at this equipment

3    that it was specified for Frito-Lay, knowing that

4    Frito-Lay had confidential agreements?

5          ANSWER:  I have personally went to many

6    equipment vendors and looked at equipment that they

7    fabricate.  And -- and -- in a lot of cases, it's not

8    our equipment.  It's somebody else's equipment.  So in

9    this instance, we looked at equipment that was on the

10   floor that was being sold to another company.

11         I didn't -- I didn't -- I didn't go with

12   the intent of anything other than looking at equipment

13   that I have never seen before.  That was my intent.

14         QUESTION:  Did you think it was an

15   acceptable business practice to go and look at this

16   equipment that was Frito-Lay-specified, knowing that

17   Frito-Lay had confidentiality agreements?

18         ANSWER:  I guess I would say yes because

19   I went.

20         QUESTION:  And is -- it's your

21   understanding that Medallion Foods, that's an acceptable

22   business practice?

23         ANSWER:  It was probably not the best

24   decision that I ever made, you know.  I -- you know, I

25   don't know what else to say.

1          (End of video clip.)

2          MR. DURST:  Today, equipment just like

3  that exclusive Frito-Lay equipment Mr. Trowbridge went

4  to inspect sets over in Newport, Arkansas, in

5  Medallion's plant, being used to make BOWLZ.  They are

6  doing it without our permission.

7          We're asking you to --

8          THE COURT:  Mr. Durst, is your mic on?

9          MR. DURST:  Thank you.  Sorry.

10          We're asking you for your judgment in

11  this case about whether this type of behavior is proper.

12          That's a little sampling of the trade

13  secrets case.  Let me move now to the trade dress case.

14  Talk about that.

15          Trade dress protects our proprietary

16  interest in the design of the package and of the design

17  of the chip.  Trade dress rights arise from our use in

18  commerce.

19          As Judge Mazzant will tell you, if a

20  distinctive design is used in sales over time, you earn

21  the right to limit others from using designs that might

22  confuse consumers.

23          Here Frito-Lay has two types of trade

24  dress:  The design of our chip and also the design of

25  this package that we used in 2012 and earlier for

selling Tostitos SCOOPS!.

Now, Defendants infringe both the chip design with their chips and also the design of the package, which they sell at Walmart. You will be asked to determine whether consumers are confused.

And some things for you to remember: There are different points for confusion. We talked a little bit about this in voir dire. There's confusion at the point of sale.

That's when it's on the shelf or maybe even at -- confusing at the point of initial interest, which is what some of the authorities say just means when you see it on the bag -- on the shelf or at the point of sale, which may be at the checkout counter.

But there's confusion in the grocery store, and then there's something called post-sale confusion. We talked about that.

Post-sale confusion is something that happens when the consumers see the product out of the bag, like at a party session -- party setting. We talked about that during voir dire.

Frito-Lay is entitled to protection at both of those places, both in the grocery store and the things that go on there, and in the party setting where the bags are shown out of the chips (sic).

1    Now, one point on voir dire yesterday, I
2    wanted to stand up when this was going on and set the
3    record straight, but I'm not supposed to do that in voir
4    dire, so I didn't get a chance to do that.  And that's
5    when Mr. Hill started launching attacks about the test
6    that we did with the chips in the bowl.
7                    MR. HILL:  Objection, Your Honor.  Just
8    as if I can stand up here, he could have stood up then.
9    That is a misstatement of the law to make this jury
10   think he was tethered in some way to his chair.
11                   THE COURT:  Okay.  Sustained.
12                   MR. DURST:  Mr. Hill suggested there was
13   an unfair quest -- unfair test to be asking questions
14   about the chips out of the bag.  You'll remember that.
15   He was asking questions about this post-sale confusion
16   and then asking and suggesting that that wasn't a fair
17   chest -- test.
18                   Well, Mr. Hill, let me have it really for
19   saying that post-sale confusion was a test you ought to
20   be thinking about.  Mr. Hill had it wrong.
21                   I'm going to show you a passage from the
22   instructions that Judge Mazzant gave -- read to you
23   yesterday, and this is a document -- you'll see
24   something like this when the Judge gives you his final
25   jury instruction, but this is the document called

preliminary jury instructions that the Court read from

you -- read to you yesterday when he was introducing the

case, and he talked about this very issue.  He talked

about confusion and where it can occur.

And I'm going to show you several things

on this, but here's a passage from that:  Confusion --

I'm focusing here at this point right at the moment.

Confusion can occur at any point that consumers

encounter a product:  Before buying it -- that's at the

grocery store -- at the moment of purchase -- that's

really at the checkout stand, still in the grocery

store -- or after buying it.  After buying it is

post-sale confusion.

So that's the legal test you're going to

be asked to apply.  Does confusion occur at any point,

even when the chips are setting there at (sic) a bowl on

the table?

You know, think of this as like a Super

Bowl party test, right?  You're at a Super Bowl party.

There are a bowl of chips out there, and you've got an

eye on the television screen watching the game, and

you're putting your hand in a bowl of chips to take a

bite.

Or maybe somebody will have a Mardi Gras

party tonight.  And that might even happen this evening.

But think of that post-scale confusion as the legal word

for that type of a test, the Super Bowl party test.

You know, that brings up another point

that I wanted to tell you about the demonstration

yesterday.  Mr. Hill made a fuss about the date on the

bag.  As you heard in voir dire yesterday, Ms. Kennedy

and I have a number of folks that are working with us

from our firm on this case, and I want to tell you about

something that happened last night.

One of the young associates that's

working on this case from my law firm came to me in my

office over at Mr. Siebman's place, and she had seen

Mr. Hill tear into me in voir dire.  She was visibly

upset.

She apologized to me for not noticing the

date on the bag that we used in that -- in that little

demonstration.  You see, she had just reached in our

evidence files, because we've been keeping things since

this case started a year ago and just grabbed a bag of

chips out of there.  Didn't pay any attention to the

date on the bag.

And I said to her last night, I said,

first, my responsibility.  I'm the one that made the

argument in Court, and I should have checked that date

on the bag.

1          But, second, don't beat yourself up too
2 badly about this.  It was an honest mistake, one any of
3 us could have made.  None of us looked at that date on
4 the bag.  And the reason we didn't look at the date on
5 the bag is because it was irrelevant to the test.
6 The date on the bag didn't matter.  That test was not
7 about freshness or the date of the bag.  That test was
8 about the shape of those chips.
9          You'll remember these chips we used
10 yesterday -- here's a -- they're all kind of messed up
11 in this box now, but the rest of them are in here.  And
12 here's the chips we used, and here's the bag that had
13 the expired date on it.
14          I brought with me this morning another
15 bag of chips.  This one I bought personally at Walmart
16 on Saturday before I came up here from Dallas.  Its
17 expiration date is April 21 of 2013.  Find a formed chip
18 in here somewhere, not the broken ones.
19          That test we did yesterday was about the
20 shape of the chip.  In my left hand is a chip out of
21 this newly opened bag.  In my right is a chip out of the
22 bag that had the expired date on it.
23          You see that chip, that demonstration we
24 did yesterday, was about whether the chip design is
25 confusing to customers.  The chip design doesn't change

by the date of the bag.

The whole exercise yesterday about the expiration date was just misdirection. This is about the fact that consumers are confused by the design of this chip, thinking it's a Tostitos SCOOPS!.

Remember when we asked those questions in the courtroom yesterday, nearly everyone, dare I even say some people over at that table over there, were confused and thought those were Tostitos chips.

Mr. Hill's focus on the date of the bag was just an attempt to get you to move your focus off of the facts that matter in the case, which is the design is confusingly similar to Tostitos SCOOPS!.

Our rights in using this chip design, they come from use. So let me just make a couple of comments about how we chose this design.

Now, we already had a -- before we started Tostitos SCOOPS!, we already had Fritos SCOOPS!. You guys have seen those, too. We've got a picture up here.

So Fritos SCOOPS! -- thanks, Tracy.

Fritos SCOOPS! on the right, that's a product we've had out there for some time in the marketplace, and it's successful. We liked it, and the company thought maybe we should try to do something like

that with Tostitos SCOOPS!.

Well, it didn't turn out to be quite so easy, as you're going to hear. But the design team worked hard and conducted a lot of consumer research and determined, what is the best shape to communicate the Tostitos brands to consumers.

Well, of course, being a good dipping chip. They knew they wanted a chip that would hold liquid, but there were a lot of different ways to do it. What they came up with here was a chip with many different design elements and one that matches the Tostitos brand.

So this is the design of the chip. This is what we have trade dress rights in. It's made up of a combination of elements.

There are, for instance, an overall round appearance. It's the round bottom of a bowl-shaped chip. It has essentially uniform flutes that run the entire height of the chip. It gives you a starlike impression.

It's made up of a combination of elements. The overall combination of those elements is a design choice. It's like a piece of art. It's a design choice for the design of that chip.

Frito-Lay made this chip selection --

1  Dr. Williams is going to tell you about this -- selected
2  this design of SCOOPS! because our consumer research
3  showed us that it brought to mind Tostitos Rounds, that
4  Tostitos Rounds -- you guys have seen those,
5  bite-size -- Tostitos Rounds communicates to the
6  consumer that this is a Tostitos product, and SCOOPS!.
7  SCOOPS!, this particular design of SCOOPS!, also
8  communicates that to the consumer.
9            In fact, Dr. Williams is going to tell
10 you that on some of the consumer tests we did, other
11 shapes performed better.  But we chose this one because
12 of its match to the Tostitos brand.
13           There were lots of alternative designs
14 available and possible.  You're going to hear testimony
15 about those, canoes.  Dr. Williams tested the canoes
16 shape.  I'll show you what that looks like when she
17 testifies.
18           Ladles, spoons, they all hold liquids.
19 They have walls to hold things in.  They're useful.  But
20 they wouldn't communicate the brand to the consumer like
21 this design does.  They wouldn't communicate Tostitos
22 like this design does.
23           That brings me back over here to my false
24 arguments piece.  I got these all out of order, but
25 we've already done No. 2.  Go to the next one.  And it's

this one right here.  Frito-Lay wants to eliminate all

choices.

You'll hear them use words like -- and

you've heard them already -- use words like monopoly,

mean-sounding words to suggest that Frito-Lay wants to

eliminate all choices.  It's just not true.

There are other choices.  There are other

chip designs that hold liquids, have walls, are useful

in the same way these chips are.

There's spoons, like an Asian soup spoon

kind of thing you see at a Chinese restaurant.  There

are ladles.  There's canoes.  We'll show you a whole

bunch.  They considered some, too, the Defendants did.

There's a whole bunch of ways to do this.

We're not trying to eliminate all

choices.  What we're entitled to under the law is that

no one will have a design that's confusingly similar to

our design.  Again, that's what this case is about.

It's not about Defendants' false statements.

After we've been selling this chip for

more than two years, Frito-Lay decided to apply for a

trademark registration.  We got our rights from the use,

and we decided in 2003 to apply for a trademark

registration.

This is the trademark registration.  This

is Plaintiff's Exhibit No. 1.  This is the certificate
that the United States Patent and Trademark Office gave
us to evidence our rights.  Our rights came from the
fact that we had been using this chip, and this is the
certificate that the government gave us to evidence our
rights.

And you see that the words of the
trademark say:  The mark consists of the bowl-shaped
configuration of the goods.  You saw the video
yesterday.  Remember the one video -- one juror or two
that had a son that worked for the United States Patent
and Trademark Office as an Examiner.

The Examiners examine the trademark
application in some of the same ways that they examine
the patent application.  And when they do that, they're
looking at -- what does this say -- the mark consists of
the bowl-shaped configuration of the goods.  They're
looking at the goods.

These are the goods.  This is what's in
the trademark file.  This is from our application,
January 7th of 2003.  This is what we submitted to the
U.S. Patent and Trademark Office as part of our
application process.

Now, the examination process that the
folks go through up in Washington, they asked

themselves:  Is this a protectable design?  Is it

functional?  Is it ornamental?  Ornamental is

protectable.  Something that's only functional is not

protectable.  The Examiners asked that question.

          And they asked the question, too, about

whether the drawing that we have in the mark is

substantially -- the test is substantially the same as

these sample chips.  The Examiners looked at that, the

experts in Washington looked at it and approved our

registration for that chip.

          Now, this design of the chip is the same

design we have been using since 2001.  It's the same

design we're using today.

          We showed -- we showed the U.S. PTO this

piece of advertising.  Defendants are going to make a

big fuss about us -- actually pay a lot of attention to

our advertising and about how our advertising talks

about dippable, about dips and shows -- shows the chips

being used with dip, and they're going to say that means

it's functional.  It should not have been allowed.  It

should not be a trademark.  It's not entitled to trade

dress protection.

          But this is an actual piece of evidence

that we showed to the U.S. Patent and Trademark Office.

It has all that same stuff on there, has the good for

dipping and has the picture of the dip -- the chip with
the dip in it (sic), and the Examiner gave us our
certificate that we have, which is Exhibit No. 1 in this
case.

That examination process was repeated in
2009, and it's underway again now. And what I have here
on Slide No. 121 is an example of what we submitted in
2003, and then our five-year anniversary period, it's
the bag, and then you see the chip over there with the
dip in it (sic).

And then the -- the affidavit that's
underway right now, those are pictures of the chips that
we sent up to Washington to the Patent and Trademark
Office.

Let me spend a minute about
functionality. So they're going to argue that our
design is not protectable because it's useful.

The test, though, is not is it useful?
Judge Mazzant is going to give you the test, and the
test is whether the overall combination of elements is
essential to the use.

Well, as you saw from this ad -- and
you'll see from other ads, we do talk about the use. We
talk about dips. We show dips. We show people holding
chips with dips in it (sic). It is useful. There's no

1  doubt about that.

2            We even talk about the usefulness of a

3  chip that holds liquid in one of our patents, in this

4  patent that's in suit today.  We talked about that.

5  It's not a secret.  It is useful.  But that's not the

6  test.  It's the overall appearance, the overall

7  combination of elements.  Is it essential to use?  It's

8  not.  It's a design choice.

9            Talked about the other shapes that

10 Dr. Williams continued, considered the canoes, spoons,

11 ladles, that sort of thing.  It was a design choice to

12 go with a star-like chip.

13            Now, what are some of the other things

14 that are protectable that are functional?

15            Here's one.  I jumped ahead a minute ago.

16 You guys recognize this.  I had to get special

17 permission from my client, Pepsi, to show this bottle,

18 but this is the Coke bottle.  You see the silhouette on

19 the right.  You recognize that's a Coke bottle because

20 of the shape of the bottle.

21            What does the bottle do?

22            The bottle holds liquid.  It functions as

23 a container to hold liquid.  Some would even say that

24 this is functional in that it has those ridges around it

25 to help you grip it.  But you see, this Coke bottle is

Coke's trade dress.  It's functional, serves a use, but it is a design choice.  The Pepsi bottle looks different.  The Dr Pepper bottle looks different. This is a design choice of Coca-Cola.  It has design elements in it.  It serves a function in that it is useful, but it is protectable trade dress.  Our chips are the same way.

Here are a couple of other examples.  You see the Hershey bar; you recognize that.  You know what those ribs are for.  That's for breaking up pieces if you choose to share it with someone.  They serve a function; they're useful; they help you break it, but that's -- that's protectable trade dress.  Hershey protects that jealously.

And the other thing on the right is a Weber grill in that particular shape.  Weber says that helps you -- helps you cook your meat better, smoke it better, but that's a protectable shape.  It serves a function, but it's a design choice, just like the Hershey bar.

Our chip is the same way.  They are going to attack our trademark saying it's functional.  They are also going to attack our trademark saying we abandoned it.  Well, you are not going to hear me say this very often, but I'm going to say it now:  That's a

silly argument.  That's a silly argument, that we have
abandoned our trade dress.

I showed you pictures a few minutes
ago -- see if I can go back to them -- there we go.
The chips in the upper right-hand corner are from 2003.
There will be evidence that the chips were out two years
at that point in time.  And the chips down here on the
bottom, that's a 2012 or 2013 picture.  It's the same.
The molds haven't changed.  The design of the molds
haven't changed.  The design of the molds we make to use
these chips haven't changed.

Now, you know they vary a little bit.
Mike Z likes to say -- he will testify that that's
Mother Nature at work, because we're dealing with corn.
We're not dealing with plastics or steel.  We are
dealing with corn models.  And so the shape of the chip
from chip to chip is going to vary just a little bit.
But when you see that design, you know it's a Tostitos
SCOOPS!.  Just like when you see a fingerprint, they're
not all the same.  You know it's a fingerprint.  Or when
you see a snowflake, they're not all the same, but you
know it's a snowflake.

So this is true with the design of our
chip as well.  It happens with other trademarks.  You
all have all seen this.  When you go on the Internet.

1  Google likes to mix up its marks, changes it all the

2  time, but you always know it's Google.

3            To say that we have abandoned our trade

4  dress because our chips vary from chip to chip is just a

5  silly argument.

6            All right.  Just a quick word about the

7  design of the bag.  So this is our -- this is our -- the

8  design of our bag right here (indicating).  You've seen

9  it.  This is our trade dress, and this is where we have

10  protection.

11            They set out to copy not only the design

12  of this bag, but they also set out -- there's the bag

13  that they copied.  That's what they sell at Walmart

14  right there.  You see some of the same styling of

15  lettering, some of the same general coloring.  You see

16  the bowl with the chip going into it, salsa.  You see

17  the window that looks like the chips are going into the

18  bag.  That's the other piece of our trade dress.  It's

19  the -- it's the bag.

20            Now, Defendants set out to emulate.  They

21  set out to copy.

22            I want to show you a slide that is from

23  their Project Backhoe document.  I'm going to have to

24  move around just a little bit here, and I apologize for

25  having to jump the slides.  I skipped over that a little

bit earlier.  It is right there (indicating).

What is Project Backhoe?

This is one of the documents we got from their internal files.  It's where they -- it's at the outset of their -- their project.  It's Plaintiff's Exhibit No. 32.  What is Project Backhoe?

Project Backhoe, this says, is Tostitos SCOOPS! emulation project.  The basis for this presentation is to introduce Ralcorp leadership to the top line of this project.  In addition, we hope to gain concurrence to move forward.

Tostitos SCOOPS! emulation project, this is a document they used internally to kick off what they call Project Backhoe.  No coincidence that that PowerPoint has a Backhoe scoop on the front of it.  They set out -- they set out to copy and to emulate.

Now, Tracy, could you move forward back to where we are.  It's probably going to be at 120. Thank you.

This is Mr. Trowbridge again.  There are two things about this that I want to mention to you. We're asking him here where they came up with the design of their chip and how they came up with it.  And he says:  Well, we wanted it to be useful.  We wanted it to be dipping.

1     And we asked him then were there any

2 other characteristics.  Well, we wanted to stay close to

3 the shape that's on the market -- that's us; that's

4 Tostitos SCOOPS!

5     And was there anything else?  Anything

6 beyond shape?

7     Mr. Trowbridge told us shape and

8 function.

9     And why do I emphasize that?

10     I emphasize that because the Defendants

11 are going to tell you that it's all about function, but

12 it's not all about function.  It's about both shape or

13 design and function.

14     Mr. Trowbridge says here, and he said it

15 in some of the other documents, and so did others at

16 Ralcorp:  They are two different things.

17     Let me show you one more thing about

18 their copying, and that is -- we showed you the design

19 of the bag.

20     Tracy, can you go to the slide that is

21 the Great Value array?

22     This is an example of what they did with

23 their package.  They moved their package over to look

24 like this, even though the other products that were

25 being sold at Walmart looked like the ones on the right.

                    Do you have any doubt about what the
intent of that was, this picture makes that clear.

                    Now, let me jump forward.  I'm going to
go to the patent.  This is our patent right here
(indicating).  This thing on the top is the patent
itself.  It's addressed with a seal from the United
States Patent & Trademark Office.  And this is the
evidence.  This is called the file history, examines the
work that the Examiner did in issuing this patent,
considering this patent.

                    One thing is clear.  The Defendants are
not challenging the validity of the patent.  You heard
about that in the video yesterday.  Defendants sometimes
challenge the validity of a patent.  That's not at issue
here.  They agree they do not take issue with the fact
that the United States Patent & Trademark Office
properly granted us this patent.

                    So this case, when it comes to the
patent, is all about infringement.  It's all about
infringement.  When we get to the details of that
infringement, I want to tell you about two other
functional tidbits.

                    There were two stop signs installed; they
put up -- that were put up to them, that they ran right
past with respect to our patent, heading to a patent

infringement.

Mr. Vickery told them that we used Wolverine for our SCOOPS! so these folks went over to talk to Wolverine about helping them work on Project Backhoe. Wolverine told them: We cannot get involved because of legal concerns. Medallion knew what they were talking about. They were talking about the patent is what Wolverine was talking about. They tried to get confidential information from Wolverine.

They went -- when Wolverine said no, they went to Jim Young, who's a former Wolverine employee. When Jim Young told them I can't give you any Frito-Lay confidential information, they stopped calling.

Wolverine, that's one of the stop signs they have on the patent.

The other is from Reading Bakery Systems. Medallion went and asked Reading to be involved in building their BOWLZ lines, and Reading told them that they could not be involved because Project Backhoe would infringe this patent.

Mr. Bender, who you're going to hear testify, says that Reading told us this patent is, quote, very tight, unquote, and Reading was concerned that the design that Medallion was pursuing would infringe the patent.

Now, Reading went ahead with them eventually, but Medallion had to assure them that Reading would not be involved in the design. So Reading said we have concerns about this very tight patent, and we will not be involved in the design of the system. Reading saw the stop sign; Medallion didn't.

Now, the patent is infringed, and I'll just tell you quickly that we will have Dr. John Floros, who's the Dean at Kansas State University, come in to talk to you about how the patent is infringed. The dispute on the patent is relatively narrow, and I'll show you what it is.

This is Claim 1 of the patent as well as Claims 5, 6, 7, 8, and 12. The primary focus of this discussion this morning will be of Claim No. 1. There are several steps in Claim 1 of the patent: Sheeting -- feeding the substantially flat pieces at a feed speed onto an alignment belt; adjusting, discharging, molding, and drying.

And let me show you the pieces that are at issue. In the discovery in this case, we were able to ask the Defendants to commit on which of these are in dispute. The Defendants admit that all of these items are satisfied.

Now, to prove infringement, we have to

show that they satisfy these other two items, and they
relate principally to the alignment system.

Dr. Floros from K State has looked at
these elements.  He's studied the patent.  He's been
over to Newport to look at the system, and he's reached
the conclusion that, in fact, the patent is infringed.

Just a quick word about how the patent is
infringed.  I'm going to show you now what is Exhibit
No. 38, which is a drawing here.  You will come to know
this as Reading's emblem up here.  They were concerned
about the process, stepped out of the design, but this
board is an overview of the Medallion system.

It is a little confusing, because it's
got two different views of a piece of the Medallion
system on there.  So the corn-cooking and soaking, if
you looked at a tortilla chip manufacturing line, the
corn-cooking and soaking equipment, which is what
Quality Fab made for them, which they got from Quality
Fab to our specifications.  They learned about our
specifications and then got it on their line.  All of
that stuff happens up this way.

The corn masa that comes in here is
sheeted onto these alignment belts, and then it's baked
in this oven.  So this is a side view of the line.

This is a view of what this same line

would look like if you were looking down on it.  So the
picture itself is a little bit complicated because of
those two different views.  But this is the side view
and this is the top-down view (indicating).

The key question are those two alignment
steps up there with respect to patent infringement.
Reading identified right here this middle part, this
part right here (indicating), includes the alignment and
phasing hardware and software systems.

There are two primary ways that they
satisfy that alignment claim.  Now, first let me tell
you what is the alignment.  So these little guys right
here, these circles, are molds.  They cut these chips
when they're raw out on this shear.  They put them on
these belts.  They come down here and they go into
another one, and they drop them on a mold to cook them
in this shape.

So each of these is a precut piece of
masa that goes down the alignment belt.  It needs to be
lined up to these molds and then drops on the mold and
goes in the oven and cooked and then it's fried, okay?

So this is what Reading described as the
alignment and phasing system, and in this system -- now
we're looking down on it, so it would be in this part on
the side as well.  So looking down on it in this system,

Dr. Floros will tell you they align their chips, for

purposes of molding, two different ways, okay?

These multiple belts operate as one

alignment belt, one alignment system, and they change

the speeds of the belt to make alignments. It's like

a -- it's like going into a school zone. When multiple

cars go into a school zone, the first one goes into the

school zone slows down first. The second one that comes

in the school zone slows down later. And the gap

between those two, those two cars, close. They can move

shifts into alignment through that process.

The second way that Medallion aligns and

uses this claim of the patent is that this whole device

is set on a pivot point. So this device, these -- this

part of the manufacturing line moves this way in this

line. So they can pivot this whole operation. That

these chips -- the pieces coming this way on these

conveyors are not aligned to the molds. They can pivot

the whole system to align those two lines. Simple as

that.

Two ways to do it. Dr. Floros has looked

at it. He'll come in and tell you all about it and give

you the details.

I'm going to wrap up with just a quick

note about damages and tell you this: We're going to

ask you for damages in this case, and we're going to ask

you for damages that are built on the Defendants'

profits.

        For the trade secret misappropriation

damages, we're going to ask you to award their profits

in their first year of operation, which is $4 and a half

million.  That number might actually be updated by the

time you guys deliberate, because we're still waiting on

the January sales numbers.

        But for their use of our trade secrets,

we're going to ask you to make them turn over their

profits on these infringing chips.  These chips

(indicating).

        Same thing with respect to trade dress,

the design of their chip, we're going to ask you to

award us their profits, which to the end of December of

2012 was about $4,500,000.

        With respect to their use of our patent,

we're going to ask you to require them to pay a

reasonable royalty.  We'll have an expert come in and

explain to you what is a reasonable royalty, and the

Judge will give you some instructions on that.  But

essentially, what that amounts to is a license for the

patent, that they pay for the use of the patented

invention, and that number is going to be $3 million.

1                So those are the damage claims that we're

2   going to make in the case that you will be asked to

3   deliberate on that.

4                You know, I started my opening statement

5   this morning talking to you about the people at

6   Frito-Lay and how they worked long and hard on this

7   process.  I thank you for your attention.  Y'all have

8   been focused.  You've taken good notes.  I appreciate

9   that.

10               Frito-Lay, this is a good company.  It's

11  got good, hard-working, honest people.  They have spent

12  decades bringing things to consumers that consumers have

13  come to love.  They have been wronged with respect to

14  this chip.  This case is about what the Defendants did

15  on this chip.  Don't lose sight of the issues in the

16  case on account of Defendants' false arguments.

17               Frito-Lay has been wronged by Defendants,

18  and we're going to be asking you to make it right.

19               Thank you very much.

20               THE COURT:  Thank you, sir.

21               Okay.  At this time, we're going to go

22  ahead and take our morning break, and then we'll come

23  back and you'll hear the opening statements from the

24  Defendants.

25               I will repeat the same instruction you're

```
 1  going to hear me say all the time.  Please, again, don't
 2  discuss the case among yourselves or anybody else, and
 3  go ahead and take about a 10- or 15-minute break, and we
 4  will come back and hear the opening statements from the
 5  Defendants.
 6                 Thank you.
 7                 COURT SECURITY OFFICER:  All rise for the
 8  jury.
 9                 (Jury out.)
10                 THE COURT:  Be seated.
11                 Okay.  We need to take up -- your side
12  we'll note that you used a little more than an hour and
13  35 minutes, but the Court wasn't -- I wasn't timing
14  that.  I don't want to slight the Defendants on its time
15  either.
16                 MR. HILL:  Just one question in that
17  regard, Your Honor.  When we get back in 15 minutes,
18  I'll have an hour and 15 minutes before we get the lunch
19  break.  I expect that will be adequate, but I need to
20  finish off two or three minutes after noon.  I hope the
21  Court will give me that indulgence before we just hit a
22  hard stop.
23                 THE COURT:  No, I'm going to stop you
24  right at noon.  No, I am user-friendly.  I will give you
25  plenty of time.  So we'll go until you finish your
```

1  opening statement, and then we will adjourn for lunch.

2              Anything else we need to take up

3  Gentlemen, Ladies?

4              MR. DURST:  No, Your Honor.

5              COURT SECURITY OFFICER:  All rise.

6              (Recess.)

7              (Jury out.)

8              THE COURT:  Okay.  Bring the jury in.

9              Mr. Hill, are you going to be doing the

10  opening?

11             MR. HILL:  Yes, Your Honor.

12             THE COURT:  Are you going to be standing

13  at the podium, or will you be walking?

14             MR. HILL:  I'll be moving, Your Honor.  I

15  have the microphone on now.

16             THE COURT:  Okay.  Very good.

17             COURT SECURITY OFFICER:  All rise for the

18  jury.

19             (Jury in.)

20             THE COURT:  Please be seated.

21             The Defense will give their opening.

22             MR. HILL:  Thank you, Your Honor.

23             May it please the Court, counsel.

24             Ladies and Gentlemen, thank you again for

25  being here this morning.  I know we're imposing on your

time, as we discussed yesterday, and I'm going to tell
you every day I get a chance that we appreciate your
service and thank you for being here.

If you strip away the allegations in this
case and you focus on the actual facts, the evidence
will show that this case is about three basic things:
$4 versus $2, American free market competition, and
consumer choice.

As we discussed in my voir dire, my name
is Wesley Hill. I'm proud to have a chance to defend
Medallion and Ralcorp against the allegations that have
been made against them in this case, because those are
just that: Allegations. They're not proof; they're not
evidence. What you're about to see is some of the
evidence.

Let me tell you a little bit first about
Medallion and Ralcorp. As we discussed a little in voir
dire, these are companies that are based on the idea of
giving consumers choice and fair prices.

We make store brands. We all know what
those are. We see them every day in grocery stores,
pharmacies, side by side on the shelf. They're packaged
similarly. They're made to perform similarly.

The idea of a store brand is to emulate a
name brand. If you don't sufficiently emulate, you are

not an adequate store brand.  You're not an adequate

substitute.  That is the nature of the business.

There's nothing wrong with that.  There's nothing

nefarious about that in any way.  It's something

Medallion and Ralcorp do well and we do proudly, and

we're not ashamed of it.

It's also something that brands like

Frito-Lay often even do themselves.  They have

competitors, and they know they have to compete, and

they know when a successful product hits the market, if

they want into that market space, they have to compete

with them with a similar product.

The evidence will show you in this case

that in 2009, Ralcorp and Medallion decided to pursue

making bowl-shaped tortilla chips, and we were doing it

to compete with Frito-Lay's Tostitos SCOOPS!.  No secret

about it.

Frito-Lay is the Goliath of the chip

business with roughly 60 percent of the U.S. snack chip

industry.  They charge a premium price for their

Tostitos SCOOPS! product.

Frito-Lay's own documents will show you

that they consider their SCOOPS! product their Holy

Grail.  I'll show you one of those documents now,

because I want you to see evidence in this case.

1                    Jack, can we see Defendants' Exhibit 213.

2                    Excuse me, folks.  There we go.  Wrong

3    input.  There we are.

4                    This is Tostitos, a PowerPoint

5    presentation produced by Frito-Lay in this case from

6    their own files.

7                    Let's go to the third page of that.  Blow

8    up that top end so the folks can see it.

9                    SCOOPS! is what they consider their Holy

10   Grail.  And why do they consider it that?  Because it's

11   profit-enhancing and because they view it as being

12   competitively insulated.

13                   Their witnesses have told us this.

14   There's no secret about it in this case.  Let's look at

15   a clip of the deposition testimony from one of

16   Frito-Lay's witnesses, Ms. Anderson.

17                        (Video playing.)

18                   MS. ANDERSON:  Certainly SCOOPS! has been

19   a component of many, many of the advertising campaigns

20   over the years because it's kind of our crown jewel in

21   the Tostitos portfolio.

22                        (End of video clip.)

23                   MR. HILL:  And, folks, what Frito-Lay's

24   goal with Tostitos SCOOPS! is, is to get consumers to

25   pay a premium price for that product all the time.

1  We've got documents that show that.

2           Let's take a look at Defendants'

3  Exhibit 63 -- 263.  This is, again, a Frito-Lay's

4  internal document, and if we flip through this document,

5  we are looking specifically -- keep going there, Jack.

6  Keep going.  Is that it?

7           All right.  Maybe I pulled up the wrong

8  document.  We'll get that one, and I'll show it to you

9  in just a second.

10          But Frito-Lay's goal is to get you, the

11  consumer, to pay the premium on a product at all times.

12  That's what they're after.

13          We've got this document, Defendants'

14  Exhibit 263.  I will show it to you at an appropriate

15  point in the case where you get a chance to take a look

16  at it.  That's what they say they're after.

17          They're looking for consumers to pay the

18  premium at all times, because they recognize they have

19  what they consider to be a premium, high-end product,

20  and they want to maintain that exclusivity and that

21  price point.

22          You'll learn that their profit margins

23  ever since their launch in 2001 with SCOOPS! has been

24  among the highest on the SCOOPS! product.  And you'll

25  learn that they've had no serious store brand

competition ever since 2001.

And, you know, Mr. Durst showed you earlier all the various products that store brands compete with with Frito-Lay and draws out that they didn't sue anybody claims on any of these other store brands.

Well, the store brands and other ones aren't the Holy Grail. They aren't SCOOPS!. They aren't their highest profit margin product.

So what did Medallion do? Let's talk about that. It began a project internally that it called Project Backhoe. And that project was to determine whether it could fairly make and compete with the bowl-shaped chip of its own, one that would share SCOOPS!' functional aspects but offer consumers a lower price, store brand choice, while respecting Frito-Lay's intellectual property rights.

Let's take a look at Plaintiff's Exhibit 32. Mr. Durst showed you this earlier. This is one of the launch documents internally in Medallion when we were looking at Project Backhoe, the initial stages, when it was still just an idea.

Let's go to the next page.

This is what Mr. Durst showed you. He points to this as if we are ashamed of the fact or

there's some mystery that this was a product emulation

process.  There's not.  This is what we set out to do.

Let's go to the next page.

We were assessing Frito-Lay's market

share and the opportunity that existed in this product

line because there was no competition for this product.

Let's keep going.

We looked at what we knew based on

existing processes that we had in our plant -- again,

Medallion has been making chips for almost 30 years --

and what we would have to learn or develop to be able to

make a bowl-shaped chip.  So we were doing what we had

to do, and we knew what we had to research and develop.

Let's keep going.

We set up a feasibility study.  What's

the first thing we did?  We did a legal review.  We

wanted to do this right, because we're in the business

of lawful competition, not stepping on other companies.

It does us no good to try to infringe

someone else's intellectual property.  That's not our

game.  That's not what we're after.  It's not what we've

been doing for 30 years.

There's our feasibility timeline.

Let's keep going.

There's the timing that we had on our

development process, our goals.  We didn't meet all
those goals.  It took longer than we expected.

Let's go one more.

And here's the new developments section
where we're discussing some of these things.

Can we highlight the first two bullet
points there, Jack?

So we recognized at the very beginning of
this process that the patent search had uncovered
limitations on how we could form the bowl shape.  But we
had two ideas of how we could do it without infringing
anyone's patents.  We were designing around patent
rights, because that's lawful and that's legal
competition.

Now, Medallion assembled a team of its
employees to tackle this project.  The team included
engineers, product development folks, plant managers,
people with dozens of years of chip-making experience,
something Medallion has been doing for 30 years.

Now, several of the team members
previously worked at Frito-Lay.  Let me address that for
a second, because you're going to hear a lot about it in
this case.

Like any smart employer in a specialized
business, Medallion looks for employees with industry

experience.  There's no shame in that.  It's something

Frito-Lay does.  It's something any good business in a

specialized industry will do.

It's because -- is it because we're

trying to rip people off?  No.  It's because we're

trying to hire folks that know about what they're doing,

that are familiar with the industry and the processes

that are necessary in that industry.

The universe of employees for the

specialized industry of tortilla-making is actually a

pretty small world.  Frito-Lay is 60 percent of the

market, so you necessarily are going to find many

tortilla chip industry folks that have work history at

Frito-Lay.  It's the nature of it.

Now, back to our team a little bit.  The

team consisted of Andy Westervelt, Rusty Karschner, Tim

Bender, Scott Allen, Woody Guinnip, and Kent Vickery.

You'll get to meet and hear from many of

these folks.

I know Mr. Durst showed you some not too

flattering pictures of several of them that were video

captures from their depositions.  You're going to get to

see much more of those people and what they have to say.

The team studied the SCOOPS! chip,

studied the publicly available information about how to

make a bowl-shaped chip, studied Frito-Lay's patents,
Frito-Lay's trademarks to make sure we didn't step on
any of Frito-Lay's patent rights or trademark rights,
and we independently developed a better way to make a
bowl-shaped competing tortilla chip.  That's our BOWLZ
or CHIPZ products.

             Now, from the very beginning of the
process, we consulted with our attorneys, and we studied
Frito-Lay's intellectual property, because Frito-Lay had
told the world what their inventions were.  They had
told the world their process for making these chips in
their published patent applications.  It was no great
mystery.

             It took us over three years and
$10 million to invent, build, and launch our BOWLZ line.

             Let me show you Defendants' Exhibit 144,
Page 2 of this -- this is Page 2 of that document.  This
is a breakdown, estimates of cost that we spent.  You
can see the numbers totaling well over $10 million that
we invested in the development of our process and lines.

             Let me also show you Defendants'
Exhibit 200-7.  This is a short video of a pilot system
we built, a prototype, as we tried to perfect a way to
properly, legally make bowl-shaped tortilla chips.

             (Video playing.)

1    MR. HILL:  See that small line -- it's

2  not real big -- production line, that's what we were

3  doing.  We were tinkering, trying to find a way we could

4  develop and make these chips.

5    And you know what?  We found one, a legal

6  one, a lawful one that has nothing to do with patent

7  rights or the trademark rights or the trade secret

8  rights that Frito-Lay tries to bring in this case.

9    (End of video clip.)

10    MR. HILL:  Now, our chips finally began

11  hitting stores in January of 2012, about a year ago, and

12  initially, our only customer was Walmart, who sold the

13  chips under their BOWLZ trademark.

14    Here's a bag of them (indicating),

15  Walmart BOWLZ.  Walmart owns the trademarks that are on

16  that bag.  You see their Great Value brand, which is all

17  their store brands, and then their BOWLZ trademark.

18    Now, after a few months, Kroger also

19  became a customer selling our chips.  Here's the Kroger

20  bag.  This is what Kroger has as their bag (indicating),

21  same chips sold with the Kroger logos and brands.

22    So what did Frito-Lay do?  They finally

23  had competition.  Our chips are about $2 a bag; theirs

24  are around 4.

25    They sued us right here in federal court

in Sherman, not because they knew we had done something

wrong, not because they knew anything about our process

or how we developed it when they filed their lawsuit;

they sued us because they're Frito-Lay.  They're the big

kid on the block, and we had the gall to compete with

that Holy Grail crown jewel, and so this is where we

find ourselves.

So what did Frito-Lay accuse us of last

February when they filed suit?  We started making the

product in January.  We were sued by February.  They

accused of us infringing their '344 patent.  That's what

you've heard about already.

That patent covers a very specific

alignment system that Frito-Lay uses to make their

SCOOPS! chips, the alignment system.  That's all it

covers that's at issue in this case.

We knew about their patent.  We

intentionally don't use such a system.  Of course,

Frito-Lay had never seen our process when they filed our

lawsuit, but that didn't stop them from making the claim

anyway.

Two, they accuse us of violating what

they say is a trade dress on their bag, and we'll show

you the bag.  We'll get into that, because it's not the

bag of chips you see today.  It's a bag they were making

a year or so ago.  So we want to make sure you know
exactly which bags to compare.

And they say we were violating a
trademark of theirs, an issued mark, the '278 trademark.
We're going to show you that, and we're going to talk
about it.

And they say that their trademark is on a
bowl-shaped chip and that our bags and chips are causing
consumer confusion.

They made this claim despite the fact
that the bags look different, despite the fact that the
bags are plainly labeled, as you can see, and despite
the fact that the chips look different.  Notice no one
has put chips in front of you yet, both chips.  We're
going to do that here in just a little bit.

Now, all of these things make consumers
recognize that these products are different, but what
they're telling you is that you, the consumer, can't
distinguish them, that when you go in the grocery store,
you get tricked.

We challenge that.  We think everyone
that goes in a grocery store recognizes the difference
between store brand and name brand, and we think there's
no confusion going on between these products.

Now, after the case had been progressing

for about six months and the patent and trademark claims weren't looking so hot, Frito-Lay added a new claim. They decided, you know, maybe it's not our IP rights. You must have stole them from us. You stole our trade secrets.

They called us thieves. They have pled in their complaint that we violated Texas criminal law and that we are thieves, third-degree felony in Texas to steal a trade secret. They've made that allegation. They base the claim on e-mail and documents that we gave to them in this lawsuit where our employees discuss what they legally know from public information, from fair investigation, and from industry experience about Frito-Lay's processes.

And they also show you the e-mails where we're trying to show how to make our process different, and they claim that's proof of theft of a trade secret, because we assembled industry information and did something different.

And they use Kent Vickery as the patsy for this. You heard a lot about Mr. Vickery, pointed at him with a laser pointer quite a bit talking about him, because he's the only management-level employee at Medallion that ever worked on the SCOOPS! line while he was at Frito-Lay.

1     They mentioned these other folks, saying

2 they had Frito-Lay experience.  They had -- 10, 15 years

3 ago had Frito-Lay experience.  Vickery is the only one

4 that saw the SCOOPS! lines, and so he's their patsy.

5     And therefore, because we're competing

6 with them, we must have stolen trade secret

7 informations -- information, even though our process is

8 different in all the ways that matter.

9     So, you know, as fair-minded people, you

10 ought to be asking yourself right now:  Hang on, Hill.

11 How do we know that's the truth?  Frito-Lay is telling a

12 completely different story.  You're telling us what you

13 say is the other side.  How do we know it's true?

14 The reason you're going to know it's true is the

15 evidence you're going to see in the courtroom this week.

16     We want to show you the facts, because

17 the facts in this case demonstrate, we think clearly,

18 what's going on here.

19     You'll know because the evidence will

20 show you that the '344 patent claims do not read on our

21 process.  We're going to go through it in detail in just

22 a moment, why that is.

23     You'll know that we do exactly what

24 Frito-Lay told the Patent Office when they were trying

25 to get that patent, that they weren't claiming as their

invention.  But now that we're in the courthouse, they

want to recut that deal.  You'll know, because you'll

get to compare the bags in this case and the chips

themselves and let your own eyes be the judge.

You'll also note that the chip in this

case that they claim is a trademark, that they claim as

trade dress, is a functional product.

And you'll know what Judge Mazzant has

already told you a little bit of and will tell you more

about, that it's the overall -- overall a product is

functional, product design is functional.  You can't

protect it with a trademark, because that's the province

of the patent laws.  That's what a patent is about.

If you want to protect the functional

aspect of a product, you have to get a patent on it.

It's a much more rigorous process where they look to see

if it's new and novel and a lot of other things.  You

can't stretch a trademark around a functional feature,

and if you do, it's a misuse of the trademark.

The Judge will instruct you on the law on

that.  We're going to talk about some of it here in a

minute, but that's what you'll see.

And finally, you'll know from the

evidence we show you that we didn't take any trade

secrets of Frito-Lay.  We didn't steal the secret

formula.  The fact that Frito-Lay calls publicly

available information and industry experience

confidential information, the fact that they label it as

such, doesn't make it so.

                    And what it especially doesn't make it is

a legally protectable trade secret.  That is a defined

term that the Judge will instruct you about what it

means, and they have to show you that what they're

claiming is a legally protectable trade secret.  And we

don't think they get there.

                    And when you separate the industry

experience, the standard industry equipment in

Frito-Lay's plants, and you separate also the

interworkings of their plants that they have actually

shown on national TV -- we're going to show you some TV

programs -- you'll get to see that what Frito-Lay claims

is a trade secret in this case isn't a secret at all.

                    Now, I want to show you the evidence on

each of these claims.  I want to walk through it right

now first thing so that you know right now what we think

you're going to know conclusively at the end of this

case, that this case is about $4 dollars versus $2.

                    First, let's talk about the patent

claims.  Frito-Lay asserts its '344 patent in this case.

                    And, Your Honor, the '344 patent is in

evidence as Plaintiff's Exhibit 2. I'd like to publish

a copy of it to the jury at this point for reference.

          MR. DURST: No objection.

          THE COURT: Go ahead.

          MR. HILL: There's 10 copies of the

patent, if you would pass it down.

          Jack, let's go ahead and put up

Plaintiff's Exhibit 2. Pull out the top quarter there.

All right. That's good.

          All right. Folks, this is the '344

patent-in-suit. That's what Frito-Lay is suing us on.

You'll see there on the cover of the patent there's the

name of it, the title for the patent.

          And it doesn't cover just making any

bowl-shaped chip. Frito-Lay will never tell you that.

It just claims a specific process.

          And we know that because the patent

claims, as the video told you yesterday, are kind of

like the property description in a property deed. It

gives you the metes and bounds of their invention.

          And so we're going to be focused on the

claim language in this case and applying it to our

accused process. So I want to show you what Claim 1

says.

          If you will flip through the patent to

1 the 12th page there -- I think there's 14 pages total,

2 and it's Page 12.

3        Go ahead and bring up Claim 1.

4        You can see there it's in Column 8.

5 You'll notice as we go through patents in this case,

6 they're numbered at the top by column.  See the column

7 numbers there?  And what I'm looking at is at Column 8,

8 and it's down here around Line 55.  There's little line

9 numbers down the center margin.

10        And here's what the claim says, and

11 here's what is at issue in this case.  The claim says

12 what is claimed:  A process of making a snack chip

13 comprising sheeting a dough into substantially flat

14 pieces, feeding the substantially flat pieces at a feed

15 speed onto an alignment belt -- all right.  Let's stop

16 right there.

17        See that word alignment belt?  What does

18 that mean?  Well, lucky for us, Judge Mazzant has

19 defined these terms for us.  This is part of the Court's

20 claim construction order that you're going to hear about

21 in this case.

22        It will be a part of your charge, and

23 you'll get a glossary of this sort with these terms and

24 others where they are defined in the patent so that you

25 know what these terms mean, because those are legal

questions that the Judge has given before we start the

trial.

So an alignment system, an alignment belt

in particular, is a belt on which uneven rows of pieces

are ingested into essentially even rows, okay?  That's

how we know what an alignment belt is.

Let's go on through the claim.  And it

says:  Adjusting positions of the substantially flat

pieces on the alignment belt -- so we're adjusting the

position of these pieces on the belt -- with an

alignment system -- all right.  There we go again.

There's another defined term Judge

Mazzant gives us.

And he tells us that's a system

positioned after the sheeter or cutter -- after the

sheeter or cutter, and that's going to become important

in a second -- for moving pieces in a row with respect

to one another.

Do you see that?  Moving pieces in a row

with respect to one another -- along an intentionally

straight line -- excuse me -- along -- with respect to

one another so that the pieces in each row are

positioned along an essentially straight line and to

align the essentially straight line of pieces for

molding.

1           All right.  That's patent lawyer speak.

2 Let me tell you what that's talking about.

3           So if we have a row of pieces -- you

4 know, there might be multiples of them here.  These are

5 those little round pieces that he was showing you in the

6 alignment system, and they're trucking down the conveyor

7 belt.  This is a row, okay?

8           And what they're telling you is that we

9 have to have an alignment system that moves those pieces

10 with respect to one another.  Do you see that?  Move the

11 pieces in each row with respect to one another.

12          Here's a row, and we have to move the

13 pieces in each row, right here, with respect to one

14 another.  So this piece has to be moved in relation with

15 that piece, where this one, where this one, something in

16 the same row.

17          So, basically, what we're doing is, we're

18 taking these pieces that aren't in a perfectly straight

19 line, and we're -- we're pushing them up, okay?  We're

20 bringing them up so that when we're done, we have

21 something that looks more like that (drawing on board).

22          So we're taking pieces in a row, and

23 we're aligning them with respect to one another to form

24 an essentially straight line.

25          See it again.  Perform essentially even

ranks to move pieces in each row with respect to one
another so that the pieces in each row or position fall
in essentially a straight line and to align the
essentially straight line of the pieces for molding.

That's what aligning the system tells us
about, that we're moving pieces in a row with respect to
one another for aligning rows and pieces for molding, is
what perform essentially even ranks, same concept, and
that's all part of the alignment belt and alignment
system, okay?

That's what the patent claims.  That is
the metes and bounds of their invention.

Notice I'm the first one telling you
about it.  It's their patent.  You think, if we
infringe, they would be pretty proud of this invention.
It's so new and novel, they got a patent on it.  I'm the
first one telling you, but I want you to see why that
is.

Now, here's a picture -- let's look at --
look at Page 3 of your patent, third page in.  There's a
series of pictures.  One of them is Figure 5.

Can we blow out Figure 5 there, Jack?

Okay.  This is a picture that's showing
you an example from the patent.  It gives you an idea of
what I was just trying to explain to you.

1          You see how those pieces in the row

2   aren't even?  And you see those little nubs coming in

3   behind it?  Those nubs are going to sure those things

4   up.  It's going to true them up.  Push it from behind

5   and true them up so that they're in a straight line

6   before they go to be molded.  That's what the patent is

7   describing.

8          Medallion does not use this invention to

9   make our chips.  I want to show you now our

10  manufacturing line.

11          MR. DURST:  Your Honor, I object.  I

12  think the Court has entered a ruling that's inconsistent

13  with what Mr. Hill is arguing.  I'll be happy to explain

14  that or we can go to the side-bar.

15          The issue, Your Honor, is that he's

16  arguing that that is what the patent is limited to.  I

17  think this is not the Court's ruling.

18          MR. HILL:  Your Honor, I -- I'm sorry.

19  Go ahead, Your Honor.  I didn't mean to interrupt.

20          THE COURT:  Go ahead.

21          MR. HILL:  I presented this as an example

22  from the patent, nothing more.  And I presented the

23  patent claim language and the Court's claim

24  construction.  I don't know what's misleading about

25  that.

1           THE COURT:  It's overruled.

2           MR. HILL:  Thank you, Your Honor.

3           I want to show you Defendants' Exhibit 43

4    now.

5           Okay.  This is our manufacturing line.

6    What you see right here on the far left -- I want you

7    folks to get oriented to this, because I'm going to show

8    you a video of it in just a second.  I want you to know

9    what you're looking at when you see it.  And notice,

10   too, I'm the first guy showing you why, because I want

11   you to see the evidence.

12          Okay.  This is our sheeter cutter, all

13   right?  The dough comes out of this extruder here at the

14   top.  It drops.  That's a sheet of masa right there.

15   You can kind of see it.  It drops into the sheeter

16   cutter.

17          There is a cutter roller in there,

18   flattens it out and cuts it into these pieces.  Our

19   cutter roller cuts our pieces into straight lines from

20   the get-go.  We don't have to align, because we cut it

21   right out of the sheeter cutter in a straight line.

22          And notice that if you look at the

23   definition of the alignment system, it says:  A system

24   positioned after the sheeter cutter.  That's where we

25   lined it up right there.  We cut it in a straight line,

and that way we don't have to move it.  Makes our

process better and cheaper.

                    Let's look at Defendants' Exhibit 27.

                    That is an up-close view of the guts of

that cutter.  You see those little circles that are in a

straight line, that's what is cutting that dough into

those circles.

                    Let's look at Defendants' Exhibit 34.

                    There's another view of that cutter.  You

can see those circles and how it cuts them into a

straight line.

                    Let's look at Defendants' Exhibit 28.

                    All right.  So this is the end of our

sheeter belt as it's going down the assembly line, going

that direction, going toward the blue belt, and it dumps

our pieces off our sheeter belt onto this transition

belt that goes on down the line, all in a straight line.

                    Let's go to Plaintiff's Exhibit 3 -- or

324, Plaintiff's Exhibit 324 at 2984, Jack.

                    This is further down our line.  You got

that blue belt coming off right there off the sheeter.

There's our blue belt and our straight line.  There is a

transition point under that guard, and then we go to

another belt that carries them on down.

                    Now, let me explain something.  Those

belts run at different speeds, and the reason they run

at different speeds is to separate those rows a little

bit as they go down, okay?  Give them more -- to phase

them, give them more space in between them.

That isn't what the claim construction is

talking about.  That's what Frito-Lay is going to try to

use as the power of suggestion to make you think we

infringe.

But when they do that, every time they

use the word alignment, or like Mr. Durst did earlier,

he points to a document of ours that says alignment in

it, look at whether he's using alignment as it's defined

in the patent, because he's not.  That's just a document

that the people were working on that have everyday usage

of the word alignment, to align something.

Alignment in this case is a defined term

when you're talking about this patent.  And if he's

using alignment in any way different than what the Court

has told you it means, something is afoot.  Something is

going on.  It's a moon-walking bear movie, okay?

So that's why I want to point out to you

about our alignment system, our alignment belts, our

transitioning.  They want to call it an alignment system

that's under the terms of this patent.  It is not.  It

cuts them in a straight row, and we leave them in a

```
1  straight row.
2                  All right.  Let's look at Defendants'
3  Exhibit 47.
4                  That is our belt in those -- the
5  transition belts spitting our dough out onto our oven
6  belt or mold belt.  So what we do is, we shoot the
7  little flat pieces of dough over kind of what looks like
8  an upside down cup, okay?  That's how we make our chip.
9  And then it goes from there on to an air blower, kind of
10 blows it down, and then it goes through a baking oven
11 and it bakes it into that shape, and then it gets dumped
12 into a fryer.
13                 Frito-Lay uses a plunge and mold system.
14 They toast their chips.  And that's why they get out of
15 alignment.  They cut their dough, and they run it
16 through a toaster, and when they toast it up, it kind of
17 pops around, and they get out of shape -- they get out
18 of line.
19                 So they've got to sure those things back
20 up before they try to shoot them onto an upside down
21 muffin tin essentially.  And then they have a big
22 plunger that plunges it down, pushes it down in that
23 cup.  And that's how they make their chip.  Couldn't be
24 more different.
25                 Here is a video of all of this in action.
```

1    Let's look at Defendants' Exhibit 201.

2                    (Video playing.)

3                    MR. HILL:  There's our sheeter cutter.

4    You see the masa dough coming down, going into the

5    roller and the cutter.  There's the actual cutter up

6    close as it's rolling that dough, cutting those pieces.

7    There are the pieces coming off the cutter in a straight

8    line.  There are the pieces again up close, coming off

9    that cutter.  There they're hitting the first belt.

10   That's a different view of that.  There they are coming

11   on down the line, going through to the second belt,

12   still in those rows, right where they started.  And then

13   there they are popping onto the oven rack at the end,

14   you'll see.  That's our system.  That's what they say

15   infringes their product, their patent.

16                    You can stop it there, Jack.

17                    (End of video clip.)

18                    MR. HILL:  Now, folks, when you look at

19   the Court's claim construction, when you look at the

20   patent claim language that you'll get to spend some time

21   with, what you see is that we do it different.

22                    And why do we do it different?  Well, we

23   do it different because we knew that that system didn't

24   infringe anybody's patent.  We knew that was a way that

25   was in the public domain that we could sheet and cut

those pieces and move them from one end down to our oven
belt.

And the reason we knew that is because we
looked at what Frito-Lay itself had told the Patent
Office.  We looked at the file history of that '344
patent.

You know, those two books that Mr. Durst
stacked up for you earlier, that is the back and forth
between Frito-Lay and the Patent Office to get this
patent.

And here's what they told the Patent
Office specifically, to overcome a rejection of that
patent.  The Patent Office had rejected the claims, and
they said:  No.  Hang on.  Don't reject it over the
prior art.  It's different.  And here's why.

Let's look at Plaintiff's Exhibit 296 at
320, Jack.

All right.  This is the disclaimer.

Let's pull out the second paragraph down
past this inset part and the third paragraph.  So I'm
looking at these two paragraphs right -- these right
here, Jack.  Can you see that?  There we go.

All right.  So this is what they tell the
Patent Office:  Contrary to the assertion in the office
action, Fink, that's the prior art, okay, it's the prior

art patent -- does not disclose an alignment system as
disclosed in the present application.

While applicant agrees that Fink
discloses that the chip preforms be aligned in rows
before they are conveyed to the mold plates, applicant
notes that Fink rely on the configuration of the cutter
roller to discharge the chip preforms onto the conveyor
in rows.

So they're telling us that's different.
That's not us.  That's not what we're trying to claim.
Using the cutter roller to put them into even rows is
different.  That's the prior art.

They go on.  Thus, according to Fink,
alignment of the chip preforms relies upon the
configuration of the assembly responsible for the
sheeting and cutting of the chip preforms.  The chip
preforms are deposited in rows directly from the cutter
onto the conveyor and conveyed onwards to the mold
plates.

After separation from the cutter, no
further manipulation or adjustment of the preforms to
form essentially even ranks is disclosed.

Well, that's what they told the Patent
Office, but that's not what they tell you.  We relied on
what they told the public, and now they've sued us for

1   it anyway.

2                   Here's a memo that Medallion's lawyers

3   wrote us about the Frito-Lay patent when we were first

4   trying to develop our system.  I want to show it to you.

5                   It's Plaintiff's Exhibit 153 at Page 10.

6   Bring up the first page first.

7                   This is a letter from one of our

8   attorneys.

9                   If you'll bring out the heading there.

10                  Regarding Project Backhoe before we

11  launched our product.

12                  And now let's go to Page 10.  And let's

13  blow out the portion that starts there in the middle of

14  the page, importantly, right through here and come on

15  down, all the way down to the bottom.  All right.

16                  And, folks, if this is hard to see -- I

17  know it's a long way to look to see something.  I

18  apologize.  We'll try and get a monitor closer to you to

19  help with that.

20                  So our lawyers told us when we were

21  working on this project, the '344 patent, the following

22  argument was presented to the Patent Office to

23  distinguish it from the prior art and was relied upon by

24  the Examiner to reject the claims.

25                  Well, there's the section from the prior

art we just read, the section from the prosecution

history we just read.

Here's what our lawyers went on to tell

us:  The backhoe method is similar to the prior art, as

characterized by the applicants during the prosecution

of U.S. '344 patent, and thus is substantially different

from the claimed invention.

The flat pieces are deposited from the

sheeter on the conveyor belt in aligned rows in the

backhoe method and are subsequently transferred to a

second belt referred to as a transfer belt that carries

them to the molding machinery in the backhoe system.

So he's talking about what we do.

He goes on.  The transfer belt operates

at a different speed than the conveyor belt to produce a

desired spacing between the rows in the backhoe system

method, but the rows themselves are not adjusted on

either the conveyor belt or the transfer belt.

The pieces of dough never move relative

to the belts once placed on the belts in the backhoe

system method.  But there is no need for a, quote,

alignment system, as recited in Claims 1, 16, and 18 of

the '344 patent.

The rows deposited by the sheeter are

sufficient for the backhoe system method.  There's no

alignment system to, quote, form even ranks in the backhoe system.

Never been there, and it ain't there today. We don't infringe the patent. But we got sued for it. Because when Frito-Lay was faced with competition, they do what they do best: Hype and marketing.

They'll point to every document we have that uses that general term alignment, and every time they point to one, ask yourself: Is that what the Court says it means? Is that what they told the Patent Office it means? That will prove to you this case is about $4 versus $2.

Now then, let me mention one thing Mr. Durst raised. He talked about Wolverine and Reading, saying those were two stop signs we ran, these two vendors we deal with, who, when we first started wanting to make the process, didn't want to help us.

Well, do you know what happens to you if you help somebody that Frito-Lay doesn't care for? And Reading, let's talk about them. That's who actually built our system. So $4/$2.

Now then, let's talk about the trade dress and trademark.

First, the trade dress claims.

1          Let me see Defendants' Exhibit 71, Jack,

2   if we can.

3          All right.  That's the bag that this case

4   is all about, that one right there.  No other SCOOPS!

5   bag, not their new one.  This is the bag they're using

6   now, okay?  That has nothing to do with anything as far

7   as trade dress, except to show you the fact that this,

8   you know, famous consumer identifying trade dress they

9   claim they developed in that bag was so famous to

10  consumer identifying that they don't use it anymore.

11          Trade dress infringement requires a

12  comparison of the bags.  So the comparison you have to

13  make is that bag and this bag (indicating), okay?

14          That's the comparison.  I'm just going to

15  leave this over here.

16          Now, Frito-Lay is claiming that the color

17  scheme of this bag all by itself has become so

18  significant in the public's mind that when people see

19  this dollar scheme, they automatically think Frito-Lay.

20  That's their claim.  They have to make you believe that

21  to win this case.

22          Let me tell you something.  Go up and

23  down the chip aisle.  It's full of blue bags with clear

24  windows, full of them.  Blue bags with clear windows

25  with bold lettering on them.  It's full of them.

1              Frito-Lay claims there's a likelihood --

2  that's what they have to prove it -- a likelihood -- not

3  a chance, a likelihood that people are confused by this.

4              Basically, they're saying that you, the

5  consumer, isn't bright enough to look at that bag and

6  look at this bag and know there's a difference.  Do you

7  buy that?

8              Clear branding, different look, 2-dollar

9  price difference.  See, their bag says 3.99 on the side.

10 You really think folks are mixed up?  Your eyes tell you

11 all you need to know about this claim, folks, on this

12 trade dress of this bag.  I'm not going to belabor it.

13             They will bring an expert witness in here

14 from Purdue University who's going to come and get you

15 to believe what they want to tell you they -- what they

16 want you to see.  The power of suggestion is what it is.

17 I want you to use your common sense and your own two

18 eyes.  Look at those two bags and decide if you think we

19 did something wrong.

20             Now, let's turn to the only registered

21 mark they have in this case.  It is the Plaintiff's

22 Exhibit 1.

23             Let's take a look at that, Jack.

24             This is the trademark that they have on

25 that chip.  Take a good look at it there.  I want to

show you now an actual scoop, a bag of Tostitos SCOOPS!
purchased recently.  I'm going to hand them to you.  I
want y'all to look at them.  Y'all look at them.  Take
them out.  You can have the whole bag.

Now, as y'all get a chance to look at
those, ask yourself something.  Do those chips look like
that trademark?  Those chips, every one of them is
different.  They're like snowflakes in that bag.  It's
hard to find two that are even close to alike.
That's why they say they abandoned the mark that Mr.
Durst called such a silly argument, is because their
process control is so lax that they try their best, but
despite those efforts, they don't make that 8-fluted
chip that's in their mark.  They make something else.
So they're not using that mark.

But they have a problem with that
trademark beyond the look of it, beyond the fact that
they can't even get it there.

You know, that's another thing, going
into the functionality, he said that shape and function
are both important.  Well, they are both important.
The only thing they're able to keep consistent about
those chips is not the shape; it's the function.

Because, again, pour them out in a bowl
and look at them.  All the shapes are different.  The

only consistency is the function.

And that's the problem with this mark, is that it's functional. And you cannot use a trademark to protect a functional design. You can't do it. It's against the law. Because like we talked about earlier, that gets you into the world where you've got to have a patent to protect something. That's what they're trying to do in this case.

How do we know it's functional? You know, the Court's going to give you instructions on functionality. Gave you some of them yesterday.

How are you going to assess it? He's going to tell you a lot more.

If the camera is on, see if it's going to cooperate.

All right. That's what the Judge told you yesterday in the preliminary instructions. Trade dress that is functional under the law is not protected. The determination of whether something is functional is made by considering the trade dress as a whole.

Did he say break it down into individual elements?

No. He said consider it as a whole.

It's functional if it's essentially used for the purpose of the article or it affects the cost or

quality of the article.  Then it's functional.

The only consistent feature about those chips that distinguishes them from a flat chip or from any chip is their function.  How do we know that?

Here's the evidence, but, again, I want you to see the evidence, not allegations.  Frito-Lay tells us that first in their advertising.

Sorry.  Thank you, Mark.

Let's look at Defendants' Exhibit 76.

(Video clip playing.)

MR. HILL:  Advertising shape and function.

Let's look at the next one.

(Video clip playing.)

MR. HILL:  We know it because Frito-Lay's documents tell us that it's functional.

Let's look at Defendants' Exhibit 204.

This is another internal Frito-Lay PowerPoint.  Let's look specifically at Page 6.

Blow up the top two bullet points there. There you go.

The first bullet point:  Both users and non-users believe the primary benefit of SCOOPS! is a dip-carrier.  Folks, that's not the only document like that.  I've got a list of them, but in the interest of

1 time, we'll show them to you as the trial goes on.

2 And finally, the thing that just ought to

3 make you scratch your head, Frito-Lay tells us in that

4 patent you've got in your hands that this design is

5 functional. In the patent that they're suing us on in

6 this lawsuit, they tell you about the functionality of

7 that chip.

8 And if we look specifically at Page 9 of

9 the patent that you have --

10 Jack, can we go back to Plaintiff's

11 Exhibit 2, Page 9.

12 Folks, if you look at Column 1 -- or

13 excuse me -- yeah, Column 1 of the patent, Page 9,

14 Column 1, Line 35 to 45.

15 Can you draw that out?

16 They tell us about it. I'll start here

17 in the middle of the paragraph. The utilitarian shapes

18 known include, for example, ridges, scoops, taco-shaped,

19 spoon-shaped, and bowl-shaped of these. Of these, a

20 bowl-shaped chip is particularly desirable as it has a

21 retaining wall or edge surrounding the entirety of the

22 chip.

23 The earlier portion of that paragraph

24 I'll let you read for yourself. It talks about the

25 functionality of it too. It allows you to scoop up a

1  desired portion without losing it.

2          Then let's look at Figure 2 on Page 2 of

3  the patent.  Second page of the patent.  We'll look at

4  Figure 2 this time.

5          This is a picture from the patent, the

6  utility patent.  Does that picture look familiar to you?

7          Can we show Plaintiff's Exhibit 1 again,

8  Jack?

9          Does that picture look familiar to you?

10          That's the very picture they use in the

11  example in the utility patent describing the

12  functionality, and they describe that functionality

13  again in the patent at Page 12.

14          If we go back to Exhibit 2 and we go to

15  Page 12, Column 7, Line 30 to 33, what do they tell us

16  about it?

17          Well, they're talking about that picture.

18  They're talking about 204.  That's the little number on

19  the picture, pointing to Figure 2.  And it says fluted

20  edges 204 allow for a point of entry and easier dipping

21  of the finished chip.  So there the fluted edges have a

22  function, too.

23          Ornamental?  That's not what they say in

24  the patent.  That's not what they say in their

25  advertising.  It's not what they say anywhere but in

this courtroom to you.

Why?  $2, $4, that's why.

You know, folks, there's one interesting thing here about that, and it's that, you know, this patent we're looking at and that trademark, those were at the Patent Office at the same time.  And if you look at the prosecution history of the '278 mark, you know how many references are in there to the '344 patent?

Zero.  Zero.  So they tell the patent division one thing.  They tell the trademark division another.  And they get what you're going to learn basically to be a, quote, competitively insulated product.

Folks, it comes down to $2 versus $4.  We knew about this trademark when we started making our chip.

Let's look at Plaintiff's Exhibit 421.  Plaintiff's Exhibit 421.  This is an e-mail, internal e-mail at Medallion.

You can blow out the top, if you would like to, Jack.

Kent Vickery to Tim Bender discussing prior art patents and things.  You can see this is in April of 2009.  This is when we were just starting to investigate.

1          Let's go to Page 3.

2          Bender -- let's look here at the bottom,

3   this section right in here (indicating), Jack.

4          I know that's small, but you'll get a

5   chance to see the document itself.  It says:  On a

6   separate but related note, we also conducted trademark

7   searches and found that Frito-Lay has a federal

8   trademark registration on configuration of this product.

9   And they -- there's the '278 mark noted.  This presents

10  some interesting descriptiveness and functionality

11  issues.  We recognized then they had a functionality

12  problem, but here's what we said:

13          But if it can be conveniently done, it

14  might be easier to make the product look different

15  rather than contend with the issues of validity and

16  infringement of the trademark.

17          You know what we did?  We took our

18  lawyers' advice.

19          I want to show you our chips.  Take them

20  out and look at them.  You had the Frito-Lay chips.  Get

21  some of theirs and look at them, if you want to, again.

22  You tell me that those chips -- let's look at

23  Plaintiff's Exhibit 1.

24          Did we succeed?  Did we make a chip that

25  looked different from their trademark?

Again, I won't belabor it. I want your own eyes to be the judge. Did we make a chip that looks different from that trademark? Compare it with your own chip, if you want to.

Folks, our chips look different. We followed our lawyers' advice. Frito-Lay didn't care. That's because this case isn't about legitimate concerns about the future. This case is about $4 versus $2.

Now, as you've seen, Frito-Lay's patent and trademark claims, we think, don't hold water. And we think it shows their true motive of eliminating their only serious bowl-shaped chip competitor, protecting that Holy Grail.

But, listen, Frito-Lay is a smart company. They're in the consumer-persuasion business, okay? That's what they do.

So what do they do halfway through this case? They come up with a storyline. Just like their advertising campaigns, they hope that narrative will carry the day in this courtroom instead of evidence.

They're hoping that that narrative about theft of trade secrets will anger you so much that you will tattoo us regardless of what the facts show. And let me ask: What more inflammatory of an allegation can you make against somebody than calling them a thief?

1 Accuse them of theft?

2         Everybody hates a thief.  Well, you heard

3 from Mr. Durst how the story goes, but I think when you

4 look at the evidence, you might find it's a lot like the

5 trademark and the patent claims, a little different

6 story.

7         First let me make something clear.  Not

8 even Frito-Lay alleges that we broke in their plant and

9 stole something; that we hacked into their computers and

10 took something; or that we had employees that took

11 documents from them and left with them and came to work

12 immediately for us.  That's not any part of this case.

13         So here's how Frito-Lay cooked up its

14 story midway through this case.

15         In the northeast corner of Arkansas, the

16 top northeast corner right close to Tennessee, there's

17 two little towns with two chip plants.  Frito-Lay is in

18 Jonesboro and Medallion is in Newport.  These are both

19 relatively small towns, and as you might expect, kind of

20 like around here with Frito-Lay in Plano, they employ a

21 lot of people.

22         And as you might expect, people in the

23 same specialized industries, they sometimes change jobs.

24 If your skill is making tortilla chips and you live in

25 northeast Arkansas, the odds are you're going to work

for Frito-Lay or Medallion.

So out of our 300 employees, all the discovery, all the hours and hours, weeks literally, maybe months of depositions, hundreds of thousands of documents that they scrubbed through for hours in this case, out of all of that, they found two former employees -- former Frito-Lay employees that were involved in Project Backhoe.  And they call them thieves:  Kent Vickery and Jackie Price.

They picked Kent Vickery, because he's the only Medallion management-level employee that worked on a Frito-Lay Jonesboro Scoops! line.  They let him go in 2006 after 25 years of employment, something you're going to get to hear all about.  I won't spend time going into it right now.

When he left, they required him to sign a severance agreement in exchange for six months' severance pay and keeping his benefits for a few months. That severance agreement contained the standard confidential agreement.  Notably, he did not sign an agreement to forget 25 years of industry experience.

Mr. Vickery tried various jobs for the next 14 months, looking around for other types of work. And then 14 months later, in 2007, he applied for a job with Medallion, and we hired him because he had 25 years

of industry experience.

They also picked Jackie Price, Jackie Morgan.  Her last name changed in the course of things, presumably because she left Frito-Lay and came to work for Medallion.  Jackie Price is a high school graduate, single mother of a 19-year-old college student.  She needs the best job she can get.  She knew Kent Vickery, and when he offered her a better position at Medallion, she took it.

Pointing at these two employees as the patsies, Frito-Lay gathered every e-mail they could find in this case among Medallion employees, their store-brand competitor, and now highlight every reference to any mention of how Frito-Lay does anything, and they claim it's a trade secret.  And they claim we obviously stole that information.

Well, folks, they're our chief competitor, and we are in the product-emulation business.  Does it surprise anybody that we talk a lot about what Frito-Lay does?

Does it surprise anybody that we focus on how they do things?

They are our chief competitor.  We stay up on the competition.  That's our business.  Of course we do that.  But they've labeled Kent Vickery and Jackie

Price as thieves.  That's a bold allegation.  This
courtroom is not about allegations.  It's about proof.

What Frito-Lay's theft claims ignore is
the legal term and the legal definition of the term
trade secret.  A trade secret is not anything that
Frito-Lay unilaterally deems confidential.  They can
label everything they've got confidential, and the fact
they label it that way and call it that way in their
house doesn't mean it's a trade secret at the
courthouse.

Common industry experience, publicly
available information, issued patents, things that can
be discovered through proper investigation,
reverse-engineering or inspection, none of that stuff is
trade secrets.  And Frito-Lay knows it.

That's why they hired an expert in this
case.  You're going to hear from Dr. Martin Okos to come
in and convince you that some of those things are trade
secrets and that we stole them.

Here's his report, Dr. Okos.

I don't want to stop your computer there,
Jack.

There it is (indicating).  He had unfair
access to look at every document in this case, inspect
every inch of our production line, talk to our

employees, and review all the depositions, whatever he

wanted to do.  And I'm not going to go through every

example of what's wrong with Dr. Okos' report.  We will

do that if Frito-Lay has the guts to put him on that

witness stand.

But so that you can see the ease that

Frito-Lay accuses people of theft, only to call, you

know, King's X, not it, when the rubber meets the road.

Let me give you some examples of what Frito-Lay is

willing to call a trade secret in this case.

In addition to Dr. Okos' report, they

gave us a list of what they claim is a trade secret.  I

want to talk about a few of those things.

First off, they say Frito-Lay

specifications, configuration and design and integration

of its corn-cooking, soaking, and washing equipment.  So

corn-cooking, soaking, and washing equipment.  You're

going to see a video in just a minute where they're

talking about a TV show.  You will get to watch a TV

show.  It will show you corn-soaking, cooking, and

washing equipment.

How Frito-Lay employees operate its

tortilla lines.  That's a pretty broad subject.  Does

that sound like a trade secret, how we operate our

tortilla lines?

1          You know, we've been operating tortilla

2 lines for 30 years.  That TV show, let me show you a

3 little something about how they operate a tortilla line.

4 The amount of time that Frito-Lay has spent developing

5 SCOOPS!  Mr. Durst told you a few minutes ago that was

6 seven years.  Let's take a look at Defendants' Exhibit

7 153.

8          Can we blow out the text there in the

9 middle, right in the middle of the page?

10          Develop.  This is a Frito-Lay press

11 release from the relevant time period following 18

12 months of development, Frito-Lay Food scientists

13 perfected the technically insulated form and fry

14 technique to create Tostitos SCOOPS!.

15          So they told -- they're going to tell

16 you -- they told us they're going to tell you at least.

17 We'll see if they've actually got the guts to do it --

18 that the amount of time Frito-Lay spent developing

19 SCOOPS! that Mr. Durst said was 7 years, was a trade

20 secret, number one, and on the face of the fact they've

21 got press releases telling you it's not 7 years; it's 18

22 months.

23          They're going to tell you that the

24 knowledge of the way that Frito-Lay makes SCOOPS!,

25 including the use of hot air, to dry chips during

molding is a trade secret.  The use of hot air to dry
chips during molding, that's a trade secret.

                    Let's go back to Plaintiff's Exhibit 2.
That's your patent you've got in your hand, public
document.  Take a look at Page 12.  And we're going to
look at Column 7, Line 60.  Column 7, Line 60.
What does the patent say?

                    Right here (indicating), once plunging is
complete and the chips are passed through a plunger and
mold conveyor, chips are conducted through a form dryer
while still retained within the molds.  Form dryer is
optionally a multi-zone dryer to dry the chips.

                    It's in their patent.  They're going to
tell you it's a trade secret.  At least that's what they
told us they were going to tell you.

                    They also have something else in the
patent on Page 12.  Look at Column 8, lines 16 to 19.
16 to 19.  They claim it's a trade secret in this case,
the knowledge that an air assist is needed to remove
chips from the molds, they use air to blow the chip off
the mold, okay?  They are going to tell you it's a trade
secret, because they saw it in looking at our plant.

                    That's something we did.  Oh, that's a
trade secret.

                    Nobody else has sense enough to come up

1  with something innovative.  What do they say in their

2  patent?

3                To release chips, molds open and

4  separate.  To assist the release of the chips, an air

5  blower beneath mold rack belt can direct a stream of air

6  toward the bottom of the molds.

7                They are in the courthouse accusing us of

8  third-degree felonies for stuff that's in the patent.

9  It's not part of the patent claims.  This is a

10  description of the background things and how you can do

11  stuff.

12                I do want to talk to you about one other

13  thing that they brought up as a trade secret.  They

14  showed you Mr. Trowbridge and they talked about Quality

15  Fabrication and an inspection that our employees took to

16  inspect some industry equipment at Quality Fab.  Quality

17  Fab makes corn washers and corn soaker-type equipment,

18  okay?  It's common industry equipment.

19                Quality Fab wanted our business, and so

20  they wanted us to see the quality of the work they do,

21  so they invited us to come and inspect product they were

22  making.  The product made by this company was

23  Frito-Lay's product.  It's not how they make the chips.

24  It's a corn washer.  There's nothing industry-specific

25  about it or proprietary about it.

1          Folks from Quality Fab will come and tell

2    you that.  But they show you Mr. Trowbridge's

3    deposition, and they show you a snippet.  They deposed

4    that man all day.  I don't know if you noticed the time

5    on that deposition.  He had been there about eight hours

6    being interrogated.  Maybe that explains his mannerism a

7    little bit.

8          What did he say?  He says:  Not the best

9    decision I ever made.  Well, what else would you say if

10   you were somebody sitting there being inquisitioned

11   (sic) by Baker Botts for nine hours?

12         What he didn't show you is the testimony

13   from Quality Fab.  Quality Fab, guys named Mr. Peter and

14   Norman know their equipment, not Mr. Trowbridge.

15         Both of them testified in this case in

16   depositions that there was nothing proprietary about any

17   of the equipment we inspected.

18         And the confidentiality agreement between

19   Quality Fab and Frito-Lay is between Quality Fab and

20   Frito-Lay.  Frito-Lay didn't sue Quality Fab.  Quality

21   Fab doesn't sell 4-dollar chips -- 2-dollar chips

22   against their 4-dollar chips.

23         Quality Fab (sic) sued us.  Of course,

24   Quality Fab also doesn't make Cheese Puffs and corn

25   chips and Doritos and other things.

                    Folks, the best proof we have that we

didn't steal any trade secrets in this case, though, are

the processes themselves.  Our process is nothing like

Frito-Lay's process where it counts, and that's what I

want to show you a little bit of right now as I get to

the end.

                    I want to show you Frito-Lay's

manufacturing process.  I want to show you first

Defendants' Exhibit No. 1.  This is that TV show we've

all been talking about.  It will take a few minutes to

run, but I think it's worth seeing.  And I want you to

see it not because it's public disclosure.  I want you

to know that, that it's their process.

                    Let's take a look, Defendants' Exhibit 1.

                    (Video clip playing.)

                    MR. HILL:  Do you see the cook room?

                    (Video clip continues.)

                    MR. HILL:  The soaking and washing

equipment.

                    (Video clip continues.)

                    MR. HILL:  Here's that toaster oven we

don't have.

                    (Video clip continues.)

                    MR. HILL:  20 to 30 percent of oil --

                    (End of video clip.)

MR. HILL:  Folks, what's curious about
that Food Network video is the part that they said was
Tostitos is a Frito-Lay secret.  I want to show you what
that secret was so that you'll have seen the entire
manufacturing process.

Let's look at Defendants' Exhibit 238.

At 18, 24, Jack.

(Video clip playing.)

MR. HILL:  This is their line.  This is
what they didn't show you in the Food Network video.
There we are coming down the line, coming out of the
toaster that we don't have.

Remember, they've got to land these
things on little molds, so they've got to have them in
alignment.

And here comes that alignment system.
See those chips jumping around over here, some of them.

Watch them.  See them moving, getting
trued up.  Happens fast because it's a high-speed
system.  But you watch; you'll see them jump.

Apologize for that part of the video.
It's like the Blair Witch Project.

See them moving?  See them truing them
up?  Those are those little nubs grabbing them and
pushing them into a line.  See, that's what the patent

is talking about.  That's what we don't do, but it's
what they claim.  They claim trade secrets when our line
where it counts, where it's anything other than industry
standard equipment that they're willing to show on TV
where our lines are completely different.

Now let me show you another picture of
that alignment system.

Let's go to 255, if we can, Jack.  This
is a slow motion of that alignment system.

No, no, no.  That's not it.  Defendant's
Exhibit 255.

Well, while Jack finds it, let me make a
point.  I think you can see there it's moving a little
fast.  I want to show it to you slowed down, but I won't
hold us up.

That alignment system is nothing like
ours.  That alignment system is the only part of the
process that's not such common industry equipment that
they don't put it on TV for the Food Network.  And
that's the part that's not going to align.

If that doesn't align with the trade
secret claim, I don't know what could better show it.
If somebody accuses you of stealing -- if somebody
steals your car, their new car looks a lot like your old
car.

1              Now, I want to show you our process again
2  so you can make the direct comparison.  You saw some of
3  it, but I want you to see it again, beginning to end.
4  Defendants' Exhibit 201.
5              (Video playing.)
6              MR. HILL:  Okay.  There's our process
7  again that you saw.  There's our sheeter cutter making
8  our chips, and the reason I want to show you this -- I
9  know you've seen parts of it already.  I don't want to
10 belabor it or drag this out any more than it has to be.
11 I want you folks to know that we want to put the
12 evidence right in your lap, because we want you to look
13 at it.  And I am showing you the whole thing.  No
14 slighting going on here.
15             (Video clip continues.)
16             MR. HILL:  There are the chips being
17 sheeted into rows off the cutter.
18             I tell you what, this is not that whole
19 clip.  This is the produced clip.  Can we go to the
20 whole video, 201?
21             (Video clip playing.)
22             MR. HILL:  All right, here we go.  Here's
23 our product coming in just like they started in the
24 Frito-Lay video.  Here's the corn coming in.  Industry
25 standard.  Similar industry standard equipment, because

1  that's how you make tortilla chips.

2          There's our corn being transported into

3  the system.  There's our pictures you were seeing

4  earlier of the cutter roller.  They stopped it there to

5  take those pictures.  You can see that's how those still

6  photos you got to see came about.

7          (Video clip continues.)

8          MR. HILL:  All right.  There it is where

9  you picked up earlier, making the chips.

10          Can we go ahead just a minute or two in

11  the interest of time?

12          Folks, I apologize for ambushing Jack

13  over here.  He didn't know I was going to try to move

14  through it like this, but I was trying to save us a

15  little time.

16          Well, I tell you what, we will just let

17  it play and I'll tell you what I want you to know about

18  it.

19          (Video clip continues.)

20          MR. HILL:  Folks, our system works better

21  and cheaper and more efficiently, because we eliminated

22  the toaster and we eliminated the need for the costly

23  alignment system.  We made a better mousetrap.  We did

24  what the Patent Office tells you to do.

25          And because it's new and better and

because we know it's new and better, we filed our own
patent application on it.  If we stole it from
Frito-Lay, do you think we would be so bold to go file
it with the Patent Office?

And speaking of bold, part of what
Frito-Lay is asking for in this case is to take our
patent application.  Ladies and Gentlemen, we haven't
stolen any trade secrets.  Frito-Lay knows it.  It's not
hype.  That's the proof.  It's also proof what the case
is about, $4 versus $2.

I'll finish where I started.  This case
is about free-market competition and consumer choice.
The courtroom is different than a flashy TV ad.  You've
got to bring proof, not just a narrative.  And the
greatest lie detector in this world is sitting in that
box right there, the jury trial.

We appreciate your time in this case.  We
appreciate your energy.  We appreciate the hard work
that you're going to put in.  And most importantly, we
appreciate your fairness in listening to the evidence
and making a decision based on the evidence in the case,
because ultimately what happens here at the courthouse
is supposed to be about justice.

Medallion's done nothing wrong except
having the guts to compete, $4 versus $2, and we think

when the case plays out, you will agree with us. I

appreciate your time. You'll get a chance to see these

videos full length over the next week, probably more of

them than you ever want to see. And we think the

evidence will be proved up.

Thank you.

THE COURT: Thank you, Mr. Hill.

Ladies and Gentlemen of the Jury, we're

going to go ahead and take our lunch break at this time.

And, again, same thing I've been telling you over and

over again. Please don't discuss the case with anyone

or do any kind of research or anything about the case.

And then if an hour and 15 minutes is

sufficient, we will come back at 1:30. Be back at 1:30

and we will start back and start hearing the evidence.

Thank you.

COURT SECURITY OFFICER: All rise for the

jury.

(Jury out.)

THE COURT: Please be seated. And,

Mr. Hill, just to be fair, you also went over a few

minutes.

MR. HILL: I apologize, Your Honor.

THE COURT: No, no apology necessary.

The Plaintiffs went over a few minutes, and you went

over a few minutes from him.

So -- and then one thing is, of course, when the jury comes back, I will go ahead and enter the exhibits.  I have Plaintiff's unobjected-to list.  I don't know if I ever received the Defendants' unobjected-to list.

MR. HARLAN:  We will bring it up in 30 minutes.

THE COURT:  That's fine.  And show it to Mr. Durst or someone with him.

MR. HARLAN:  We will.

MR. DURST:  Not yet, but we will look at it.

THE COURT:  Then who's our first witness after?  Is it going to be a live witness?

MR. DURST:  Yes, Your Honor.  It's going to be Mr. Z.

THE COURT:  Mr. Z.  I'm looking forward to hearing from Mr. Z.

The jury will have clipboards with the questions, the form of the questions that went out.

MR. DURST:  Okay, great.

THE COURT:  So we'll be passing those out, and they will have those when they come back.

Anything else?

                    MR. DURST:  Yes, Your Honor.  May I raise

a couple of issues real quick?  It will be fast.

                    THE COURT:  That's fine.  Don't worry.

                    MR. DURST:  Can I borrow something over

here, fellows?

                    THE COURT:  You can flip the lights back

on, Mr. Strandlien.

                    MR. DAWSON:  You see these (indicating),

Your Honor?

                    I just noticed this this morning.  This

is subject to a motion in limine, and they have had it

stacked out here the whole time.  There is a motion in

limine, Your Honor, that says that they're not to --

they're not to mention any claims we haven't dropped --

you gave that whole spiel about -- or that we're not

asserting.  You heard that whole spiel about Jackie

Price.

                    He played deposition testimony, Your

Honor, in opening that has not even been designated in

the case.

                    THE COURT:  Well, I'm going to ask that

first, Mr. Hill, did you play that?

                    Please go to the microphone or have a mic

on.

                    MR. HILL:  Your Honor, I played about

1  three to -- maybe an eight-second clip of their witness,

2  Janelle Anderson, is the only deposition testimony I

3  played.  And I believe that testimony has been

4  designated in the case by one party or the other.  We

5  thought it was fair game to use.

6              It's their witness who we think is going

7  to testify live.  We don't know that, so we played a

8  clip of the depo.  She's a will-call witness.

9              MR. DURST:  She's coming, Judge, but the

10 deposition testimony has not been designated.

11             Here's the point, Your Honor:  Mr. Hill

12 showed a pendant -- a penchant for time and again

13 violating the Court's motion in limine orders, and you

14 saw, Your Honor, how he argued the pin alignment system,

15 which I thought was against the spirit of another ruling

16 the Court made where he said:  You see how Frito-Lay

17 does it?  We don't do it; therefore, we don't infringe

18 the patent.

19             MR. HILL:  Your Honor, I --

20             MR. DURST:  Your Honor, I urge the Court

21 to -- and I'm not going -- I didn't want to do it.  I

22 chose not to do it in opening, but we've got to put

23 these lawyers on a little bit careful leash -- a little

24 bit more careful leash, Your Honor, in terms of

25 following the Court's orders.

1          It's -- it's -- it shows lack of order

2    and respect for the Court's orders for him to get up

3    there and do what he just did, Your Honor.  There's the

4    STAX motion in limine.  There's the Janelle testimony

5    that's not designated.  There's the Jackie Price motion

6    in limine.  There's the direct comparison of their

7    system to our system to argue non-infringement, which

8    the Federal Circuit could not say any clearer is

9    inappropriate.

10          MR. HILL:  Your Honor, I never made a

11   comparison between their system and the patent.  I

12   discussed it as the contents of trade secrets as the

13   Court has said it is relevant, and that's it.  The Court

14   gave a proper limiting instruction on that thing, and I

15   never violated a limine motion one.

16          MR. DURST:  But a limiting instruction,

17   Your Honor, is not a license to violate the law.  The

18   quote is -- and we'll have the transcript shortly.  The

19   quote is:  It's what that patent does -- showing our

20   system.

21          MR. HILL:  Showing it's in the public

22   domain.

23          MR. DURST:  It's what we don't do.

24          MR. HILL:  Showing we didn't

25   misappropriate a trade secret.  I didn't mix trade

1  secret claims and patent claims in one case, Judge.

2              MR. DURST:  Your Honor, you saw that list

3  yesterday.  There is no -- there is -- we -- you

4  required us, and we've done it now, to give you a list

5  of our trade secrets.  There isn't a one of them that

6  says anything about a pin alignment system.

7              MR. HILL:  Judge, to respond to that

8  particular point -- it's what I just showed the jury,

9  and it's as fair as fair can be -- this is their list

10 you ordered them to produce, Interrogatory No. 5 list,

11 of what they allege is a trade secret in this case.

12             This is what's alleged:  How Frito-Lay

13 operates its tortilla chip lines.  How that doesn't make

14 the whole line appropriate to be discussed in the

15 context of a trade secret when they've told us that's

16 what they're suing us on now, I couldn't understand

17 more.  I mean, how do I not show the line if they say

18 the line is the trade secret?

19             Mr. Durst doesn't like the evidence.  I

20 understand.  He shouldn't.  It's not good for him, but

21 it's not improper in any way.

22             THE COURT:  Well, what is improper is

23 that making any assertion that their system and your

24 system is not the same in regards to infringement.

25             MR. HILL:  With regard to the patent,

1   absolutely.

2               THE COURT:  And so just make it clear as

3   you go forward, and especially when you get to closing

4   argument, I would suspect if that happens again,

5   Mr. Durst will object and I will sustain that objection,

6   and I will give the limiting instruction to the jury

7   before they get the charge.

8               I want to make sure we keep that clear,

9   because that's not proper, and I think you know it's not

10  proper.  And so I understand you're walking a fine line

11  regarding the issue of trade secrets, but make sure you

12  clearly say this argument relates to the trade secret

13  issue, and then we will deal with that.

14              Now, as I said, please cover up the issue

15  with the Pringles.

16              MR. DURST:  I certainly will, Your Honor.

17  I'm going to withdraw that motion in limine.  I hereby

18  withdraw that motion in limine.  So they can leave it

19  there.

20              MR. HILL:  Judge, we haven't used it.

21              THE COURT:  You raised the issue.  Why

22  now are you upset?

23              MR. DURST:  Because, Your Honor, Your

24  Honor the -- the -- it's been setting over there during

25  voir dire and this morning.  It's out in the open.  I'm

1  going -- I'm going to have to deal with it in front of

2  the jury.

3              MR. HILL:  Your Honor, that's hardly been

4  highlighted by -- I don't know if they can see it past

5  the people.

6              MR. DURST:  In any event, Your Honor,

7  it's my motion and I withdraw the motion.

8              THE COURT:  No, that's fine.  I'll grant

9  you that request.  I doubt that they've even noticed it,

10  so I'm not sure that anyone else noticed it.

11             MR. HILL:  Your Honor, just one other

12  thing, and this is a point of pride for me, so maybe I

13  probably ought to keep my mouth shut.  But the idea that

14  we're over here engaging in some hooligan stuff is

15  nonsense.  We're trying a lawsuit that he brought,

16  claims that he put in the case together, and we're doing

17  it fairly.

18             I didn't violate a limine order one, and

19  there was no objection during the whole thing and the --

20  I just want the Court to know that we -- you know, that

21  kind of allegation we don't take lightly, and we don't

22  take the Court's orders lightly and so...

23             THE COURT:  I understand.  I just want --

24  let's just be mindful of the orders, and I do think

25  that -- just be careful when you get to closing argument

1  that the arguments you're making relates to trade secret

2  and not -- and not to infringement.

3            MR. HILL:  Absolutely, Your Honor.  I

4  made that clear in the argument.  I made specifically

5  clear to the jury that the comparison for patent

6  infringement was the claim and the claim language to our

7  accused process.  I'm doing my best to abide by what the

8  Court says the way we try the lawsuit.

9            THE COURT:  Anything else?

10           MR. DURST:  No, Your Honor.  See you at

11  1:30?

12           THE COURT:  Yes.  1:30.

13           COURT SECURITY OFFICER:  All rise.

14           (Lunch recess.)

15           * * * * * * * * * * * * * * * * * *

16

17

18

19

20

21

22

23

24

25

1                      <u>CERTIFICATION</u>

2

3          I HEREBY CERTIFY that the foregoing is a

4 true and correct transcript from the stenographic notes

5 of the proceedings in the above-entitled matter to the

6 best of my ability.

7

8

9

10 /s/_____                 _____
JUDITH WERLINGER, CSR             Date
11 Official Court Reporter
State of Texas No.:  731
12 Expiration Date  12/31/14

13

14 /s/_____        _____
SUSAN SIMMONS, CSR           Date
15 Official Court Reporter
State of Texas No.:  267
16 Expiration Date  12/31/14

17

18

19

20

21

22

23

24

25